Sandra GARRITY, a developmentally disabled citizen, by her parents and guardians, Melton and Arlene Garrity; Nancy Haggerty, a developmentally disabled citizen, by her parents and guardians, Frederick and Eleanor Haggerty; Richard Pond, a developmentally disabled citizen; Debra Roman, a developmentally disabled citizen, by her mother and next friend, Shirley Jenks; Janet Smith, a minor, a developmentally disabled citizen, by her parents and guardians, Harvey and Freda Smith; Thomas Vaillancourt, a minor, a developmentally disabled citizen, by his parent and guardian, Helene Vaillancourt, all of the above individually and on behalf of all others similarly situated; The New Hampshire Association for Retarded Citizens and United States of America, Plaintiff-Intervenor

v.

Hugh J. GALLEN, Governor of the State of New Hampshire; Edgar J. Helms, Commissioner of the Department of Health and Welfare; Robert M. Brunelle, Commissioner of the Department of Education; Gary E. Miller, M.D., Director of the Division of Mental Health; Richard G. Lacombe, Director of Public Welfare; Maynard H. Mires, M.D., Director of the Division of Public Health Services; Jack E. Melton, Ph.D., Superintendent and Chief Administrator of the Laconia State School and Training Center; Manfred Drewski, Chief of the Offices of Mental Retardation; John Holland, Edward C. Sweeney, Jr., Shirley Ganem, Ivan A. Hackler, George F. Hurt, Betty Anne Lavallee, and Marianne Noyes, Members of the State Board of Education; Bruce Archambeault, Chief of the Division of Vocational Rehabilitation, all of the above in their official capacities only

Civ. A. No. 78–116–D.

United States District Court,
D. New Hampshire.

Aug. 17, 1981.

Richard Cohen, John MacIntosh, Alan Cronheim, N. H. Legal Assistance, Concord, N. H., for plaintiffs.

Leonard Rieser, Arthur Peabody, Stephen Mikochik, U. S. Dept. of Justice, Washington, D. C., William Shaheen, U. S. Atty., Concord, N. H., for plaintiff-intervenor United States.

Wilbur Glahn, III, Atty. Gen., Anne Clarke, David Marshall, Donald Perrault, Asst. Atty. Gen., Concord, N. H., for defendants.

Ronald Lospennato, Concord, N. H., for amici curiae Developmental Disabilities Advocacy Center, Inc., and N. H. Society for Autistic Children.

## MEMORANDUM OPINION

DEVINE, Chief Judge.

The model of democracy adopted for (both federal and state) governance in the United States provides that the legislative branch shall raise and allocate funds necessary for the common good.[1] Not unusually, there are more competitors for a share of such funds than there are funds to be divided. When, as in the instant litigation, a defined group perceives it is being deprived of what it believes to be an "entitlement", litigation ensues. This is more particularly true when such group comprises a segment of society which, "because of its position of political powerlessness, is least able"[2] to ensure its right to priority upon the legislative fiscal agenda.

This litigation "inhabits the twilight area of developing law concerning the . . . rights of the . . . mentally retarded".[3] The named plaintiffs in this class action are residents of Laconia State School & Training Center (hereinafter "LSS"), the only institution of the State of New Hampshire for the provision of services to the mentally retarded.[4] Procedurally the relief sought is injunctive in nature, seeking vindication of the rights of plaintiffs and those of similarly situated mentally retarded citizens of New Hampshire. The substantive relief sought arises in the context of certain federal statutes, including the Developmentally Disabled Assistance and Bill of Rights Act,[5] the Nondiscrimination section of the Rehabilitation Act of 1973,[6] and the Education for All Handicapped Children Act.[7] Plaintiffs additionally claim relief under the New Hampshire statute entitled "Services for the Developmentally Impaired",[8] and also claim that the actions complained of have deprived them of their rights pursuant to the Federal Constitution.[9]

In a trial of approximately forty days before this Court, plaintiffs attacked the conditions at LSS, adducing evidence about numerous specific programs and practices thereat, and calling into question the validity of institutional life itself. To that end, plaintiffs offered the testimony of a bevy of

1. In New Hampshire it is well established that the Legislature exerts the fundamental control of appropriation for the carrying out of particular services. *Opinion of the Justices*, 118 N.H. 582, 589, 392 A.2d 125, 130 (1978).

2. *See Harris v. McRae*, 448 U.S. 297, 332, 100 S.Ct. 2701, 2703, 65 L.Ed.2d 784 (1980) (Brennan, J., dissenting).

3. *Romeo v. Youngberg*, 644 F.2d 147, 154 (3d Cir. 1980).

4. Mental retardation may be defined as referring to significantly subaverage general intellectual functioning existing concurrently with defects in adaptive behavior and manifested during the developmental period. *North Carolina Association for Retarded Children v. State*

*of North Carolina*, 420 F.Supp. 451, 453 (M.D. N.C.1976) (Three-Judge Ct.).

5. 42 U.S.C. § 6000, *et seq.*

6. 29 U.S.C. § 794.

7. 20 U.S.C. § 1401, *et seq.*

8. New Hampshire RSA 171–A was originally entitled "Services for the Developmentally Disabled" when enacted in 1975, but amendments in 1979 changed the title to "Services for the Developmentally Impaired".

9. First, Fourth, Fifth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.

experts on the issue of whether habilitation [10] can ever be provided in the traditional institutional setting as opposed to a setting in the "community".[11]

The ultimate relief which the plaintiffs herein seek is a ruling to the effect that their right to habilitation requires that such be effected in the least restrictive alternative, *i. e.*, community placement. As put by plaintiffs' counsel:

> the relief which these parties seek is the creation of a network of community-based services which will provide for and be available to Laconia residents. The reason this case has gone through a prolonged trial is because the parties disagree on one major point: the responsibility on the part of the State of New Hampshire to affirmatively create these community programs.[12]

The Court has accordingly been required to review the volumes of depositions, exhibits, and other evidence in an effort to arrive at a just resolution of these contentions. Institutional reform cases of this type require courts to venture into areas foreign to their traditional expertise—including the fields of medicine, sociology, psychiatry, and education—an excursion which this Court undertakes with some trepidation. However, the important constitutional and statutory rights invoked by the parties require that such concerns be addressed.

## I. The Parties

This action was commenced on April 12, 1978, by six mentally retarded residents of LSS (whose backgrounds will be briefly summarized below), joined by the New Hampshire Association for Retarded Citizens ("NHARC"), a non-profit corporation whose members include developmentally disabled persons and parents, guardians, relatives, and friends of mentally retarded citizens in New Hampshire. On November 29, 1978, over the objection of defendants, the Court granted the United States of America leave to intervene in this lawsuit pursuant to Rule 24, Fed.R.Civ.P.; the United States filed its Complaint in Intervention on December 1, 1978.[13] Following extensive discovery by the parties on the issue of class certification,[14] the Court granted plaintiffs' motion to certify this as a class action, defining said class as follows:

(1) Class

Developmentally disabled persons who are presently residing at LSS or who in the future may be institutionalized or reinstitutionalized at LSS.

(a) Subclass

Persons between the ages of three and twenty-one years who are or in the future may be confined at LSS, and whose rights under the Education of the Handicapped Act, 20 U.S.C. § 1401, *et seq.*, may be violated.

In the above class certification Order dated February 22, 1980, the Court emphasized that it construed plaintiffs' Complaint to challenge only the conditions at LSS itself in an effort to make this lawsuit more manageable and as a signal to the parties that the Court would not entertain a gener-

---

**10.** "Habilitation" is the term of art used to refer to that education, training, and care required by retarded individuals to reach their maximum development. *Halderman v. Pennhurst State School and Hospital*, 612 F.2d 84, 95, n.14 (3d Cir. 1979), *rev'd sub nom. Pennhurst State School and Hospital v. Halderman*, —— U.S. ——, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). The term, however, is not intended to negate the possibility of improvement or to convey a static image of the functioning abilities of retarded persons as the modern "developmental view" stresses that all developmentally disabled individuals have potential for learning and growth. *Romeo v. Youngberg*, 644 F.2d 147, 165, n.40 (3d Cir. 1980).

**11.** The term "community placement" was used somewhat indiscriminately throughout the course of trial as a shorthand reference to a continuum of residential parents' homes, foster homes, and group homes, most of which have day program components.

**12.** Plaintiffs' post-trial memorandum of law, p. 2.

**13.** The Court denied defendants' Motion for Reconsideration and Motion to Dismiss Complaint in Intervention by Order of February 5, 1980.

**14.** *See* this Court's Order on "Discovery of Class Action Issues", dated February 5, 1980.

alized assault on the State of New Hampshire's mental health and education systems. The above class is represented by six named plaintiffs, whose profiles the Court has set out below.[15]

1. *Sandra Garrity* is an eighteen-year-old resident of LSS who was admitted to the School in 1966 at the age of eight by order of the Hillsborough County Probate Court,[16] upon petition by her parents and legal guardians. Although the etiology of her mental retardation is in question, it appears that at the age of nine months she had her first seizure, which was associated with the measles.[17] Since then she has had a history of convulsive seizures, psychiatric impairment, behavioral disorder, and speech impediment, and has been diagnosed as "moderately mentally retarded"[18] as late as May 14, 1976, and more recently as "severely mentally retarded".[19] Ms. Garrity resides in Floyd I and takes frequent vacations with her family.

Plaintiffs allege that since her commitment to LSS, Ms. Garrity has lost communication skills and some of her self-care and toileting skills; that she now walks badly and rocks constantly; that she has sustained numerous bodily injuries because of lack of supervision; that she has been given inappropriate drugs by untrained ward attendants; and that she has been placed in physical restraints, all of which have caused her to regress and deteriorate.

2. *Nancy Haggerty* is a thirty-two-year-old resident of LSS admitted by court order in 1962 at the age of 17 after having spent two years at the New Hampshire Hospital. Her parents are her legal guardians. Although as a child she walked at age nine months and talked at thirteen months, she shortly thereafter developed spinal meningitis and convulsions.[20] She resides at Keyes Building, and visits regularly with her family. Ms. Haggerty's medical record, which is one of the more inadequate records[21] at the School, reflects that she has been diagnosed as "severely mentally retarded". As with Sandra Garrity, Ms. Haggerty's primary problem is maladaptive behavior. Although plaintiffs admit that Ms. Haggerty had maladaptive behavioral problems prior to her commitment to LSS, they allege that defendants have exacerbated the problem by indiscriminately administering psychotropic[22] drugs. The effect of the ingestion of drugs plus a lack of habilitative programs has allegedly caused her to become self abusive as well as unmotivated. Plaintiffs also claim that she has sustained many injuries, either accidentally or otherwise, for which no causes have been documented.

3. *Richard Pond* has lived almost one half of his life at LSS, having been committed by court order in 1961 at the age of 19 when he reportedly had a dramatic change of personality. At the time of the Complaint, Mr. Pond was diagnosed in the "mild" range of mental retardation, although a recent report filed in February

---

**15.** Unless otherwise noted by the Court, the information given reflects the status of these plaintiffs as of the date of filing of the original Complaint.

**16.** Plaintiffs Garrity, Pond, Haggerty, and Smith were committed to Laconia State School by court order, pursuant to N.H. RSA 171, which was repealed by the Legislature in 1975.

**17.** *See* Plaintiffs' Exhibit 1, Report of Annual Physical Examination (Dube), dated October 31, 1978 (Testimony ["T."] Andrews, Grossman).

**18.** *Id.*, Report of Annual Physical Examination (Keyes), dated May 14, 1976.

It should be noted that there are four basic levels of mental retardation: (1) mild (I.Q. 52–69, which comprises 89% of the mentally re-

tarded population; (2) moderate (I.Q. 36–51), which comprises 6% of the mentally retarded population; (3) severe (I.Q. 20–35), which in conjunction with (4) profound (I.Q. less than 20) comprises 5% of the mentally retarded population. The incidence of mental retardation is about 3% in the general population.

**19.** *Id.*, Report of Annual Physical Examination (Keyes), dated September 29, 1977.

**20.** T. Andrews.

**21.** T. Andrews.

**22.** "Psychotropic medication" can be briefly defined as medication having an altering effect on the mind, such as tranquilizers.

1980 recommended that his AAMD[23] diagnosis be changed to a higher functioning category, "borderline of intelligence".[24] Mr. Pond's abstract reasoning skills are fairly well developed (he enjoys talking politics and is fascinated with the study of American history and electricity), and his self care skills are good. He is afflicted, however, with a psychiatric impairment known as "schizophrenia, simple type".[25] Mr. Pond is apparently unable to cope with personal pressure, which defendants say accounts for his failure to adjust to three different community placements—at Great Bay Training Center in Portsmouth, New Hampshire; at a foster home; and at a group home in Danbury, New Hampshire. Plaintiffs have alleged that defendants did not adequately diagnose Pond prior to his transfer and that this lack of preparation caused his failure in the community. They claim that LSS defendants regularly administer psychotropic drugs to Pond without his consent and that he has been placed in isolation rooms for punitive purposes. Mr. Pond has no legal guardian.

4. *Debra Roman* is the other named plaintiff who at the time of the Complaint lacked a legal guardian.[26] After entering kindergarten in Lebanon, New Hampshire, at the age of six, Ms. Roman progressed slowly. She was eventually placed in a special trainable class in the Lebanon School, but was admitted to the State School in 1970 at the age of 13 by her parents when her behavior became aggressive. Like Richard Pond, Ms. Roman falls in the upper range of mental retardation (she has been diagnosed as "moderately retarded"). Her health is adequate, except for her problem with obesity, and her self care skills are good. Like Pond, she is severely compromised by her psychotic tendencies, for which she has received medi-

cation and for which she has occasionally been transferred to Keyes Building as a disciplinary technique.

During most of her time at Laconia, Ms. Roman has resided in Blood Building, although she spent a short time in Peterson Cottage. Plaintiffs allege that her transfer to the Cottage was without adequate preparation, and that it therefore resulted in her failure to adjust and her subsequent bad reaction. Plaintiffs also allege that Ms. Roman has sustained a number of injuries at LSS, and has steadily regressed since her entrance to the School.

5. *Janet Smith* is one of three plaintiffs representing the "subclass" of plaintiffs under the age of 21. Her parents and legal guardians had her admitted to LSS at the age of five. An epileptic with severe brain damage, Ms. Smith is blind in the left eye and deaf in the left ear, and has little use of the left side of her body. She has ongoing major motor seizures, for which she receives medication. She reportedly could walk at one time in her life before she arrived at the School, and although defendants once attempted corrective procedures with a leg brace, they later ceased such endeavors.[27] Currently she is non-ambulatory. Ms. Smith resides in Dube C, and is totally dependent on staff members for all of her daily activities. Her parents have requested that she not be allowed to interact with other residents. They frequently visit her and often take her home for what amounts to about four months of each year, which the staff at the School says has a deleterious effect on her habilitation.

Plaintiffs allege that since Janet Smith's entrance to LSS she has regressed physically, claiming that she has been "irreversibly crippled" by inappropriate posturing and lack of physical therapy.

**23.** "AAMD" stands for American Association of Mental Deficiency.

**24.** *See* Plaintiffs' Exhibit 3, Report of Interdisciplinary Team, February 1980.

**25.** *See* Plaintiffs' Exhibit 3, Report of September 1976.

**26.** Debra Roman's mother was subsequently appointed her legal guardian on January 24, 1979, by the Hillsborough County Probate Court.

**27.** The record reflects that personnel at the School made repeated attempts to retrieve Ms. Smith's leg braces, which her parents had taken home, but they received no response.

6. *Thomas Vaillancourt*, aged 14 at the time of the commencement of this lawsuit, also represents the plaintiff subclass. Mr. Vaillancourt was afflicted with a prenatal brain infection known as "toxoplasmosis", a diffuse and severe infection of the complete brain, resulting in a profound level of retardation.[28] He is mentally and visually handicapped and has hearing and seizure disorders. He has "spastic quadroplases" (all four limbs are involved), mild cerebral palsy, and curvature of the spine in two different planes.[29] In short, Mr. Vaillancourt has acute and maintenance health needs. He is non-ambulatory, and completely dependent on the staff for care. At the time of the Complaint, he resided in King Building, where plaintiffs allege he is often strapped to a chair or lying on a mat. From 1977 to 1979 Vaillancourt was repeatedly recommended for occupational therapy, but such was never delivered. According to plaintiffs, the lack of habilitation treatment afforded Mr. Vaillancourt has resulted in his regression and debilitation.

Defendants in this lawsuit are several officials of the State of New Hampshire, including the Governor, who have been sued in their official capacities only. Since the original Complaint was filed on April 12, 1978, the State ushered in a new administration; thus, on August 20, 1979, the Court granted defendants' motion to substitute party defendants. The defendants [30] are as follows: The Governor of the State of New Hampshire, Hugh J. Gallen; the Commissioner of the Department of Health and Welfare, Edgar J. Helms; the Commissioner of the State Department of Education, Robert M. Brunelle; the Director of the Division of Mental Health, Gary E. Miller, M. D., Director of the Division of Public Health, Richard G. Lacombe; the Director of the Division of Public Health Services,

Maynard H. Mires, M.D.; the Superintendent and Chief Administrator of Laconia State School, Jack E. Melton; the Chief of the Offices of Mental Retardation, Manfred Drewski; members of the State Board of Education, including John Holland, Edward C. Sweeney, Jr., Shirley Ganem, Ivan A. Hackler, George F. Hurt, Betty Anne Lavalle, and Marianne Noyes; and the Chief of the Division of Vocational Rehabilitation of the State Department of Education, Bruce Archambeault.

## II. *Conditions at Laconia State School*

■ Laconia State School and Training Center, the State's only public residential facility for the retarded, was conceived by act of the Legislature in 1901 and came into existence in 1903. Once known as the "School for the Feeble-Minded", the School's original purpose was to provide special treatment to children, but its scope was soon widened to accommodate "adult defectives" in order to serve the dual purpose of caring for these individuals while at the same time providing a "safeguard[ ] whereby society may protect itself from the vice, corruption, and licentiousness with which it is threatened when anyone of this defective class is left unrestrained and unprotected in the community".[31] As societal attitudes have changed and evolved over the ensuing years, LSS has evolved with them. The School has expanded from a singular dormitory building in 1903 to its present physical plant on 437 acres in Laconia, New Hampshire, consisting of twelve living units and twenty-two auxiliary buildings, including a recently constructed training and education center, the Arthur E. Toll Habilitation Complex (hereinafter "Toll"). Likewise, the School's population has fluctuated between a mere sixty residents in 1903 to a peak population in 1970 of 1167

---

28. T. Andrews.

29. T. Andrews.

30. Budgetary and employment changes have caused changes in some of the defendants here listed, but they are here listed as named in the Complaint with the exception of those substitutions and amendments specifically mandated by the granting of the defendants' motions to substitute party defendants.

31. Plaintiffs' Exhibit 101, "Second Biennial Report of the Trustees of the New Hampshire School for Feeble-Minded", September 30, 1904, p. 21.

residents; at the time of the trial the in-residence population was 564.[32] Approximately eighty of these residents are under the age of twenty-one years, and the rest are fairly evenly distributed in chronological age from twenty-one to sixty-two, with just a few over the age of sixty-two.[33] Fifty-seven percent of the client population has been institutionalized for more than twenty years,[34] thirty-two percent have been in the institution from ten to twenty years, and eleven percent have been at LSS for ten years or less.[35]

Admission to LSS is "voluntary", in the sense that no individual shall be admitted without his or her consent or, in the case of a minor or a legally adjudicated incompetent person, without the consent of his or her parent or guardian. N.H. RSA 171–A:5 (Supp.1979). For those individuals who are incapable of managing their own affairs and who lack guardians, N.H. RSA 171–A:10 II (Supp.1979) requires the administrator of LSS to petition the probate court for appointment of same. The statute provides that prior to admission a comprehensive screening evaluation take place, N.H. RSA 171–A:6 II, and that a hearing be afforded to any applicant who challenges the appropriateness of his or her placement, or whose legal guardian challenges same. The client is entitled to representation by legal counsel at such hearing, and the results are appealable to the State's Superior Court. The

admission procedures set out herein are of recent vintage; prior to 1975 individuals could be committed to LSS by court order, as indeed four of the named plaintiffs were.[36] Notwithstanding the change in procedure, several residents at LSS still lack guardians, including named plaintiff Richard Pond.[37] As for termination of services, N.H. RSA 171–A:7 (Supp.1979) indicates that a client is free to withdraw entirely from the service delivery system at any time; however, defendants admitted that if a resident who lacks a guardian was deemed to be incompetent by an interdisciplinary team, the staff might refuse to release him on his own request.[38]

As a whole, the population at LSS falls predominantly into the "severe" and "profound" ranges of mental retardation, as defined by the AAMD. A 1980 survey places the population by percentages into the following levels of retardation:

| | |
|---|---|
| Borderline | 2% |
| Mild | 9% |
| Moderate | 19% |
| Severe | 33% |
| Profound | 37%. |

The "under twenty-one" category at LSS is even more skewed toward the "profound" range of mental retardation, with fifty-two percent having been diagnosed as falling within the AAMD category of "profound" mental retardation.[39] Most recent admis-

---

32. Although 686 people were on the rolls of LSS in February 1980, 122 of them were in some kind of community placement, which left only 564 residing at LSS. See Defendants' Exhibit 35 for a breakdown of LSS's population from June 30, 1960, to February 29, 1980. Note that the figures in this document are slightly inconsistent with Defendants' Exhibit 32, "LSS Medical Department Statistical Report".

33. Defendants' Exhibit 33 shows that in 1979, LSS had a total enrollment of 96 people under the age of twenty-one with 82 in residence and 14 in the community.

34. Of these people, eight percent have been institutionalized for more than fifty years. Action for Independence 3d Draft, January 3, 1980, Defendants' Exhibit 139, p. 79.

35. See Action for Independence, 3d Draft, January 3, 1980, Defendants' Exhibit 139, p. 179.

36. See footnote 16 above.

37. At the time of the filing of the Complaint, named plaintiff Debra Roman lacked a legal guardian; subsequently her mother was appointed her legal guardian. At present 170 residents have guardians and 54 petitions are pending.

38. See Defendants' Answer, ¶ 44. See also Plaintiffs' Exhibit 88 (1–19) which indicates that some residents are discharged even though incompetent.

39. See Defendants' Exhibit 33 for the following breakdown of residents under the age of twenty-one years:

| | |
|---|---|
| Borderline | 0 |
| Mild | 2 |
| Moderate | 10 |
| Severe | 18 |
| Profound | 52. |

sions to LSS have tended to be in the "severe" and the "profound" ranges, regardless of age. Defendants' Exhibit 34.

The quality of the living quarters at LSS is inconsistent, at best. Of the twelve buildings, only six [40] are certified by the federal government as Intermediary Care Facilities for the Mentally Retarded ("ICFMR"),[41] and these have a maximum capacity of 276 residents. T. Gunther. It was undisputed at trial that of these six buildings, the four "cottages", Dube, Peterson, Rice, and Speare, are by far the most desirable residences at LSS, in that they not only have sound structures, but they also provide for at least a modicum of privacy and more pleasant surroundings. The "cottages" accommodate only 110 residents (or twenty percent of the population), and non-ambulatory residents are completely excluded from access to these buildings due to their structural designs.[42]

As for the non-ICF buildings, there was little dispute about the need for their renovation. Although defendants did not go so far as to agree with the plaintiffs' expert that the living quarters reflect "total environmental deprivation", T. William S. Talley, they did admit severe inadequacies. Most strikingly, many of these buildings have just recently complied with the minimum safety provisions such as sprinkler systems and smoke alarms, crash bars, etc.[43] Because of overcrowding and the lack of partitions in bedrooms and bathrooms, there is little to no privacy in these buildings. T. Jones, Talley, Clements. Often male and female residents use adjoining toilets with no partitions. T. Clements; Plaintiffs' Exhibit 23, Photograph No. 9. Many of the wards have large open rooms with little furniture or other accouterments, and can only be described as sterile environments. In some, the level of noise is problematic, due to the large open spaces, bare concrete surfaces, and bad acoustics. T. Clements. In short, the residential facilities at LSS are less than optimal.

Recently officials in the State of New Hampshire have joined the national trend of paying increased recognition to the care and treatment of the mentally retarded. At the core of this movement is the goal to provide individualized treatment to the mentally retarded in the setting least restrictive of their freedom, yet responsive to their needs. To this end, State officials, health care professionals, and concerned citizens worked for the passage of the above-mentioned statute, N.H. RSA 171–A,[44] which gained legislative approval in 1975 and was amended in 1977. The stated purpose and policy of this statute, which will be discussed more fully in Part III of this Opinion, is "to enable the division of mental health to establish, maintain, implement and coordinate a comprehensive service delivery system for developmentally disabled persons".[45]

40. ICFMR's include Dube, Murphy, Dwinnell, Speare, Rice, and Peterson.

41. LSS has been certified for ICFMR's since 1976. "ICFMR" has been defined by the Government as follows:

An intermediate care facility is certified to provide long-term health-related care and service to individuals with mental diseases who do not require the degree of care or treatment which a psychiatric hospital or SNF is designed to provide but who, because of their mental or physical condition, require intermediate care and services.

T. Marie Gunther, member of Bureau of Health Facilities; Federal Program Coordinator for Medicaid in New Hampshire (paraphrasing 42 U.S.C. § 1396d[c]).

42. The cottages were last renovated in 1973; recognizing the lack of access by handicapped people to these buildings, defendants apparent-ly intend to rectify the situation by adding wheelchair ramps, etc. T. Melton (LSS Superintendent).

43. One residential building at LSS, Murphy, houses nonambulatory residents on an upper story.

44. N.H. RSA 171–A is discussed in part later in this Opinion.

45. The term "developmentally disabled" is not a medical term, but a term coined and defined by Congress. It refers to people with "substantial" handicaps, either physical or mental or both, likely to last a lifetime, who are likely to need three or more of a list of services including but not limited to: residential facilities, transportation, special medical care, etc.

In an attempt to secure the implementation of N.H. RSA 171–A, the Governor of New Hampshire, Hugh J. Gallen,[46] ordered the preparation of a master plan, now known as "Action for Independence".[47] There are three drafts of Action for Independence, the last of which was issued on January 3, 1980. The document, which sets forth in some detail timetables for the accomplishment of certain goals such as community placement of LSS residents, is explicitly intended to be a "dynamic, living document", which can be amended as experience dictates. See Action for Independence 3d Draft, Defendants' Exhibit 139; T. Shumway.

Action for Independence sets forth a proposed schedule for deinstitutionalization, calling for a residual population of 155 residents in 1987. See Action for Independence 3d Draft, Defendants' Exhibit 139, p. 234. But like many ambitious plans, this too has endured a rocky beginning. The original plan was to complete Individual Service Plans (ISP's) for each resident by June of 1980, and to deinstitutionalize one hundred people over 1980 and 1981. T. Shumway. As of the date of trial, however, only 366 of 562 (or 65%) of the ISP's had been completed, making it dubious that an additional 200 would be completed according to schedule. As for the plan of deinstitutionalization, since funding was available for only eighty residents, the figure was revised to thirty residents by June 1980 and fifty residents by June 1981. Action for Independence 3d Draft, Defendants' Exhibit 139. At trial, Planning Director Donald L. Shumway testified that due to the unexpected demise of another community project, Guardianship Trust, which created the need for thirty-five additional placements, once again these figures would have to be revised downward. In sum, although the State appears to be committed to its plan of deinstitutionaliza-

tion, even its short history reveals that the perennial problem of funding looms ahead, presenting a substantial threat to the integrity of the plan.

## A. Staff

All parties to this litigation appeared to agree that the staff at LSS is dedicated and does attempt to provide the best care possible under the circumstances that exist at the School. However, it was also undisputed that staff shortages account for many of the problems at LSS. Eighty percent of the total budget at LSS is allocated toward personnel cost; obviously, therefore, the quantity and quality of staff rises and falls with the mercurial budgetary process. More than lack of funding is to blame for staff shortages, however. Although the number of programs which matriculate professionals trained in caring for the developmentally disabled has increased in direct proportion to the rapidly growing awareness of their problems, such is a recent phenomenon, and there is therefore still a nationwide shortage of people in their field. In particular, the dearth of physical and occupational therapists was often cited by experts for both parties. T. Cook, Grossman, Jones, Melton, and Griepentrog.[48]

While recognizing this nationwide scarcity of staff, plaintiffs' experts indicted the State of New Hampshire for creating a system which exacerbates the problem. They claimed that the State's ability to recruit staff to LSS is shackled because of the remote location of its institution, and they argued that one way of ameliorating the situation is to provide community settings for these residents to which professionals would be drawn. Plaintiffs also attempted to attribute the problem of staff

**46.** Governor Gallen, elected in 1978, is presently serving his second term. His original campaign platform included as one of its three major goals the reform of LSS. T. Shumway, Helms.

**47.** The Governor's work group was chaired by the Commissioner of Health and Welfare, Ed-

gar J. Helms, Jr., and the primary author of the plan was Donald L. Shumway, Planning Director.

**48.** Gerry Griepentrog testified that there are 2000 vacant physical therapy positions in the United States due to lack of training.

"burnout"[49] to institutional settings, but this claim was successfully refuted by evidence of similar "burnout" in community settings. T. Gold.

Nevertheless, the fact remains that LSS is severely understaffed. T. Melton. Because of the lack of personnel, for example, direct care staff are required to undertake duties not related to their job descriptions, which obviously minimizes the effectiveness of their other efforts. Plaintiffs' Exhibit 64 represents a census of staff workers taken on two different typical days in 1979, indicating the number of direct care staff positions authorized, the number filled, and the number actually employed on the days in question. On the second shift on February 8, 1979, for example, the count was as follows: number of direct care positions authorized—167; vacant positions—44; number of positions filled—123; number of staff who reported to duty—72; number of staff on regular days off—35; number of staff on vacation—2; number of staff taking personal day—2; number of staff out sick—12. See also Defendants' Exhibit 4, which lists for a typical day, broken down by ward, the number of positions filled and vacant in relation to the resident population. Thus, not only were there several positions which were authorized and not filled; of those filled, there were a number who never reported to duty. Melton testified that national accreditation standards call for a staff/resident ratio of two to one. Accordingly 1124 staff members would have been needed to meet that goal as of the time of trial when LSS had a resident population of 564. Yet at the time of trial the number of staff members was set at 875,[50] with a vacancy rate of ten to twelve percent at any given time. In 1977 Melton had requested 276 new staff members from the New Hampshire Legislature. In response, the Legislature appropriated the money for 124 staff people in 1977, 14 in 1978, and 87 in 1979—a gain of 225 staff members by 1979, when the request had been for 276 in 1977.

An additional problem facing the School is staff turnover, caused by "burnout" and other factors. Melton testified that the turnover rate among direct care staff members is substantial; LSS loses an average of fifty percent of its workers yearly, and this figure has risen as high as ninety percent in the past. T. Brown. The turnover rate overall (for other than direct care staff) is much lower. T. Melton. The consistent vacancy rate of ten to twelve percent at any given time and the difficulty of recruitment pose a major threat to the operation of the School, in that every six months the Legislature abolishes any position which has not been filled within six months. In 1979, for example, a total of one million dollars lapsed. See Melton's Deposition, Vol. 3, pp. 42–43.

In addition to their allegations regarding the minimum numbers of staff, plaintiffs also challenged the adequacy of preparation and training for staff members, citing instances in which workers had been required to undertake duties in areas in which they lacked expertise. Although the evidence supports plaintiffs' contention of inadequate training in several areas, recently the School has exhibited much improvement in staff training. The Court heard testimony from Frances Cook, who has been director of staff and program development at LSS since 1975. The philosophy of her department is that clients have the right to receive services from competent staff. The eight major functions of the department are: (1) orientation and training of staff, (2) continuing education for staff to maintain competence, (3) incentive and support

---

49. The term "burnout" is self explanatory. It is used in the profession to refer to the point at which a staff member feels overwhelmed with or frustrated by the demands of dealing with the mentally retarded.

50. Two hundred of these staff members are maintenance people. The professional care and treatment budget is broken into five components, according to Melton: (1) custodial, (2) professional care; (3) training and development, including education and special education; (4) vocation services; (5) administration; (6) expanded services to patients (direct care staff and professional staff are funded under expanded services and professional staff).

of staff who wish to advance, (4) mandatory training when required, (5) a system of promotional competency-based options, (6) development of affiliations with colleges, (7) coordination of volunteer services,[51] and (8) development of a system of policy development and review. T. Cook. According to Cook, ninety-five percent of the staff completes twenty hours of training in the first month, and most complete one week of basic training, including one day of on-the-job training and four days of classroom training. There is also ongoing training by the supervisors in the buildings. T. Cook. The witness admitted that prior to her arrival in 1975, there was no such orientation, but that now training is a precondition to employment. The major problems Cook has faced in her department during the past few years have been caused by various hiring freezes imposed by the Governor of New Hampshire,[52] forcing staff to venture outside their own areas into areas in which they lack expertise.

In sum, although efforts have been made to improve the quality of staff at LSS, the fact remains that LSS is understaffed. As will be seen from the following descriptions of the various components of the School, this deficit seriously detracts from the operation of almost every program and operating procedure at LSS. Thus, finding a panacea for this problem of lack of staff would contribute immeasurably to overall improvement at the School; however, since staff accounts for eighty percent of the entire budget at LSS, the problem defies easy solutions.

### B. Habilitation

"Habilitation" is the term of art used to refer to that education, training, and care required by retarded individuals to reach their maximum development. See n. 10, p. 176, supra. It is the process by which individuals are assisted in acquiring and maintaining "those life skills which enable them to cope more effectively with the demands of their own persons and of their environment, to be economically self-sufficient and to raise the level of their physical, mental and social efficiency. Habilitation includes but is not limited to programs of formal, structured education and treatment." N.H. RSA 171–A:2 IX.

Both parties agreed that the linchpin of any habilitation plan is an individual service plan which assesses the present abilities of a given individual, establishes goals to be sought, and diagrams a course of action to meet those ends. Without such a systematic and individualized approach, progress will be sporadic at best. As mentioned above, as of the date of the trial only 366 of 564 residents (or 65%) had completed ISP's, and despite defendants' purported intentions, it appeared very dubious that two hundred more would be completed by defendants' target date of June 1980. Of those residents who had ISP's, Superintendent Melton admitted that a fair percentage of the goals stated therein could not be met, due to a lack of resources. Notwithstanding this fact, the Court hereby rejects the contention of some of the plaintiffs' experts that no habilitation could occur or is occurring at LSS.

### 1. Education and Training at LSS

Defendants readily admit that historically education and training services at LSS have been inadequate, having been directed (if at all) toward only the higher-functioning residents. T. Gamache. Today the situation is much brighter. The Education and Training Department (hereinafter "E & T") has evaluated and serves approximately 350 of the 564 residents. Defendants admit that the two hundred residents not yet evaluated for services are almost all residents of non-ICF facilities (the testimony reflects that the residents of non-ICF's tend to fall in the more severely retarded range), but at

---

51. LSS has approximately 80 volunteers from church and civic groups and a community action program. There are also 32 "foster grandparents". See Defendants' Exhibit No. 53 regarding deployment of volunteers in 1979.

52. Governor Gallen has recently exempted LSS and the New Hampshire Hospital from the present freeze imposed on other State agencies.

trial they fully intended to have all residents evaluated by October of 1980. Of the 350 served by E & T, approximately 260 are adults and 90 are children between the ages of three and twenty-one. There exist separate educational components for adults and children (although they share the same four fields of learning), and the latter are acknowledged to have the more extensive services. Nevertheless, at the time of trial a new "adult curriculum" had just been developed, and defendants planned to continue to improve and expand services for adults as well as children.

### a. Children Aged Three to Twenty-one

As mentioned above, three of the named plaintiffs, Janet Smith, Tommy Vaillancourt, and Sandra Garrity, represent a subclass of those individuals between the ages of three and twenty-one who are asserting their rights to a free and appropriate education, which they claim is mandated under state and federal law. Most of the testimony at trial relative to the State's education of handicapped children came from Edward DeForrest, Director of Special Education for the State of New Hampshire since 1979, and Peter Gamache, Director of "Therapeutic Services" at LSS.

In order to understand the framework within which LSS provides services to these school-age children, it is essential to provide a brief backdrop herein of the education system in the state. In New Hampshire, education is under the combined jurisdiction of local as well as state agencies, although the public schools are funded primarily by property taxes collected by the towns and cities. The State itself contributes less to education than almost any other state in the Union; nevertheless, it retains control over the localities through its State Board of Education which by statute is given the "same powers of management, supervision, and direction over all public schools in this state as the directors of a business corporation have over its business, except as otherwise limited by law". N.H. RSA 186:5. Working through a Commissioner of Education (N.H. RSA 186:9), the State Board performs those duties such as supervising the expenditure of all money appropriated for schools within the state and establishing the standards for teacher certification within the state, as well as establishing all minimum standards which local school districts must meet in the various areas of curriculum. N.H. RSA 186:11. Additionally, schools themselves must be approved by the State Board of Education in order for the school district maintaining the school to receive *any* form of aid to education. N.H. RSA 194:23-d. In 1980, the sum of all monies spent for education in New Hampshire was $38.6 million, of which $31.6 million was contributed by the local school districts, $3.2 million by the State, and $3.8 million by the federal government.

From July 1, 1965, to June 30, 1981, the New Hampshire "Program of Special Education" was set forth in N.H. RSA 186-A.[53] Thereunder, the State Board of Education was charged with the maintenance of a "section of special education", N.H. RSA 186-A:3 (Supp.1979).[54] Additionally, local school boards were made responsible for the identification of handicapped students within their districts, N.H. RSA 186-A:4 (Supp. 1979), who were to be provided with an approved plan of special education. N.H. RSA 186-A:6 (Supp.1979).[55] If provided without the local district (and LSS is con-

---

**53.** N.H. RSA 186-A was repealed effective June 30, 1981, by Chap. 100 Laws of 1981 §§ 2 and 5.

**54.** As originally enacted in 1965, N.H. RSA 186-A:3 required the establishment of a program of special education *within the funds appropriated or available* (emphasis added). Subsequent amendments deleted the emphasized language and mandated the establishment of the section of special education and the ap-

pointment of necessary personnel for its proper operation.

**55.** In its original version, N.H. RSA 186-A:6 was interpreted to make such assignment discretionary rather than mandatory. *Swain v. State Board of Education*, 116 N.H. 332; 360 A.2d 887 (1976). However, subsequent amendments made clear that provision of a special education for children determined to be handicapped was mandatory and not precatory.

sidered to be an out-of-district placement), the expenses of such special education (including tuition, transportation, and, if necessary, board and room) were limited to "twice the state average cost per pupil" for primary or secondary public schools as estimated by the State Board of Education. N.H. RSA 186–A:8 II (Supp.1979).

■ Effective July 1, 1981, N.H. RSA 186–A was replaced by N.H. RSA 186–C which, while purporting to diminish the financial obligations imposed on these defendants, otherwise makes no substantial changes in the nature of their duties as previously imposed pursuant to N.H. RSA 186–A.[56] But the procedures outlined in N.H. RSA 186–C (and formerly contained in N.H. RSA 186–A) do not comprise the exclusive means by which a child aged three through twenty-one can be placed in an "out-of-district" program such as LSS.

In addition to placement by a local education agency, a handicapped child can be placed by the Division of Mental Health, through an "area agency" pursuant to N.H. RSA 171–A (Services for the Developmentally Impaired). This statute charges the Division with maintaining "a state service delivery system, comprised of a substantial number of programs and services, *including Laconia State School and Training Center*, for the care, habilitation, rehabilitation, treatment and training of developmentally impaired persons. Such service delivery system shall be under the supervision of the director [of the Division of Mental Health]". N.H. RSA 171–A:4 (Supp.1979) (emphasis added). Although by statute the Director has no obligation to bow to the wishes of the State Board of Education, the staff of the "area agency" is to "take into account the provisions of and services established under N.H. RSA 186–[C] ["Program of Spe-

cial Education"]." N.H. RSA 171–A:6 II (Supp.1979). The difficulties inherent in these crossed lines of authority will be discussed subsequently; suffice it to say here that New Hampshire maintains parallel systems of responsibility for services to handicapped children.

From 1971 to 1975 there were three hundred school-age children at LSS; today there are only ninety-four children between the ages of three and twenty-one. T. De-Forrest.[57] Of these individuals, approximately eighty percent are in the severe and profound ranges of mental retardation. By 1978, each child at LSS had an "Individual Education Program" (hereinafter "IEP") completed for him or her. Mandated by federal law,[58] the IEP is an individualized evaluation reflecting the educational needs of each child and identifying the appropriate sources for the provision of those services. Despite the establishment and publication of such goals, defendants candidly admitted the improbability of fully attaining same. For the ninety-four school-age children there are six or seven teachers available. Fewer than one half receive the full 5¼ hours of formal education per day, which is the average amount given a non-handicapped child. More than fifty percent receive about one half a day's training, and seventeen receive services for only one hour per day. Two of the children have been deemed "medically fragile" and are therefore excluded entirely from those services. T. Gamache.

Since 1975, however, the overall educational services have improved remarkably. Whereas in the past only the higher-functioning children were served, now every individual between the ages of three and twenty-one is served, barring extraordinary

---

**56.** Accordingly, absent manifest injustice, statutory direction, or legislative history to the contrary, we apply, for the purposes of the injunctive relief here sought, the law as in effect at the time of decision, *i. e.*, N.H. RSA 186–C. *Bradley v. Richmond School Board*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974).

**57.** There are a total of approximately 1700 out-of-district placements of developmentally disabled children between the ages of three and twenty-one.

**58.** The Education for All Handicapped Children Act, 20 U.S.C. § 1401, P.L. 94–142, required that IEP's be promulgated for any handicapped child receiving special education by October 1, 1977. 45 C.F.R. § 121a.342.

reasons. Recently inaugurated was a "ward stimulation" program, for example, which is aimed at the profoundly retarded who are medically involved. That is considered the lowest developmental area of a four-part curriculum which was developed by personnel in occupational therapy ("OT"), physical therapy ("PT"), speech, psychological services, and social services. "Ward stimulation" encompasses OT, PT, and medical services, and is designed for individuals who function on a six-to-twelve month chronological age level. Phase two is directed at children in the twelve-to-eighteen month level, wherein there is more group activity and involvement with fine motor skills. The next tier constitutes a "readiness period", in which students attend group classes in Toll Building, a recently constructed center for education and recreation which is separate from the residential buildings, and thus requires the transportation of many residents in a shuttle-bus. Until recently multiply handicapped residents were excluded from the programs at Toll because the shuttlebus could not accommodate those with physical handicaps. Phase four is "preacademics" for students with a developmental level of up to five years, which includes training in the cognitive and prevocational skills. The ultimate goal is the attainment of skills which allow an individual to participate in vocational programs, including work activity centers, sheltered workshops, or residential work programs, and thus to progress toward economic self sufficiency. All of the above classes take place either in the wards or at Toll. Occasionally some of the residents have field trips into town, at which time they have the opportunity to practice the community skills they have acquired, such as using cross-walks, tendering money, etc.[59] Two children enrolled at LSS attend public schools in the community full time, and seven others attend part time.

Plaintiffs have emphasized that the above four-part curriculum is a very recent addition, and that even now many of the education and training needs of the residents are not being met. Indeed, the record supports their contention that for years few services were afforded the most severely handicapped residents, T. Sontag, and at present they receive much less attention from the E & T Department than do more advanced children. T. Sontag. In addition, a significant number of individuals are denied services because of lack of staff or funding. T. Sontag, Green. Because of the lack of staff, there is very little carryover from the classroom to the wards, an enforcement technique which is particularly needed for the mentally retarded. As mentioned earlier, the greatest deficiencies in staff are in the areas of OT, PT, and speech. One named plaintiff, Janet Smith, whose physical problems are recounted above on pages 10 and 11, was scheduled to have regular OT, but such was canceled in 1976 due to lack of staff. T. Frieda Smith. She received PT from 1966 to 1970, but it too was then canceled and not picked up again until 1980. Doctor Andrews, one of the State's witnesses, testified that Ms. Smith must receive more PT and that consistent programming is desirable.[60] Tommy Vaillancourt, the other representative plaintiff of this subclass, is a severely and profoundly multiply handicapped individual who was repeatedly recommended for OT services from 1977 to 1979, but such were never delivered, presumably because of lack of staff. T. Andrews. The Court heard testimony that at least three other children similarly had planned services terminated. OT was recommended for Mary Beth A. in 1977, 1978, and 1979, but was discontinued because of funding. T. Andrews. Jeffrey, age 18, is a resident who has lived in King I for twelve years. T. Andrews. Three days after his IEP was established, all services were terminated for him. PT was recommended for Mike B., age 15, who lives in Dube C, but he has received no services. T. Andrews.

---

**59.** Some residents leave the campus as much as once a week; the older residents and the most severely retarded leave seldom if ever. T. Gamache.

**60.** It was emphasized at trial that interruptions in Janet Smith's programming were caused in part by her frequent trips home.

Education and training for residents at LSS aged three to twenty-one is limited to 180 days, the same cycle as in the public schools. The summer program is largely recreational. Although fourteen teachers at LSS take vacation in the summer, seven lifeguards are hired. Approximately 350 residents attend day camp, which consists of trips to beaches at a nearby lake. For one week, residents partake in swimming, boating, arts and crafts, and hiking. Non-ambulatory residents are included on these trips as well. In addition, approximately 100 residents attend other camps in New Hampshire, but the criteria for eligibility are dictated by the camp supervisors who in the past have rejected non-ambulatory and profoundly retarded residents and residents with behavioral problems. During the summer some non-ambulatory residents continue to receive PT and OT.

### b. Education and Training for Adults

Of the 350 residents served by the E & T Department, approximately 260 are adults (although only 215 are listed as receiving services [T. Gamache]). The Department is aided in the provision of these services by a new therapeutic recreation staff. As mentioned earlier, the disparity between treatment of ICF and non-ICF residents is striking. Two hundred residents receive absolutely no services from E & T, and not coincidentally each one of those residents lives in a non-ICF unit. Similarly, of the 350 residents who have been evaluated for OT services, all reside in ICF units. T. Talley, York. By October of 1980, each resident, including those in non-ICF's, was to have been evaluated. T. Gamache. However, the record reflects that a mere evaluation does not assure that the identified needs will be met. Of the 350 residents who were evaluated for OT services, for example, 330 were found to need serv-

ices. But only seventy are receiving direct OT services, while 260 receive no services or nothing more than some adaptive equipment. T. Talley.[61] Lack of OT can result in dysfunction and contractures. T. Talley. Likewise, the vacancies in the PT staff result in deprivation of services to many in need,[62] which in turn can cause curvatures of the spine, hip dislocation, and problems concerning the upper respiratory tract, among others. T. Green.

One of the major criticisms of the E & T curriculum for adults at LSS is its lack of age appropriateness. T. Brown, Sontag. This is explained in part by the lack of training models for adults. Whereas children can follow traditional developmental guidelines (i. e., reaching stage X by age X), there is no such formula for adults. T. Karan. Perhaps as a result, the new LSS adult curriculum which was published during the course of this trial includes the exact same four phases which are applied to residents aged three to twenty-one: (1) social skills, (2) cognitive skills, (3) prevocational skills, and (4) vocational skills. T. Gamache.

As with the younger residents, the staff at LSS has attempted to devise classes which attempt to prepare adult residents to live in the community. Such activities as handling money, cooking, and field trips into town are aimed at the transition from institution to semi-independent living. Although the efforts in this regard are increasing, the evidence indicates that only a small percentage of residents are afforded these opportunities, and that even for those who receive such instruction there is little carryover into their wards.

The vocational education programs are well developed at LSS, but as in other departments, the program accommodates fewer than one half of the residents[63] due to

---

61. In November of 1979, one resident (Jeanne P.) had OT expressly waived until the School could receive a fulltime occupational therapist. T. Sontag.

62. The record of another resident, Ernie B., reflects that "physical therapy will be implemented when staff are hired". "Ward position-

ing" (presumably a form of PT) was also canceled for Kathleen L. due to "lack of staffing". T. Sontag.

63. In 1979, approximately 176 of 605 residents were served in vocational programs.

lack of staff, facilities, and in some instances the lack of available work from outside sources. Residents in the non-ICF's have yet to be evaluated for placement in vocational programs, but officials at LSS hoped to complete this by October 1980. T. Gamache. Recently LSS hired a full-time vocational evaluator (or job developer) and more vocational teachers. Vocational education is divided into four categories: (1) adult vocational classes, (2) work activity centers,[64] (3) residential work programs,[65] and (4) "sheltered workshops".[66] T. Gamache.

### c. Summary of Education and Training

In conclusion, although great strides have been made in the Education and Training Department at LSS, major deficiencies still exist, most markedly in the services to residents of non-ICF buildings and to those who are most severely handicapped. Because of lack of staff and other resources, many residents capable of participating in these programs are excluded. Records (such as IEP's and ISP's) have not been completed for many residents, and for others they are very inadequate; as a consequence, residents are not often receiving appropriate individualized services.[67] Those who do receive training inevitably fail to retain skills due to a lack of follow-up in their wards. Physical therapy and occupational therapy, while needed by a significant number of residents, are administered sporadically, if at all. And although much emphasis has recently been placed on preparing residents for a transition to community living, relatively little time is actually spent by many residents outside of the institution, and some residents never venture outside of the institution.[68]

The education and training for residents aged three to twenty-one, although not so bleak, represents a marked contrast to the kinds of services which their non-handicapped peers receive in public schools. The majority of these children do not receive the full $5\frac{1}{4}$ hours of schooling as do their peers in public schools, and their formal education ceases after the requisite 180 days. Even the purely physical needs of some, like named plaintiffs Tommy Vaillancourt and Janet Smith, are not met.

### 2. Feeding

The Court heard sharply conflicting testimony regarding the feeding practices at LSS. Whereas one of plaintiffs' experts opined that 41% of deaths occurring at LSS from 1975 to 1978 were due to aspiration caused by poor feeding techniques, T. Clements, other experts dismissed these findings as alarmist. T. Grossman. The Court finds that many of the findings of Doctor Clements regarding death by aspiration were successfully impeached by other testimony. (See, e. g., T. Dunn.) Nevertheless, deficiencies clearly exist in the food service program at LSS. Because of the lack of staff, residents are often fed too quickly and with not enough care.[69] Plaintiffs' wit-

---

**64.** In a "work activity center", the United States Department of Labor authorizes an entity to pay below the minimum wage.

**65.** In the "residential work program" residents are paid to do work of benefit to LSS. As of September 1979, 135 residents were involved in this program. T. Gold.

**66.** In "sheltered workshops" the individuals do subcontract work for local industries and are paid on a piece-work basis.

**67.** Named plaintiff Nancy Haggerty had received no individualized plan until March of 1980. Probably as a result, she has received no organized training or programming since 1962 in self care skills, has had no psychiatric as-

sessment, and no PT, OT, or speech evaluations. T. Haggerty.

Richard Pond, another named plaintiff, has not had a psychiatric evaluation since 1962, even though his problems are rooted in schizophrenia and maladaptive behavior.

Mike M. was denied physical education because of "full capacity, class cancellations, and transportation problems". T. Sontag.

**68.** Named plaintiff Nancy Haggerty has reportedly never been taken into town.

**69.** The evidence reflects that twenty-four staffers serve approximately 840 meals per day. T. Andrews; U.S. Exhibit 16, "Plan of Action".

ness, staff member Carol Benoit,[70] described being placed in a situation in which she and another attendant were required to feed dinner to approximately twenty residents, four of whom had to be fed by hand. Their attention was necessarily diverted from several of the residents; as a result, a few of the residents sustained injuries, including choking on food. T. Benoit. Another witness testified that because of lack of manpower residents were being spoonfed more rapidly than they could swallow. T. Clements. The most significant problem in feeding appears to derive from the lack of adaptive equipment,[71] which results in poor positioning and body alignment, creating a risk of aspiration. Many residents are fed in a supine position, which exacerbates their problems with swallowing and coughing. T. Clements, Grossman. Finally, it was undisputed that as in many institutions the food at LSS is unattractive and cold, and is often served in barren environments.

### 3. Medical Care

Laconia State School has no full-time medical director and at the time of the trial had no on-site physicians. However, the School contracts with the Laconia Clinic in Laconia, New Hampshire, for the provision of medical services, and Dr. Craig Markert from that Clinic, who is Board-certified in internal medicine, is the acting medical director. The School also has its own "Administrator of health services", Mr. Dalback, who has no medical training. Three medical specialists[72] and three pediatricians are on rotating shifts at LSS; one internist and one physician conduct daily rounds in the out-patient department (which is closed on weekends) and in the infirmary, and there is a 24-hour on-call service. Nurse practitioners are employed to extend physician services, a system which seems to be appropriate[73] but which suffers because of a lack of staff. Although there are four positions for nurse practitioners, only two are filled. These two have divided their labors equally between ICF's and non-ICF's, and each covers one-half of the entire population (which amounts to approximately 275 residents per person). In addition, LSS maintains positions for thirty-two RN's (registered nurses), of which eight are vacant; and for eleven LPN's (licensed practical nurses), in which there is one vacancy.[74] Also providing medical services at LSS are two registered lab technicians, a dentist, a dental assistant, a hygienist, two regular pharmacists, a pharmacy assistant, and a pharmacist on call on weekends, and approximately seven attendants. T. Lanahan.

The majority of the population at LSS need "little or no nursing intervention"; fifty-three residents need nursing intervention once per day or more, while twenty-nine have a medical condition which inhibits the client's level of functioning in the activities of daily living.[75] As for other disabilities, approximately ten percent of the residents need constant behavioral intervention

**70.** Benoit was employed at LSS from August 1977 to July 1979 in the capacities of behavior modification, attendance, and "Psych Aide I".

**71.** "Adaptive equipment" can be defined as supportive and corrective equipment adapted to the physical needs of individual residents, including such items as specially designed wheelchairs and hearing aids.

**72.** This includes one specialist in cardiology and two in internal medicine.

**73.** Dr. Markert testified that because many medical problems are relatively minor, they do not require the attention of a doctor; therefore, the nurse practitioner provides a good substitute, and can act as a link to the doctor, if necessary. Such is a good use of resources.

**74.** Twenty-five full-time nurse positions are filled on the day shift, fifteen nurses are in the field on the second shift, and three are on duty for the third shift.

**75.** The figures cited are from *Action for Independence*, 3d Draft, Defendants' Exhibit 139, which contains a study conducted by Cornhill Associates in October 1979. The study provides overall nursing characteristics of the 605 LSS residents in 1979, and then gives a breakdown of nursing needs in relation to the three different levels of independence, including (1) "Most Independent" (comprised of 13% of the LSS population); (2) "Moderate Dependence" (69%); and "Most Dependent" (18%). *Id.* at pp. 79–94.

for antisocial or destructive behaviors; seventeen percent have cerebral palsy, but for most not to the extent that it severely limits daily activities and functions; and twenty-nine percent either currently have or have recently had epileptic seizures, but again, for most these seizures are not so severe as to completely prevent the client's ability to function. *See Action for Independence* 3d Draft, Defendants' Exhibit 139, at 80.

Two groups of residents are cared for in the infirmary:[76] (1) those needing acute medical supervision, and (2) those profoundly impaired persons with medical problems. T. Andrews.[77] Doctor Markert testified that given more staff and resources, the latter group would more appropriately be served in the residential wards. T. Markert.

Experts on both sides agreed that the provision of acute health care (*i. e.,* treating fevers, sicknesses, etc.) at LSS is very adequate with the exception of a few specialties for which the School calls upon consultants; however, long-term health treatment, including developmental programs, suffers because of lack of staff. As mentioned above, an Individual Service Plan (ISP), the precursor of methodical long-range treatment, has been completed for only sixty-five percent of the residents. Although plaintiffs urged that a medical doctor must be a full-time member of any interdisciplinary team which meets to develop the ISP and to evaluate the resident's progress thereunder, the Court was convinced by other testimony to the effect that full-time attendance by a physician would constitute an unwise use of scarce resources. T. Grossman, Melton. At present, nurse practitioners are called into team meetings at crucial stages. As in many other fields at LSS, an ISP in and of itself guarantees very little. Recommended corrective treatment such as PT, OT, and adaptive equipment (wheelchairs, eyeglasses, hearing aids, etc.) is not always forthcoming, and although surgical intervention has been recommended for certain residents, the School has not followed through on same.[78]

In conclusion, although at LSS acute medical care for the retarded equals that in some of the best clinics and hospitals in New Hampshire, T. Andrews, Markert, LSS is lacking in some specialties such as ophthalmology, neurology, and developmental medicine.[79] Most importantly, LSS lacks a medical director.

### 4. *Drugs*

As in many institutions, the administration of drugs constitutes a major part of the medical services, and as in many institutions, the method of prescribing and dispensing drugs has come under fire. Critics have concentrated their attack on psychotropic [80] (or so-called "mind controlling") drugs, which they claim are utilized all too often as convenient restraints and punishments.

Approximately forty percent of the population at LSS receives psychotropic drugs. T. Lenahan, Sprague; *see also* Plaintiffs' Exhibit 65,[81] Defendants' Exhibit 75,[82] and

---

**76.** The infirmary was expected to receive ICF approval in July of 1980.

**77.** The infirmary has five permanent adult residents and three pediatric residents with complex medical needs.

**78.** Doctor Andrews testified that LSS lacks a defined policy regarding residents with severe deformities.

**79.** Developmental medicine attempts to interrelate available information regarding multiple problems.

**80.** Doctor Mason described "psychotropic drugs" as drugs which are prescribed to produce beneficial mood disorders, including: (1) anti-depressants, (2) anti-anxiety, (3) anti-psychotics, (4) stimulants, and (5) sedatives and hypnotics.

**81.** Plaintiffs' Exhibit 65 represents defendants' answer to Plaintiffs' Interrogatory, which lists those residents receiving medication.

**82.** Defendants' Exhibit 75 is Dr. Aaron S. Mason's report from a "medication audit" he conducted at LSS in 1979, concentrating on psychotropic drugs.

U.S. Government Exhibit 38.[83] However, this percentage is steadily decreasing due to a concerted effort on the part of the School. T. Mason.

LSS has lacked a methodical approach in the past toward the dispensation of psychotropic drugs. Dosages have been unnecessarily high, and there has been no comprehensive review of medication. T. Lenahan, Sprague. Untrained staff members have been charged with the duty of dispensing these drugs. Recently a major effort has been undertaken to reduce dosages of drugs at LSS by making more exact assessments of need; relating the use of drugs with other programs; distributing the drugs carefully by trained personnel; and monitoring the progress of residents on a consistent basis. To this end, medication is reviewed every twenty-five to thirty days by a nurse and an internist (unless there is a manifest problem, in which case the reviews are more frequent). There has been a fifty percent reduction in the total tonnage of dosage of drugs dispensed in the ICF wards. Drugs are dispensed daily in a "unit dosage" system, which means that each tablet has its own packaging with its own dosage level listed to avoid errors in distribution. (LSS has about a one-per-month error rate.) Any problems related to the administration of drugs are brought to the nurse practitioner's attention, who in turn decides whether it is necessary to go to a doctor. Only one percent of the population at LSS receives drugs on a "PRN",[84] or "as needed" basis, a method which gives the person in charge the discretionary authority to administer the requisite amount of drugs. A new policy at LSS dictates that a nurse practitioner screen all psychotropic "PRN's".

In conclusion, compared with other institutions, the dosages at LSS are presently not out of line. T. Sprague.[85] However, as evidenced by its own reevaluations and corrective measures, many residents have been receiving excess dosages. Once again, the discrepancy between treatment of ICF's and non-ICF's is great. At the time of trial the effort to reduce the dosages had taken place only in the ICF's. In addition, there was evidence that whereas drugs are dispensed to ICF residents by nurses, in non-ICF units the charge attendants have this responsibility.[86] T. Sprague; see also U.S. Government's Exhibit 38. Finally, there was little showing of integration of psychotropic drugs with other ongoing programs, except perhaps the effort that would presumably be made by an interdisciplinary team when formulating an Individual Service Plan.

## C. Restraints and Seclusion Rooms

In the past, restraints [87] have been used somewhat indiscriminately at LSS with little accompanying documentation of the reasons therefor, T. Melton, Dornin, although it is apparent that at least one reason for their use has been as a control mechanism in the face of staff shortages. Seven different types of restraints are used at LSS: (1) tube restraints which lock elbows; (2) straight jackets; (3) mittens; (4) belt vest restraints to secure people in bed; (5) wheelchair belts; (6) wrist restraints, and (7) helmets. T. Dornin. Although re-

83. U.S. Government's Exhibit 38 is Dr. Robert L. Sprague's report from a survey he conducted of the medication administered to fifty-eight selected residents.

84. The term "PRN" is derived from the Latin, "pro re nata", translated, "as circumstances require".

85. Doctor Sprague also testified in the *Pennhurst* case, and compared LSS favorably to that institution.

86. Plaintiffs' witness Carol Benoit testified that as an attendant she was instructed to adminis-

ter medication even though she had never been trained.

87. "Restraints" have been described as being both physical and chemical, the latter comprising such elements as the psychotropic drugs referred to on pp. 46–48 of this Opinion. *See Halderman v. Pennhurst*, 446 F.Supp. 1295, 1306, n.33 (E.D.Pa.1977). Although recognizing that psychotropic drugs could be used as a restraint, this Court finds that the use of drugs is more appropriately categorized as "Medical Services".

straints serve salutary purposes such as preventing self abusiveness (scratching, banging, etc.) and preventing abuse to others, reports show that residents have been placed in restraints for reasons which are not compelling or appropriate, sometimes for long stretches at a time. For example, because of the lack of adaptive equipment at LSS, residents have been belted into wheelchairs; others have been placed in straight jackets to prevent them from tearing their clothing. T. Dornin; U.S. Government's Exhibit 20.[88] Restraints have been used on many of the named plaintiffs, including Sandra Garrity, Nancy Haggerty, Debra Roman, and Richard Pond.

Currently LSS is attempting to diminish the use of restraints, and has promulgated a policy whereby staff requesting their use must telephone the central office and state the reasons for the request before receiving authorization. Even this new system occasionally lends itself to "rubberstamping", and apparently there continue to be unauthorized uses at times.

*Seclusion rooms* are rooms with an area of ten feet by twelve feet which contain no furnishings and which can be locked from the outside. "Time-out rooms", of which there are four or five at LSS, are smaller but similar to seclusion rooms. Residents at LSS have been placed in these rooms in the past sometimes for the purpose of punishment and occasionally as part of a plan for behavior modification. Because the staff has occasionally abused this method, LSS has adopted a new policy regulating the use of seclusion rooms. They are used much less frequently now, and only after other methods have been attempted. The current official policy is that no resident is to be placed in a seclusion room without a written program promulgated by an interdisciplinary service team. At present only four residents use seclusion rooms with any regularity, and only two are consistently placed in restraints.

### D. Abuse of Residents; Accidents and Injuries

Reports and allegations of staff abuse of residents have recently increased at LSS, but according to Superintendent Melton this reflects heightened awareness of residents' rights and the consequent willingness to report infractions rather than an increased incidence of abuse. Nevertheless, the types and frequency of abuse are disturbing.

The Court heard testimony from Government witness Christopher Laird Dornin, a second-shift supervisor at LSS whose job is to investigate alleged abuses at LSS and to report accidents and injuries. During his tenure of four years at the School, Dornin has investigated forty serious cases of abuse, of which thirty (although not all proven) are in his opinion bona fide. For example, in 1979 an employee abused three residents, hitting one in the stomach and kicking another for being wet with urine. He was fired. (T. Dornin.) One resident was found with a long abrasion from a belt tied to a stick; although the staff members were never proved guilty, they resigned. Another resident was discovered with a broken leg in the middle of the night, but there was a delay of twenty-four hours before medical help arrived, which Dornin attributed to lack of cooperation on the part of the staff. Two residents reported having had sexual relations with a staff member who had taken them home for the night. One employee was terminated for poor attendance; in cleaning out his personal effects, LSS officials discovered three hundred empty beer bottles and an abusive instrument. And a doctor was terminated from LSS because he had a practice of suturing injuries (especially facial) without anesthesia. T. Dornin.[89]

Dornin estimated that only fifty percent of staff abuses result in discipline because of the difficulty of persuading people to

---

88. U.S. Government's Exhibit 20 shows that residents have been put in straight jackets to prevent tearing of clothing. (*See* documentation of November 1977.)

89. Consequently a new policy has been adopted at LSS which requires that all suturing be performed with anesthesia unless otherwise documented.

report their fellow staff members. But, as mentioned above, the trend has been toward increased reporting.

### Accidents and Injuries

Because of a shortage of staff, Melton testified that "[t]here are far too many accidents for which no known cause can be cited". T. Melton. Reported accidents and injuries are documented in Government Exhibit 20, a twenty-four-hour log kept by Supervisor Dornin and his counterparts on other shifts. A typical entry in the log reflects the following, except that causes are sometimes listed with more frequency:

Monday, October 1, 1979. 12:30 p. m., Keyes: Ruth H. bitten on arm by Nancy K.; Bruce G. found with 3 large bruises on left eye.

October 2, 6:30 a. m., Baker: John D. found with several scratches on lower back, cause unknown. 9:30 a. m., King: Deborah B. found bruised on left hip, cause unknown. 4:20, Joseph D., bruise 3″ on hip, cold compress. 8:00 p. m., Keyes: resident found with bruise on left corner of eye.

Throughout the trial the Court also heard testimony regarding accidents and injuries to the named plaintiffs.

Dornin expressed the opinion that there was a lack of systematic training of the staff to deal with aggressive residents at LSS, although he conceded that while training could prevent some of these mishaps, in many instances the injuries cannot be attributed to lack of diligence or training on the part of staff. As an example, he cited the accidental drowning of one resident, Richard B., in a pond outside Dube building, for which he attributed absolutely no staff neglect. Because the staff recognizes the importance of affording a certain degree of freedom to residents, many of the ambulatory residents are allowed to roam around the grounds.

In conclusion, it is clear that among any large population, accidents and injuries are inevitable.[90] The Court finds, however, that this problem at LSS is exacerbated by the lack of supervision of residents because of staff shortages. In addition, one need not be trained in psychiatry to conclude that staff shortages lead to increased anxiety and frustration among employees which can ultimately lead to resident abuse.

### E. Community Placements

Much of the testimony in this trial focused on various community programs for the mentally retarded throughout the country. To describe the myriad of programs nationwide herein would be unproductive; suffice to say that many of these placements accommodate people of all levels of retardation, providing them with residential and day programs which are in some cases far superior to institutional settings. New Hampshire too has joined the national trend of developing community placements for the mentally retarded, about which the Court heard extensive testimony.

New Hampshire maintains an array of residential community placements including group homes, foster homes, and semi-independent apartments, as well as day program components, in which several residents have been placed over the years. Every year an increased percentage of clients on the rolls of LSS are placed in these programs,[91] and as elsewhere referenced the State's present goal is eventually to deinstitutionalize all but a small residual population at LSS. (Defendants' Exhibit 139, *Action for Independence*, proposes that no more than 155 residents remain at LSS as of 1987. T. Melton.) At the time of trial, of 686 on the rolls of LSS, 564 were in residence and 122 were in community placements.

90. During the period from January 1, 1977, to March 31, 1979 (a period of 820 days), there were 700 bruises or contusions among 600 residents, which Superintendent Melton pointed out was less than one bruise per day (T. Melton).

91. *See* Defendants' Exhibit 35 for a breakdown, by year, of the number of residents placed in the community.

Although defendants' present official policy would exclude no resident from consideration for placement, history reflects that such was not always the case. For example, defendants' "Act to Improve Services for the Mentally Retarded", promulgated in 1978, stated that defendants had "identified approximately 320 Laconia State School residents (clients), that can be appropriately programmed in a less restrictive environment", and another 280 who were "too fragile for community placement". Defendants' Exhibit 103, pp. 7, 9. Similarly, Dr. Gary Miller, Director of the Division of Mental Health, in 1979 instructed that lists should be made of those who could and could not be placed. Government's Exhibit 91, T. Shumway.

At the present time the LSS clients in community placement fall predominantly into the ranges of mild and moderate retardation; rarely is a severely or profoundly retarded resident so placed. The State's current policy is to include people of all levels of mental retardation in their future deinstitutionalization plans so that only the most medically fragile will remain at LSS. This latter population will itself be transient as new and better alternatives are devised.

Although experts on both sides endorsed the general concept of community placement for the retarded given the appropriate resources, there was not unanimous agreement that community placement (versus an institution) is the least restrictive alternative or the safest environment for all residents. Defendants' experts, for example, pointed to the limited recreational facilities in some towns, the absence of public transportation, the lack of peer interaction, the lack of around-the-clock medical help, and the difficulties faced by those mentally retarded people who often encounter hostile reactions from the members of the community which they have joined.[92]

Although these reservations on the part of defendants' experts have validity, the Court recognizes if assimilation of the mentally retarded into the mainstream of society is the ultimate goal, there is no substitute for community placement. However, recognition of the value of such placement does not necessarily translate into a legal entitlement thereto. It is to the resolution of this key issue that we now turn our attention, commencing our analysis with the statutes hereinabove referenced in accordance with the mandate imposed upon federal courts.[93]

## III. The Statutory Claims

### A. The Developmental Disabilities Assistance and Bill of Rights Act of 1975

In late 1977 the Eastern District of Pennsylvania had before it for resolution a case similar in many respects to the instant litigation. At issue therein (following extensive discovery and a thirty-two-day trial) were the legal rights of the residents of Pennhurst State School and Hospital ("Pennhurst"), a state-operated facility for the care and treatment of the mentally retarded. Of the approximately 1200 residents at Pennhurst, one half had been admitted upon application of their parents or guardians and the remainder by virtue of court order.

In a thoughtful and compassionate opinion, the Court (Raymond J. Broderick, J.) held that the conditions of confinement at Pennhurst violated the rights of its residents under the Eighth and Fourteenth Amendments of the United States Constitu-

---

**92.** This unfortunate bias against the mentally retarded has been underscored by recent attempts to exclude the retarded from residential areas through zoning mechanisms. T. Shumway; *see also Region 10 Client Management v. Town of Hampstead*, 120 N.H. 885, 424 A.2d 207 (1980).

**93.** It is well settled that if cases may be decided on either statutory or constitutional grounds, federal courts will inquire first into the statutory question in reflection of the deeply rooted doctrine "that we ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable". *Harris v. McRae*, 448 U.S. 297, 306–07, 100 S.Ct. 2671, 2682–83, 65 L.Ed.2d 784 (1980), *citing Spector Motor Service, Inc. v. McLaughlin*, 323 U.S. 101, 105, 65 S.Ct. 152, 154, 89 L.Ed. 101 (1944).

tion, state law,[94] and the Rehabilitation Act of 1973, 29 U.S.C. § 794. The subsequent relief order required the eventual closing of Pennhurst in favor of community living arrangements for its displaced residents.[95] *Halderman v. Pennhurst State School and Hospital*, 446 F.Supp. 1295 (E.D.Pa.1978).

On appeal, the United States Court of Appeals for the Third Circuit substantially affirmed the orders of the District Court,[96] but eschewed the constitutional ground, choosing to rest its decision on a favorable construction of the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. § 6000, *et seq.* ("DD Act").[97] *Halderman v. Pennhurst State School and Hospital*, 612 F.2d 84 (3d Cir. 1979) (en banc). Finding that the "bill of rights" provision of the DD Act, 42 U.S.C. § 6010(1) and (2) granted mentally retarded persons a right

to "appropriate treatment, services and habilitation", in the setting that is least restrictive of personal liberty, the Court found that plaintiffs possessed an implied cause of action under the statute which permitted them to enforce such rights.[98]

With the state of the law interpreting the DD Act in the position hereinabove described, the parties plaintiff herein urged upon this Court at trial their right thereunder to habilitation in the least restrictive environment. The DD Act was passed in 1975 as an amendment to the Developmental Disabilities Services and Facilities Construction Act, 42 U.S.C. §§ 2661–2666 and 2670–2677c, whereunder funds were provided for the construction of health care facilities and the development of community-based programs was encouraged. The "bill of rights" section of the DD Act, 42 U.S.C. § 6010,[99]

---

94. Pennsylvania Mental Health and Mental Retardation Act, Pa.Stat.Ann. tit. 50 § 4201, *et seq.* (Purdon 1969).

95. The Court also appointed a Special Master to supervise the implementation of its orders. *See* 446 F.Supp. at 1326–29.

96. The Circuit Court refused to order, as had the District Court, that Pennhurst be closed, that alternative employment be found for its employees, and that future admissions therein be barred. 612 F.2d at 116.

97. Although the DD Act had been asserted by the *Pennhurst* plaintiffs as a ground for relief by virtue of their amended complaint, the District Court did not rely upon it as a basis for its decision and order.

98. The Circuit also found the DD Act was promulgated by Congress pursuant to both § 5 of the Fourteenth Amendment and the Spending Power, art. 1, § 8, cl. 1. Additionally, as an alternative ground of recovery, it affirmed the District Court's holding that Pennhurst residents had a right pursuant to state statute to an adequate "habilitation".

99. *§ 6010. Congressional findings respecting rights of developmentally disabled.*
Congress makes the following findings respecting the rights of persons with developmental disabilities:
(1) Persons with developmental disabilities have a right to appropriate treatment, services, and habilitation for such disabilities.
(2) The treatment, services, and habilitation for a person with developmental disabilities should be designed to maximize the de-

velopmental potential of the person and should be provided in the setting that is least restrictive of the person's personal liberty.
(3) The Federal Government and the States both have an obligation to assure that public funds are not provided to any institutional or other residential program for persons with developmental disabilities that—
(A) does not provide treatment, services, and habilitation which is appropriate to the needs of such persons; or
(B) does not meet the following minimum standards:
(i) Provision of a nourishing, well-balanced daily diet to the persons with developmental disabilities being served by the program.
(ii) Provision to such persons of appropriate and sufficient medical and dental services.
(iii) Prohibition of the use of physical restraint on such persons unless absolutely necessary and prohibition of the use of such restraint as a punishment or as a substitute for a habilitation program.
(iv) Prohibition [of] the excessive use of chemical restraints on such persons and the use of such restraints as punishment or as a substitute for a habilitation program or in quantities that interfere with services, treatment, or habilitation for such persons.
(v) Permission for close relatives of such persons to visit them at reasonable hours without prior notice.
(vi) Compliance with adequate fire and safety standards as may be promulgated by the Secretary.
(4) All programs for persons with developmental disabilities should meet standards which are designed to assure the most favor-

had been construed, prior to the decision of the Third Circuit, to vest in retarded persons statutory rights enforceable by private factions in federal courts. *Naughton v. Bevilacqua,* 458 F.Supp. 610 (D.R.I.1978), *aff'd* 605 F.2d 586 (1st Cir. 1979).[100] In a pretrial Opinion and Order (February 22, 1980, pp. 2–8) this Court, in reliance on the Opinions in *Halderman v. Pennhurst, supra,* and *Naughton v. Bevilacqua, supra,* denied the defendants' motions to dismiss such of the plaintiffs' claims as were grounded upon the DD Act.

On April 20, 1981, the United States Supreme Court, holding that 42 U.S.C. § 6010 created no substantive rights for the developmentally disabled, reversed and remanded to the Third Circuit for further proceedings. *Pennhurst State School and Hospital v. Halderman,* —— U.S. ——, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). Concluding that the general structure of the DD Act proved it to be similar to other federal-state grant programs in which "the States are given the choice of complying with the conditions set forth in the Act or foregoing the benefits of federal funding", *id.* at ——, 101 S.Ct. at 1536 (citations omitted), the Court appointed to a "variety of conditions" outlined in other sections of the Act with which states must comply as a condition of the continuing receipt of federal largesse.[101] *Id.* at ——, 101 S.Ct. at 1537–38.

Further noting that § 6010 sharply contrasted with those sections of the DD Act which contained such conditions precedent, *id.* at ——, 101 S.Ct. at 1538, the Court focused attention on the constitutional source of statutory enactment, ruling that the DD Act had been enacted pursuant to the Spending Power[102] rather than § 5 of the Fourteenth Amendment.[103] *Id.* at ——, 101 S.Ct. at 1538–40.[104] Finding it ambiguous, both as to specific language and legislative history, *id.* at ——, 101 S.Ct. at 1540, the Court went on to state that § 6010 "in no way suggests that the grant of federal funds is 'conditioned' on a state fund-

able possible outcome for those served, and—

(A) in the case of residential programs serving persons in need of comprehensive health-related, habilitative, or rehabilitative services, which are at least equivalent to those standards applicable to intermediate care facilities for the mentally retarded promulgated in regulations of the Secretary on January 17, 1974 (39 Fed.Reg. pt. II), as appropriate when taking into account the size of the institutions and the service delivery arrangements of the facilities of the programs;

(B) in the case of other residential programs for persons with developmental disabilities, which assure that care is appropriate to the needs of the persons being served by such programs, assure that the persons admitted to facilities of such programs are persons whose needs can be met through services provided by such facilities, and assure that the facilities under such programs provide for the humane care of the residents of the facilities, are sanitary, and protect their rights; and

(C) in the case of nonresidential programs, which assure the care provided by such programs is appropriate to the persons served by the programs.

**100.** In its Opinion and Order of February 22, 1980, denying, *inter alia,* defendants' motion to dismiss the plaintiffs' claims advanced pursuant to the DD Act, this Court noted (p. 3, n.1) that in the context of the limited appeal presented to it, the First Circuit (605 F.2d at 588, n.3) had made clear that it would express no opinion as to the merits of whether the DD Act created substantive rights that are privately enforceable.

**101.** Such conditions, including statements set forth in §§ 6005, 6009, 6011, 6012, and 6063 will be hereinafter discussed as they are perceived relevant. § 6063, for example, requires a state to submit an "approved plan" to the Secretary of Health and Human Services as a condition to the receipt of federal funds.

**102.** The Spending Power is encompassed in art. I, § 8, cl. 1, of the Constitution, which states, the "Congress shall have the Power To ... provide for the ... general welfare of the United States."

**103.** Section 5 of the Fourteenth Amendment provides that "[t]he Congress shall have power to enforce, by appropriate legislation, the provisions of this article."

**104.** The dissenters (White, J., joined by Brennan and Marshall, JJ.) concurred with the majority in the holding that § 6010 was enacted "pursuant to Congress' spending power, and not pursuant to its power under § 5 of the Fourteenth Amendment." *Id.* at ——, 101 S.Ct. at 1549.

ing the rights described therein." *Id.* at ——, 101 S.Ct. at 1542. In summation of its principal holding to the effect that § 6010 created no substantive right, the Court concluded

> Congress in recent years has enacted several laws designed to improve the way in which this Nation treats the mentally retarded. The Developmentally Disabled Assistance and Bill of Rights Act is one such law. It establishes a national policy to provide better care and treatment to the retarded and creates funding incentives to induce the States to do so. But the Act does no more than that. We would be attributing far too much to Congress if we held that it required the States, at their own expense, to provide certain kinds of treatment.

*Id.* at ——, 101 S.Ct. at 1547 (footnote omitted).

Having held that 42 U.S.C. § 6010 created no substantive rights, the Supreme Court found it unnecessary to reach the question of whether a private cause of action existed thereunder or under 42 U.S.C. § 1983 [105] to enforce those rights. *Id.* at ——, n.21, 101 S.Ct. at 1545, n.21. However, the Court outlined certain issues to be addressed on remand, and, as this Court must resolve such issues in the context of the instant litigation, it now directs its attention thereto. Initially, these issues arise from the claim that sections of the DD Act other than 6010 may be enforced by suit.[106] A brief overview of those sections must therefore preface further analysis.

Section 6005 conditions the provision of assistance under the DD Act on the taking of affirmative action by each recipient of such assistance to hire and promote qualified handicapped individuals. Under § 6009, each state must, again as a condition of assistance, submit to the Secretary of Health and Human Services a time-phased plan for the implementation of a comprehensive system for the evaluation of services provided the developmentally disabled. After October 1, 1982, in conjunction with any such plan, the states must also provide "assurances satisfactory to the Secretary that the State is using such a system". *Id.*

Detailed habilitation plans are required by § 6011 (as a condition of funding), and such plans are to be annually reviewed.[107] Section 6012 conditions aid on a state's promise to "have in effect a system to protect and advocate the rights of persons with developmental disabilities". § 6012(a)(1). Such advocacy system must

---

**105.** 42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

**106.** Here, as in the *Pennhurst* case, the plaintiffs have invoked the DD Act generally without attempting to confine themselves to the provisions of § 6010.

**107.** Section 6011(b) requires that such habilitation plans be in writing, jointly developed by a representative of the program primarily responsible for delivery or coordination of the delivery of services to the person for whom the plan is established, such person, and, where appropriate, such person's parents, guardians, or other representatives. Additionally, the plan must contain a statement of the long-term habilitation goals and the intermediate habilitation objectives relating to the attainment of such goals, which objectives are to be specifically stated and in sequence and to be expressed in behavioral or other terms that provide measurable indices of progress. The plan further must describe how the objectives will be achieved and the barriers that might interfere with the achievement of such objectives, and must state objective criteria and evaluation procedure and the schedule for determining whether such objectives and goals are being achieved. A program coordinator responsible for implementation of the plan must be provided, and the plan must contain a readily understandable statement of specific habilitation services to be provided, identifying each agency which will deliver such services, describing the personnel and their qualifications necessary for the provision of such services, and specifying the date of initiation of each service to be provided and its anticipated duration. Finally, the plan is to specify the role and objectives of all parties to its implementation.

"have the authority to pursue legal, administrative, and other appropriate remedies to ensure the protection of the rights of such persons who are receiving treatment, services, or habilitation within the State". § 6012(a)(2)(A). Additionally, the advocacy system must "not be administered by the State Planning Council", § 6012(a)(2)(B), and it must "be independent of any agency which provides treatment, services, or habilitation to persons with developmental disabilities". § 6012(a)(2)(C).

States receiving assistance under the DD Act must establish a "State Planning Council", at least half of whose members should either be developmentally disabled persons or be their parents, relatives, or guardians. 42 U.S.C. § 6067. The functions of such council include joint development with state agencies of the state plan required by the pertinent sections of the DD Act (§§ 6061, et seq.) and the monitoring of the plan's implementation. § 6067(b)(1), (2).

The hereinabove described sections of the DD Act derive their substance from the funding provisions set forth in §§ 6061 through 6063. The authorization of specific amounts of appropriation is detailed in § 6061, and the formula for allocation to the various states is detailed in § 6062. A condition precedent to allotment of any funds under the DD Act is the submission by each participating state to the Secretary of Health and Human Services of a detailed plan setting out specific objectives to be achieved thereunder. § 6063(b)(2)(A). Services furnished under such plan must be consistent with standards prescribed by the Secretary, § 6063(b)(5)(A)(i), and be provided in an individual manner consistent with § 6011. § 6063(b)(5)(B). The plan must also be supported by assurances that any program receiving assistance is protecting the human rights of the disabled consistent with § 6010. § 6063(b)(5)(C).[108] The Secretary may disapprove a state plan, § 6063(c), and, should a state fail to satisfy the requirements of § 6063, the Secretary may

terminate or reduce its federal grant. § 6065. Judicial review for states dissatisfied with the actions of the Secretary is vested in the United States Courts of Appeal. § 6068.

### 1. Does the DD Act Create a Private Cause of Action?

■ The Supreme Court in its *Pennhurst* decision focused on the provisions of §§ 6011 and 6063(b)(5)(C) in reviewing the issue of whether the plaintiffs could claim a private cause of action under the DD Act. Recognizing that the recent decision of *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), held that 42 U.S.C. § 1983 provides a cause of action for state deprivations of any rights secured by all laws of the United States, the Court outlined various factors which it felt bore upon the application of *Thiboutot* to the case before it. The first of these is whether the interest of the *Pennhurst* plaintiffs in claiming that the state plan had not provided adequate "assurances" to the Secretary constituted a "right secured" by the laws of the United States within the meaning of 42 U.S.C. § 1983. *Pennhurst State School and Hospital v. Halderman, supra,* —— U.S. at ——, 101 S.Ct. at 1545. Turning to the suggestion in Justice Powell's dissent in *Thiboutot* that § 1983 would not be available where the "governing statute provides an exclusive remedy for violations of the Act", 448 U.S. at 22, n.11, 100 S.Ct. at 2513, n.11, the *Pennhurst* Court expressed doubt whether the express remedy contained in the DD Act was exclusive. *Id.* —— U.S. at ——, 101 S.Ct. at 1545. Turning, then, to §§ 6011 and 6063(b)(5)(C) of the statute, the Court stated that these referred only to "programs assisted" under the DD Act, and because Pennhurst received no federal funds under the Act, it was arguably not a "program assisted." *Id.* at ——, 101 S.Ct. at 1545. Accordingly, the Court stated that there may be no obligation on the state pursuant to § 6011 to assure the Secretary that each Pennhurst resident had a habilita-

---

**108.** In the 1978 revisions of § 6063, § 6063(b)(5)(C) replaced § 6063(b)(24) of the 1975 Act, which required a similar "assur-

ance", the difference being that the later version contains the specific reference to § 6010.

tion plan or to assure the Secretary under § 6063(b)(5)(C) that Pennhurst residents were being provided services consistent with § 6010. *Id.* at ——, 101 S.Ct. at 1545.

Turning to the question of remedy, the Court then suggested that relief might well be limited to enjoining the Federal Government from providing funds to Pennsylvania pursuant to the doctrine outlined in *Rosado v. Wyman*, 397 U.S. 397, 420–21, 90 S.Ct. 1207, 1221–22, 25 L.Ed.2d 442 (1970). *Id.* —— U.S. at ——, 101 S.Ct. at 1545–46. Pointing out that there had been instances of departure from the *Rosado* rule, but stressing that in no cases had it required the provision of funds to plaintiffs or requirements that a state "take on such open ended and potentially burdensome obligations as providing 'appropriate' treatment in the 'least restrictive' environment", the Court remanded these issues under the DD Act to the Court of Appeals. *Id.* at ——, 101 S.Ct. at 1546.

More recently, the Supreme Court has stated that its *Pennhurst* decision constituted the recognition of two exceptions to the application of § 1983 to statutory violations. In *Middlesex County Sewerage Authority, et al v. National Sea Clammers Association, et al*, —— U.S. ——, ——, 101 S.Ct. 2615, 2625–26, 69 L.Ed.2d 435 (1981), the Court

stated these exceptions to be (1) whether Congress had foreclosed private enforcement of the statute at issue in the enactment itself, and (2) whether the statute at issue was the kind that created enforceable "rights" under 42 U.S.C. § 1983. The Court also, however, reviewed its well established and often recurring factors bearing on the issue of whether Congress intended to create a private right of action under a federal statute without saying so explicitly. *Id.* at ——, 101 S.Ct. at 2621–22. As we deem it clear that *Maine v. Thiboutot, supra,* did not overrule the requirement that we consider those factors as outlined in the seminal decision of *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975),[109] we now direct our attention to such factors.[110]

In our consideration of the first factor cited in *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975), *i. e.,* whether plaintiff is " 'one of the class for whose *especial* benefit the statute was enacted,' ... —that is, does the statute create a federal right in favor of the plaintiff?" (citations omitted) (emphasis in original), we note the statement of the Supreme Court in its *Pennhurst* decision that the "overall purpose" of the DD Act, as amended in 1978, is:

This confirms the Court's opinion that analysis herein must proceed under both *Cort v. Ash, supra*, and *Maine v. Thiboutot, supra.*

**109.** In the recent decision of *Yapalater v. Bates*, 494 F.Supp. 1349 (S.D.N.Y.1980), the Court had before it an action wherein a physician brought suit complaining of the refusal of state officials to approve Medicaid reimbursements for the services of ancillary personnel working under his direction. In holding that plaintiff could proceed with his cause of action pursuant to 42 U.S.C. § 1983 (although he was denied relief on the merits), the Court concluded that *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), had not been overruled by *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), although the applicability of the *Cort* factor was limited where the alleged deprivation resulted from state action conflicting with federal statutory law. However, we note that in its approach in *Middlesex County Sewerage Authority, et al v. National Sea Clammers Association, et al*, —— U.S. ——, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), the Court specifically indicated that the rulings of *Thiboutot* constituted "a possible alternative source of *express* Congressional authorization of private suits". *Id.* at ——, 101 S.Ct. at 2625.

**110.** These factors are as follows:

In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted,' ... —that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? ... Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? ... And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?
422 U.S. at 78, 95 S.Ct. at 2088 (citations omitted) (emphasis in original).

*To assist* the states to ensure that persons with developmental disabilities receive the care, treatment, and other services necessary to enable them to achieve their maximum potential through a system which coordinates, monitors, and plans and evaluates those services and which ensures the protection of the legal and human rights of persons with developmental disabilities.

42 U.S.C. § 6000(b)(1), as quoted in *Pennhurst State School and Hospital v. Halderman*, —— U.S. at ——, 101 S.Ct. at 1537 (1981) (emphasis supplied by the Court).

The Court also cited the specific purposes of the Act as outlined in § 6000(b)(2) [111] and stressed that the DD Act was a federal-state grant program designed to financially assist states in planning for and creating comprehensive services for the developmentally disabled. *Id.* at ——, 101 S.Ct. at 1536. Unlike § 504 of the Rehabilitation Act, 29 U.S.C. § 794 (hereinafter discussed) and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, which are modeled on Title VI of the Civil Rights Act of 1964, and which also regulate the states' use of federal funds, the DD Act does not speak in terms of personal rights but focuses rather on the obligations of the recipient states. But even though the states are the primary and direct beneficiaries of federal funds under the Act, it is clear that developmentally disabled persons derive benefits from the statute; and the Court therefore concludes that plaintiffs are among "the class for whose especial benefit the statute was enacted".[112] However, the right enjoyed by plaintiffs is a limited one, which does not even come into existence unless and until the state decides to accept funds from the federal government. At the point of such acceptance, it can be implied from the Act that a developmentally disabled person has a limited right to assure that the Secretary of Health and Human Services performs his statutory duty in enforcing the Act. By way of example, pursuant to 42 U.S.C. § 6065, plaintiffs have the right to assure that the Secretary will withhold funds from the state if the Secretary finds that the state has:

(1) failed to comply substantially with any of the provisions required by section 6063 to be included in the State plan; or
(2) failed to comply substantially with any regulations of the Secretary which are applicable to this subchapter.

While the foregoing analysis of the nature of the rights conferred on these plaintiffs under the DD Act may appear to confuse the question of (1) the rights created by the statute with (2) the remedies available thereunder,[113] it is impossible to answer

---

**111.** Section 6000(b)(2) provides
The specific purposes of this chapter are—
(A) to assist in the provision of comprehensive services to persons with developmental disabilities, with priority to those persons whose needs cannot be covered or otherwise met under the Education for All Handicapped Children Act, the Rehabilitation Act of 1973 ..., or other health, education, or welfare programs;
(B) to assist States in appropriate planning activities;
(C) to make grants to States and public and private, nonprofit agencies to establish model programs, to demonstrate innovative habilitation techniques, and to train professional and paraprofessional personnel with respect to providing services to persons with developmental disabilities;
(D) to make grants to university affiliated facilities to assist them in administering and operating demonstration facilities for the provision of services to persons with developmental disabilities, and interdisciplinary training programs for personnel needed to provide specialized services for those persons; and
(E) to make grants to support a system in each State to protect the legal and human rights of all persons with developmental disabilities.
*Id.* at ——, 101 S.Ct. at 1537, n. 8.

**112.** In so holding, we find nothing to be incompatible with the dicta set forth in *Cannon v. University of Chicago*, 441 U.S. 677, 690–92, 99 S.Ct. 1946, 1954–55, 60 L.Ed.2d 560 (1979), and the examples footnoted thereunder, for in *Cannon* the Supreme Court did not foreclose the possibility of finding a limited private right of action under such type statutes.

**113.** The Court is not unaware that "the question whether a litigant has a 'cause of action' is analytically distinct and prior to the question of what relief, if any, a litigant may be entitled to receive." *Davis v. Passman*, 442 U.S. 228, 239, 99 S.Ct. 2264, 2274, 60 L.Ed.2d 846 (1978). The

the first question without taking into account the second. As outlined in our subsequent discussion of the question whether the DD Act provides an "exclusive remedy", it would clearly be a distortion of the statute to describe such rights as the instant plaintiffs possess under the DD Act without the above built-in limitation.

### 2. Does the DD Act Provide an Exclusive Remedy for Any Violations of Its Provisions?

■ As we have previously discussed, the DD Act, similar to other statutes which create federal-state grant programs, contains a preliminary statement of purpose (§ 6000) and Congressional goals (here, the "bill of rights" contained in § 6010), but the bulk of the Act mandates a list of conditions with which the states must comply as a basis for the receipt of funding. The statute also sets forth in detail a system of enforcement by the agency (Health and Human Services) which administers the Act. The keystone of the funding scheme in keeping with the goal of comprehensive planning is the state plan approved by the Secretary. Section 6063(a) states that: "Any State desiring to take advantage of this subchapter must have a State plan submitted to and approved by the Secretary under this section."

The Secretary is charged with the responsibility of monitoring the implementation of the numerous elements of the state plan, and if there is a failure "to comply substantially" with same, or if there is a failure of the state "to comply substantially" with any applicable regulations promulgated thereunder, the Secretary "shall notify such State Council and agency or agencies that further payments will not be made to the State" pursuant to § 6062, "or shall limit further payment under section 6062" to such state to activities in which there is no such failure. 42 U.S.C. § 6065. Thus, to the extent that the Secretary has full power to decide when the state has complied or

failed to comply substantially with its state plan or the regulations of his Department, the Secretary has been vested with considerable discretion under the DD Act.

The delegation of such discretion to an administrative agency by Congress is a typical—and this Court believes sensible—arrangement under a complex federal-state funding scheme, of which the DD Act is a prime example. This permits the administrative agencies the flexibility to implement an ongoing review process and allows the Secretary in effect to engage in continuing dialogue with the states, issuing directives to them and listening to their complaints regarding the feasibility or lack thereof of any of the agency regulations. Additionally, the Secretary may urge the states to amend procedures where necessary and can compel compliance with his mandates through the withholding of all or part of the federal funding.

It should be noted, however, that the Secretary's power is not unlimited. Although possessed of the discretion to decide whether or not the state has substantially complied with the statute, once having reached the decision that the state has failed to comply, the Secretary "shall make no further payment to the State under section 6062" or shall limit further payment under section 6062 to "activities in which there is no such failure". § 6065. It is here that the limited right of the plaintiffs under the DD Act which we have above discussed, i. e., the right of plaintiffs to assure that the Secretary performs his mandatory duties under the statute, comes into play. To that point, the Act contemplates that the Secretary shall exercise wide discretion in order to assure flexibility, but thereafter, the language is clear and unmistakable: The Secretary *must* perform his statutory duties.

Accordingly, the Court finds and rules that pursuant to the DD Act the plaintiffs herein have an implied private right of action against the Secretary of Health and

"cause of action" is focused on the nature of the right asserted by the petitioner while "relief" is focused on the "various remedies a federal court may make available". *Id.* at 239, 240, n.18, 99 S.Ct. at 2274, n.18.

Human Services for the purpose of compelling him to perform his mandatory statutory duties. The implication of this limited private right of action is consistent with the DD Act and furthers its purposes, whereas permitting action against the state or its employees pursuant to 42 U.S.C. § 1983 would serve only to undermine the carefully formulated regulatory scheme created under this federal-state cooperative program. Additionally, policy reasons abound as to why the Secretary and not the state or its employees should be made to answer under the DD Act.[114]

In the case at hand, the Secretary has continued to place his imprimatur on the State of New Hampshire's state plan required by the Act, and has apparently determined that New Hampshire substantially complies with the Act, for there is no indication that the Secretary has ever withheld—or threatened to withhold—funds from the State. It would be anomalous indeed for this Court to enjoin the State of New Hampshire to comply with a federal-state grant program administered by the Secretary when the Secretary himself has already deemed—either explicitly or implicitly by approval of the state plan and the forwarding of funds to the State—that the State is in compliance. In the event that the Secretary has failed to comply with the statutory duties, then the Secretary should be made to defend his action (or inaction) in court.

We are not unaware of the political unsavoriness of exercising the sanctions provided for in the statute. However, this Court refuses to save the Secretary from the "pain of decisionmaking" by allowing him to shift the battle to federal court and to have it waged against the states in a § 1983 action. Without the Secretary as a party the Court is unable to extract vital information from the party charged with enforcing the program, and will therefore be hampered in its efforts to develop an adequate record on which to base its decision. Significantly, the more a Court exercises the power entrusted to administrative agencies, "the more we encourage the responsible public officials to default in their obligations." *Robinson v. Pratt*, 497 F.Supp. 116, 121 (D.Mass.1980).

> There is much pressure on our courts to find a remedy for every wrong, to fill vacuums in political and executive leadership. The temptation to intervene is strong. To do so, however, is only to encourage further abdication.

*Id.* at 120.[115]

Additionally, this Court does not believe that its decision precluding a private right of action against the State under § 1983 is contrary to the Supreme Court's holding in *Rosado v. Wyman*, 397 U.S. 397, 90 S.Ct.

**114.** In short, this is not an action where § 1983 grants a right of recovery, but rather is one of the relatively rare cases in which a cause of action against a responsible federal official may be implied from the governing substantive statute. *Maine v. Thiboutot*, 448 U.S. 1, 24, 100 S.Ct. 2502, 2514, 65 L.Ed.2d 555 (1980) (Powell, J., dissenting).

**115.** In *Robinson v. Pratt, supra*, plaintiffs alleged that the State of Massachusetts had failed to comply with certain provisions of the Social Security Act. In fact, the Secretary of Health and Human Services had determined that the State was not in compliance, but had refused to cut off funds. Unlike in the case at hand, the Secretary was joined as a defendant. The Secretary's brief, cited by the Court, reflects her willingness to shift the burden to the Court.

> The drastic sanction of withholding Federal payments under 42 U.S.C. § 1396c also is an indirect sanction. The Secretary withholds further payments 'until the Secretary is satisfied that there will no longer be any such failure to comply.' The Secretary cannot compel compliance. If this Court is so inclined, it can give plaintiff the relief she seeks by issuing an order directly against the State defendant . . . .

*Robinson v. Pratt*, 497 F.Supp. at 120, citing Secretary's Brief. The Court's response to the Secretary's brief is well taken:

> I am at a loss to discover what remedy the Secretary thinks the court can impose other than offering the state the option of complying or losing the benefit of federal participation. That is precisely what the Secretary is authorized to do. It is clear, furthermore, that the Congress intended the imposition of sanctions, the form of sanctions and relief from sanctions to be committed to the discretion of the Secretary.

*Robinson, supra*, 497 F.Supp. at 120.

1207, 25 L.Ed.2d 442 (1970), that "[i]t is ... peculiarly part of the duty of this tribunal, no less in the welfare field than in other areas of the law, to resolve disputes as to whether federal funds allocated to the State are being expended in consonance with the conditions that Congress has attached to their use". *Id.* at 422–23, 90 S.Ct. at 1222–23, as cited in *Pennhurst State School and Hospital v. Halderman, supra,* —— U.S. ——, 101 S.Ct. at 1558 (White, J., dissenting).

In *Rosado,* plaintiffs sued the Commissioner of Social Services of the State of New York, challenging a state statute which they claimed was inconsistent with the federal Social Security Act.[116] Aside from its inconsistency with the regulatory scheme provided for under the Act, the New York statute was attacked as violative of the Equal Protection Clause. The Supreme Court held that New York's statute was incompatible with § 402(a)(23) of the Social Security Act and that petitioners were entitled to an injunction by the district court against the payment of further federal monies should the State not develop a conforming plan within a reasonable time. *Rosado, supra,* 397 U.S. at 420, 90 S.Ct. at 1222. However, recognizing what a massive undertaking it would be for New York to comply with the federal statute, the Supreme Court remanded the case to the district court to allow New York the option of either complying by a certain date or declining to accept funds altogether.

The instant challenge under the DD Act is distinguishable from that under the Social Security Act in *Rosado* for two major reasons. First, unlike the DD Act, the Social Security Act is an entitlement statute. Federal money is funneled through the states to individuals who meet the specific federal requirements and qualifications enumerated under the Act. Under the DD Act sums are allotted to the states based on their populations, financial need, and the extent of need for services and facilities for persons with developmental disabilities, *see* 42 U.S.C. § 6062 (Supp.1981), and the states are allowed much discretion in deciding how to apply these funds.[117]

Second, in *Rosado* plaintiffs' attack against the state focused on a specific state statute which they claimed was inconsistent with the federal statute. In the instant case against officials of the State of New Hampshire, plaintiffs cite no state statute or regulation which conflicts with the DD Act, but merely allege *generally* that the State is not complying with conditions under the Act. The judicial task of resolving whether a particular state statute is at loggerheads with a federal statute is far more manageable than reviewing whether a state is in "substantial" compliance with a federal-state cooperative program, the enforcement of which is entrusted to the Secretary. The very conditions said to be violated by the State of New Hampshire are those which the Secretary has deemed that the State has fulfilled. We note the dissent's warning in *Rosado v. Wyman, supra,* about the problems of courts becoming entangled in federal-state regulatory schemes.

> I regret that I cannot join an opinion which fails to give due consideration to the unmistakable intent of the Social Security Act to give HEW primary jurisdiction over these highly technical and difficult welfare questions, which affirms what is to me a clear abuse of discretion by the District Court, and which plunges this Court and other federal courts into an ever-increasing and unnecessary involvement in the administration of the Nation's categorical assistance programs administered by the States.

*Rosado v. Wyman,* 397 U.S. 397, 431, 90 S.Ct. 1207, 1227, 25 L.Ed.2d 442 (1970) (Black, J., dissenting) (footnote omitted).

*Maine v. Thiboutot,* 448 U.S. at 30, 100 S.Ct. at 2517 (1980) (Powell, J., dissenting).

**116.** Even today there is disagreement within the Supreme Court as to whether plaintiffs in *Rosado* were suing under 42 U.S.C. § 1983. The majority in *Maine v. Thiboutot, supra,* later said that such was the case, but Justice Powell for the dissent strenuously disagreed. *See*

**117.** Although the funds must be used in accordance with the state plan, 42 U.S.C. § 6062, the plan itself is devised by the state.

Because of the nature of the statute, the prudential limitations described above weigh even more heavily against court intervention in the administration of the DD Act than the Social Security Act. As 42 U.S.C. § 1983 is not available where the "governing statute provides an exclusive remedy for violations of the Act", *Pennhurst State School and Hospital v. Halderman, supra,* —— U.S. ——, 101 S.Ct. at 1545, 67 L.Ed.2d 694, *citing Maine v. Thiboutot,* 448 U.S. at 22, n.11, 100 S.Ct. at 2513 (1980) (Powell, J., dissenting), and as review of the enforcement mechanisms incorporated into the DD Act reveals that the remedies therein provided are exclusive, we conclude that plaintiffs herein are precluded from proceeding with a § 1983 suit against the defendants herein named. Inasmuch as the Secretary of Health and Human Services, against whom the Court finds and rules such limited right of enforcement exists, is not before the Court and could not be sued pursuant to § 1983, it is accordingly ruled that within the context of the instant litigation plaintiffs are entitled to no relief under the DD Act. Having so ruled, it becomes unnecessary for us to address the question of whether Laconia State School is a "program assisted" under the statute.[118]

*B. The Non-Discrimination Section (§ 504) of the Rehabilitation Act of 1973, 29 U.S.C. § 794*

Recognizing the parallels between the discrimination suffered by the handicapped and other minority groups, manifested particularly through their segregation from the rest of society,[119] members of Congress sought to combat the problem through a remedy which had proven successful in the past, civil rights legislation. Introduced in the House on December 9, 1971, and in the Senate on January 20, 1972, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (hereinafter "§ 504") was framed initially as an amendment to the Civil Rights Act of 1964. Although it was ultimately adopted as part of a separate Act, its language is patterned after other civil rights legislation, including Title VI of the Civil Rights Act of 1964,[120] 42 U.S.C. § 2000d, and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681.[121] The statutory mandate of § 504 is found in one deceptively simple sentence:

> No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . .

29 U.S.C. § 794 (1980 Supp.).

Unfortunately Congress apparently relied on the assumption that § 504 would be enforced as had previous civil rights legislation, and therefore set forth no language in the statute itself requiring rule making. On April 28, 1976, President Ford ordered the then Department of Health, Education and Welfare (now Health and Human Services; "HHS") to "establish standards for determining who are handicapped individuals and guidelines for determining what are discriminatory practices within the meaning of § 504".[122] The President's Executive Order charged HHS with coordinating and implementing § 504, and required other fed-

---

**118.** The Supreme Court in its *Pennhurst* decision suggested that because Pennhurst did not receive federal funds under the DD Act it was arguably not a "program assisted.". 101 S.Ct. at 1545. Resolution of that question was left to the district court on remand. We here note that Laconia State School does receive a limited amount of federal funds pursuant to the DD Act.

**119.** *See, e. g.,* statement of the Honorable Hubert Humphrey, 118 Cong.Rec., S.525 (January 20, 1972).

**120.** Title VI prohibits discrimination on the basis of race, color, or national origin in any program receiving federal assistance.

**121.** Title IX prohibits discrimination on the basis of sex by any educational institution receiving federal financial assistance.

**122.** Executive Order No. 11,914, April 28, 1976, *reprinted in* 29 U.S.C. § 794 (Supp.1979). (Revoked by Executive Order No. 12,250 issued on November 2, 1980, *reprinted as a note to* 42 U.S.C. § 2000d–1 [Supp.1980], pp. 199–200).

eral agencies to issue § 504 regulations consistent with HHS standards. However, it was not until May 4, 1977, and then only pursuant to a federal district court order that such regulations issue without "further unreasonable delay",[123] that such regulations were finally promulgated.[124]

While bureaucratic lethargy may have contributed to delay, another obvious factor accounted for the failure of HHS to expedite promulgation of the § 504 regulations. Contrary to the assumption of Congress, the Title VI and Title IX models were not automatically adaptable to the problem of discrimination against the handicapped, but involved a very different analytical undertaking. Indeed, attempting to fit the problem of discrimination against the handicapped into the model remedy for race discrimination is akin to fitting a square peg into a round hole, as revealed by the regulations' numerous exceptions and exemptions to the sweeping non-discrimination statute. We turn to a brief discussion of the two major elements contributing to the analytical divergence between race discrimination and discrimination against the handicapped.

First, unlike classifications based on race, there are no readily apparent divisions among the handicapped. Rather, mental and physical handicaps cover a continuum, from color-blindness or forgetfulness on the one hand to total spasticity or profound mental retardation on the other. In relation to other human beings, we are all handicapped to a certain degree, however insignificant or debilitating that handicap may be.

Most citizens would be handicapped in playing baseball as compared to Carl Yastrzemski, in singing as compared to Beverly Sills, in abstract thinking as compared to Albert Einstein, and in the development of a sense of humor as compared to Woody Allen. Human talent takes many forms, and within each talent is a continuum of achievement. While one individual might be on the high end of the scale of achievement in one area, that same individual might rank very low in another area. Woody Allen will probably never win the Triple Crown, and Carl Yastrzemski is not likely to perform "Aida". In sum, the identification of various gradations of handicap is not an easy task, especially if such is attempted in a vacuum. Assessing the capability of various individuals to perform without knowledge of the particular task under consideration and its various requirements, or without an individualized determination of their strengths and weaknesses would appear to be impossible. In fact, it was partly in recognition of this fact that Congress passed § 504—to encourage treatment of the handicapped on the basis of individualized assessment of ability; ironically, however, the legislation has had the effect of forcing federal courts (at least in class actions of the type herein) to draw broad and imprecise classifications[125] of handicaps, i. e., non-ambulatory, profoundly retarded, etc., for the purpose of testing legal violations.

Even if it were possible to discern clear-cut classifications of handicaps, there is a second reason why the racial discrimination model falters in this context. Whereas the American system of justice is "colorblind", operating on the assumption that the question of one's race is completely irrelevant to and separate from the question of one's ability, handicap and ability are inextricably linked. Indeed, *certain* handicaps bear no relationship to *certain* tasks, but the very existence of a "handicap" implies a deficiency in some ability. While individuals can in many instances overcome their handicaps to perform equally with others, they are by definition at an initial disadvantage as to certain tasks. To ignore this reality and to apply the racial discrimination model remedy to this problem could cause one of two extreme results.

**123.** *Cherry v. Matthews*, 419 F.Supp. 922, 924 (D.D.C.1976).

**124.** 45 C.F.R. § 84.1–81.62 (1980).

**125.** For a discussion of the problems inherent in judicial line-drawing in complex areas, *see San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 29–43, 93 S.Ct. 1278, 1294–1302, 36 L.Ed.2d 16.

First, as in the consideration of questions of race, courts could insist on blindness to all handicaps, allowing (or requiring) all individuals, regardless of their handicaps, to succeed or fail on the basis of their ability, with no special help from external sources. Such a system harkens back to Social Darwinism. On the other extreme, the law could require equality of results among all handicapped and nonhandicapped persons. This second scenario would call for an unlimited amount of resources for special aids and individualized training, and could produce such absurd results as blind bus drivers.

Obviously, both of these interpretations of § 504 are unworkable, and presumably neither was intended by Congress. In the regulations which provide the flesh to the bareboned § 504,[126] HHS has attempted to avoid these extremes by qualifying the statute with numerous exclusions and exemptions. The flat statutory ban has been modified, for example, to require recipients of federal funds to make "reasonable accommodation" to the handicapped *"unless* the recipient can demonstrate that the accommodation would impose an undue hardship on the operation of its program", 45 C.F.R. § 84.12 (emphasis added). Thus, unlike the rules prohibiting discrimination on the basis of race, from which we do not tolerate a deviation based on anything less than a "compelling state interest", the rules under § 504 governing discrimination against the handicapped appear to be governed by a "reasonableness" standard. Federal courts are therefore entrusted with the unenviable task of divining that which is reasonable and unreasonable under this open-ended statute. Given a single plaintiff alleging discrimination in a single program, the task seems manageable. But the difficulty of the task increases exponential-

ly when a court is confronted with class-wide allegations involving innumerable programs and activities.

In *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), the plaintiff sought enrollment in a college nursing program but was rejected because the College, following interview and physical examination of plaintiff in consultation with the executive director of the state board of nursing, concluded that plaintiff had a serious hearing disability, which made it impossible to safely participate in the normal clinical training program or to safely care for patients. The College's justification was accepted by the district court in plaintiff's subsequent suit brought pursuant to § 504, but the Court of Appeals for the Fourth Circuit reversed on the ground that pursuant to the regulations promulgated under § 504, the plaintiff's application was to be considered without regard to her hearing ability and that inquiry was to be confined to plaintiff's academic and technical qualifications. In turn, the Supreme Court reversed, holding specifically that "an otherwise qualified" person within the statutory language of § 504 is "one who is able to meet all of a program's requirements in spite of his handicap". *Id.,* 442 U.S. at 406, 99 S.Ct. at 2367.[127] The Court additionally held that the defendant College was not required to undertake affirmative action, *i. e.,* to adjust its programs to accommodate the plaintiff, particularly as "nothing less than close, individual attention by a nursing instructor would be sufficient to ensure patient safety if respondent took part in the clinical phase of the nursing program", *id.,* 442 U.S. at 409, 99 S.Ct. at 2368. The Court expressed awareness of the fact that "situations may arise where a refusal to modify an existing program might become unreasonable and discrimina-

**126.** The regulations are divided into seven subparts, four of which are relevant to the case at hand: Subpart A—General Provisions, Subpart C—Progam Accessibility, Subpart D—Preschool, Elementary, and Secondary Education, and Subpart F—Health, Welfare, and Social Services.

**127.** Perceiving that it disposed of the case on the merits, the Supreme Court avoided deciding whether § 504 provided plaintiff with an express private right of action or whether, absent such private right of action, plaintiff might maintain her suit pursuant to 42 U.S.C. § 1983. *Southeastern Community College v. Davis,* 442 U.S. 397, 404, 405, n.5, 99 S.Ct. 2361, 2366, n.5, 60 L.Ed.2d 980.

tory", *id.*, 442 U.S. at 412–13, 99 S.Ct. at 2370, but made clear that as to the plaintiff Davis,

> Moreover an interpretation of the regulations that required the extensive modifications necessary to include respondent in the nursing program would raise grave doubts about their validity. If these regulations were to require substantial adjustments in existing programs, beyond those necessary to eliminate discrimination against otherwise qualified individuals, they would do more than clarify the meaning of § 504. Instead, they would constitute an unauthorized extension of the obligations imposed by that statute.

*Id.*, 442 U.S. at 410, 99 S.Ct. at 2369.

On April 29, 1981, the Supreme Court had before it for decision another case brought pursuant to the provisions of § 504. In *University of Texas v. Camenisch*, the Fifth Circuit, 616 F.2d 127 (1980), had upheld the granting of preliminary injunctive relief to the plaintiff, a deaf graduate student at Texas University, who had sought relief on the ground that the University had discriminatorily refused to pay for a sign-language interpreter for him. The preliminary injunction which had been awarded had required plaintiff to post a bond pending the outcome of the litigation. By the time the Court of Appeals had entered its rulings, the University had obeyed the injunction of the district court and had paid for plaintiff's interpreter, and plaintiff had graduated. Holding that the Court of Appeals was correct in ruling that the case as a whole was not moot, *University of Texas v. Camenisch*, —— U.S. ——, 101 S.Ct. 1830, 1833, 68 L.Ed.2d 175 (1981), the Court remanded to the district court for trial on the merits the remaining issue as to whether the University or the plaintiff should ultimately pay for the interpreter. *Id.* at ——, 101 S.Ct. at 1835.

Although the Supreme Court was careful to rule that until the trial on the merits had been completed "it would be inappropriate for this Court to intimate any view on the merits of the lawsuit", *id.* at ——, 101 S.Ct. at 1835, the Chief Justice, concurring, saw fit to caution the trial court as to the scope of the relief to be afforded pursuant to § 504 and its regulations.

> The Court's opinion, of course, is not to be read as intimating that respondent has any likelihood of success on the merits of his claim. The Court holds no more than that, since there has been no trial, respondent has a right to present evidence in support of his claim. The trial court must, among other things, decide whether the federal regulations at issue, which go beyond the carefully worded *nondiscrimination* provision of § 504, exceed the powers of the Secretary under § 504. The Secretary has no authority to rewrite the statutory scheme by means of regulations. *Southeastern Community College v. Davis*, 442 U.S. 397, 410, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1979); see also *Pennhurst State Hospital v. Halderman*, —— U.S. ——, ——, 101 S.Ct. 1531, 1540, 67 L.Ed.2d 694 (1981) ("[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.").

*Id.* at ——, 101 S.Ct. at 1835–36 (emphasis in original).

The regulations to which the Chief Justice makes reference are to be found in 45 C.F.R. § 84.44(d), which provides as follows:

> § 84.44(d)(1): Auxiliary aids. (1) A recipient to which this subpart applies shall take such steps as are necessary to ensure that no handicapped student is denied the benefits of, excluded from participation in, or otherwise subjected to discrimination under the education program or activity operated by the recipient because of the absence of educational auxiliary aids for students with impaired sensory, manual, or speaking skills.

> § 84.44(d)(2): Auxiliary aids *may* include taped texts, interpreters or other effective methods of making orally delivered materials available to students with hearing impairments, readers in libraries for students with visual impairments, classroom equipment adapted for use by students with manual impairments, and other similar services and actions. *Recipi-*

*ents need not provide attendants, individually prescribed devices, readers for personal use or study, or other devices or services of a personal nature.*

(Emphasis added.)

■ A fair reading of the emphasized portion of these regulations would seem to indicate that, *as to the relief sought* by litigants under § 504, there is, as very recent decisions have indicated, no statutory or regulatory mandate to states and their agencies to expend substantial funds or assume excessive administrative burdens for the purpose of removing barriers to the handicapped. *Dopico v. Goldschmidt,* 50 U.S.L.W. 2061–63 (S.D.N.Y. July 24, 1981); *American Public Transit Association v. Lewis,* 49 U.S.L.W. 2756 (D.C.Cir. May 26, 1981).[128]

It accordingly appears, and the Court finds and rules, that the concurring opinion of the Chief Justice in *Camenisch, supra,* and the decisions in *Dopico, supra,* and *American Public Transit Association, supra,* indicate that if the plaintiffs herein are entitled to relief by way of a private action pursuant to § 504 (a matter hereinafter discussed), such relief will be limited in scope to requiring the imposition of reasonable funding and administrative burdens upon the defendants herein. Indeed, the dissenters in the Third Circuit *Halderman* decision[129] put the matter in what this Court believes to be the proper narrow focus.

> One of the clear purposes of these grants was to offer states financial incentives to deinstitutionalize the mentally retarded. *See, e. g.,* 118 Cong.Rec. 32,305 (Sept. 26, 1972) (remarks of Senator Javits); *id.* at 36,414 (Oct. 14, 1972) (remarks of Congressman Badillo).

> ... I do not believe that there should be read into section 504 ... a legislative mandate for deinstitutionalization. The carefully tailored system of programs and grants in the legislation as a whole belies any congressional intention to impose an absolute duty to provide the least restrictive treatment.

*Halderman,* 612 F.2d at 120–01 (dissenting opinion).

In short, while the Court is aware that the Fifth Circuit, *see Camenisch v. University of Texas, supra,* 616 F.2d 127 (5th Cir. 1980); *Tatro v. State of Texas,* 625 F.2d 557 (5th Cir. 1980) (catheterization constitutes "related service", which must be provided elementary school child pursuant to § 504); *Baker v. Bell,* 630 F.2d 1046 (5th Cir. 1980) (remanding to district court for determination whether mobility-disabled plaintiffs' claim for alleged discrimination in mass transit advanced pursuant to § 504 was meritorious and holding that plaintiffs were entitled to adduce evidence in support of such claims and were not limited by previous administrative record), in well-reasoned opinions has advocated an expansive interpretation of § 504 and the regulations promulgated thereunder as to the relief to be afforded, the Court is persuaded that there are stringent limitations upon such relief for the reasons outlined in the authorities which it has hereinabove cited. *See also Upshur v. Love,* 474 F.Supp. 332 (N.D.Cal. 1979); *Kentucky Association for Retarded Citizens v. Conn.,* 510 F.Supp. 1233 (W.D. Ky.1980).

Turning to the § 504 claim in the instant case, same is set forth by plaintiffs in paragraph 83 of their Complaint of April 12, 1978, wherein it is alleged,

> In denying plaintiffs and members of the classes they represent federally assist-

---

**128.** *Dopico, supra,* and *American Public Transit Association, supra,* held that § 504 did not require mass transit programs to expend substantial funds to adjust their systems to accommodate the handicapped. In reliance at least in part on *American Public Transit Association, supra,* the Department of Transportation on July 20, 1981, amended its regulations, which had previously required mass transit systems to become accessible to handicapped persons.

The interim rule promulgated on that date now merely requires mass transit operators who receive financial assistance from DOT to certify that they are making special efforts to provide transportation that handicapped persons can use. 50 U.S.L.W. 2073.

**129.** Chief Judge Seitz, joined by Aldisert and James Hunter, III, JJ.

ed services and programs at LSS and in the community defendants have denied plaintiffs and members of the classes they represent their rights secured by the Rehabilitation Act of 1973.

Neither in their complaint nor throughout the forty days of trial in this case did plaintiffs provide the Court with a detailed list of (1) the programs or activities at LSS; (2) the admission criteria of those programs or activities; (3) the particular individuals who were being excluded from those programs and activities; (4) the capabilities of each individual in relation to the requirements of the program or activity from which he or she was excluded. Without such specific information it is difficult indeed for a court to determine and rule that as to a certain program or activity a certain individual is an "otherwise qualified individual" against whom § 504 proscribes discrimination. To state that this is a class action accounts for plaintiffs' lack of individualized proof but does not eliminate the difficulty of applying a statute such as § 504, the very premise of which is the need for individualized treatment. It is anomalies such as this, no doubt, which provoked one writer to state:

> We should consider very carefully the fact situations in the cases that are involved in class suits. Generally speaking, they represent an attempt to provide something in the nature of a mass production remedy. That offends the sense of individualization that is very important in the administration of justice. It is incongruent with the sense of scale that we are used to as lawyers. It calls on the courts to confront matters in a dimension of social consequence that perhaps we would rather not deal with. Thinking of "class" legal problems is a disconcerting intellectual, social and moral responsibility. It raises difficult questions about the role of judges and lawyers, not only in the narrow ethical sense, but in the larger sense of our professional office and function.

But if all that is true, it is also true that the occasions generating the class suits were themselves mass production events.[130]

In its Order of February 22, 1980, this Court certified this action as a class action under Rule 23(b)(2), having determined that plaintiffs represented a class of people who shared common legal claims and whose joinder as individual plaintiffs in a lawsuit would be impracticable. Although recognizing at that time that any class action calling for institution-wide reform would present judicial management problems, the Court nevertheless determined that such an action would best serve the interests of justice. Today we reaffirm that principle, but candidly admit that in construing § 504 we necessarily paint with a broad brush, in the same way that plaintiffs were forced to present their proof at trial.

Three preliminary issues arise in considering the applicability of § 504 to plaintiffs. First, does § 504 provide a private right of action? Second, must plaintiffs exhaust their administrative remedies prior to filing suit in federal court? Third, even if plaintiffs have properly brought suit herein, are the programs under attack "recipients" of federal funds within the definition of § 504?

### 1. Private Right of Action

■ As we have hereinabove indicated, see n.127, the Supreme Court in its *Davis* decision did not reach the issue as to whether § 504 creates a private cause of action. Similarly, and for somewhat parallel reasons, the Court of Appeals for the First Circuit has not reached this issue. *Massachusetts Coalition of Citizens With Disabilities v. Civil Defense Agency, et al.,* 649 F.2d 71, 75, n.6 (1st Cir. 1981). However, support for such cause of action may be found in *Cannon v. University of Chicago,* 441 U.S. 677, 706–08, n.41, 99 S.Ct. 1946, 1962–63, n.41, 60 L.Ed.2d 560 (1979), wherein the

---

**130.** Geoffrey B. Hazard, "The Effect of the Class Action Device Upon the Substantive Law", 58 F.R.D. 299, 300–01 (1972), as cited in

1 Newburg on Class Actions, *Introduction*, p. xiii.

Court held that a private right of action should be implied under § 901(a) of Title IX of the Education Amendment of 1972, 20 U.S.C. § 1681, *et seq.* (hereinafter "Title IX"). We note that the language of § 504 parallels the language of Title IX,[131] and that the regulations of HHS promulgated pursuant to § 504 adopt Title VI enforcement procedures,[132] *i. e.*, the same administrative mechanism used to enforce Title IX.[133] Analyzing the four factors of *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the Court found that (1) Title IX confers a benefit on persons discriminated against on the basis of sex; (2) the history clearly indicates that Congress intended to create a private cause of action; (3) implication of a private remedy would not frustrate the underlying purposes of the legislative scheme but would assist in achieving said purpose; and (4) the subject matter involved is not of the type traditionally left to the states, but to the contrary, federal courts have been the " 'primary and powerful reliances' in protecting citizens against such discrimination", 441 U.S. at 708, 99 S.Ct. at 1963. Since we find that the discussion in *Cannon* is applicable to § 504, we need not at this juncture engage in a lengthy review of the legislative history of § 504. We note, however, two aspects of the legislative history of this Act which lend credence to a finding of a private right of action.

First, as stated in a report [134] of the Senate Labor and Public Welfare Committee, § 504 was patterned after Title VI and Title IX, and less than a year prior to the writing of that Report the Supreme Court had held in *Lau v. Nichols*, 414 U.S. 563, 566, 94 S.Ct. 786, 788, 39 L.Ed.2d 1 (1974), that Title VI created a private cause of action. The same Report stated that § 504 "would ensure administrative due process (right to hearing, right to review), provide for administrative consistency within the Federal government, as well as relative ease of implementation, and permit a judicial remedy through a private action." 1974 U.S.Code Cong. & Ad.News, p. 6391. Second, in 1978 the Rehabilitation Act was amended to provide the following two provisions:

§ 794a Remedies and attorney fees.

(2) The remedies procedures and rights set forth in title VI of the Civil Rights Act of 1964 shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under § 794 of this title.

(b) In any action or proceeding to enforce or charge a violation of a provision of this subchapter, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

29 U.S.C. § 794a(2), § 794a(b). That Congress specifically provided for private attorney's fees under § 504 certainly indicates that it intended private litigation under the Act.

The courts that have squarely faced the issue as to whether § 504 provides a private right of action have held that the statute does afford such relief. *See Kling v. County of Los Angeles*, 633 F.2d 876 (9th Cir. 1980) [135]; *Camenisch v. University of Texas*, 616 F.2d 127 (5th Cir. 1980); *NAACP v. Medical Center, Inc.*, 599 F.2d 1247 (3d Cir. 1979); *Davis v. Southeastern Community College*, 574 F.2d 1158 (4th Cir. 1978), *rev'd on other grounds*, 442 U.S. 397, 99 S.Ct.

---

**131.** The pertinent part of Title IX provides "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance...." 20 U.S.C. § 1681.

**132.** *See* 29 C.F.R. § 84.61 (1980); *see also* 29 U.S.C. § 794(a).

**133.** *See* 45 C.F.R. § 86.71 (1980).

**134.** S.Rep. 93–1297, 93d Cong. 2d Sess. [1974]. 1974 U.S.Code Cong. & Ad.News, pp. 6373, 6390.

**135.** *See also* 45 C.F.R. § 84.61, App. A, p. 355, in which the Secretary states that to confer a private right of action is beyond the authority of the executive branch, but nevertheless cites current case law which supports such a right.

2361, 60 L.Ed.2d 980 (1979); *Leary v. Crapsey,* 566 F.2d 863 (2d Cir. 1977); *United Handicapped Federation v. Andre,* 558 F.2d 413 (8th Cir. 1977); *Lloyd v. Regional Transportation Authority,* 548 F.2d 1277 (7th Cir. 1977); *Upshur v. Love,* 474 F.Supp. 332 (N.D.Cal.1979); *Boxall v. Sequoia Union High School District,* 464 F.Supp. 1104 (N.D.Cal.1979). Believing that the better-reasoned rule is as set forth in this weight of authority, the Court rules that the plaintiffs herein possess a private right of action which may be enforced pursuant to § 504.[136]

### 2. Exhaustion of Administrative Remedies

In relying, as has this Court, on *Cannon v. University of Chicago,* 441 U.S. 677, 706–08, n.41, 99 S.Ct. 1946, 1962–63, n.41, 60 L.Ed.2d 560, many of the courts which have upheld the existence of a private right of action have similarly held it unnecessary that plaintiffs exhaust their administrative remedies prior to maintenance of their respective litigation. Inasmuch as § 504 utilizes the same enforcement provisions as does Title IX,[137] the reasoning of the *Cannon* Court has equal application to the administrative enforcement procedures available under § 504. *Kling v. County of Los Angeles,* 633 F.2d 876, 879 (9th Cir. 1980); *Camenisch v. University of Texas,* 616 F.2d 127, 135 (5th Cir. 1980); *Upshur v. Love,* 474 F.Supp. 332, 341, n.23 (N.D.Cal.1979); *Whitaker v. Board of Higher Education of City of New York,* 461 F.Supp. 99, 108 (E.D.N.Y.1978). The Court accordingly here rules that plaintiffs need not have exhausted any administrative remedies prior to the filing of the instant litigation.

### 3. Are the programs under attack "recipients" of federal funds and thus subject to § 504?

The provisions of § 504 apply only to "recipients of federal funds". HHS regulations under § 504 define the term "recipient" as

> any state or its political subdivision, any instrumentality of a state or its political subdivision, any public or private agency, institution, organization, or other entity, or any person to which Federal financial assistance is extended directly or through another recipient, including any successor, assignee, or transferee of a recipient, but excluding the ultimate beneficiary of the assistance.

45 C.F.R. § 84.3(f). Defining the scope of the "recipient" under attack in any given case is essential, especially in light of the fact that the ultimate remedy for a violation under § 504 is a cut-off of all federal funds flowing to the recipient. Thus, whether the violator is viewed as the entire State of New Hampshire (in which case the State could lose millions of dollars in federal aid) or merely a small program within one of the State's schools (which might lose a negligible amount of federal aid) is a crucial distinction.

In the case at hand, plaintiffs have sued various officials of the State of New Hampshire for alleged violations at Laconia State School. Thus, in determining the "recipient" for § 504 purposes the Court could take an overly broad view, construing the attack as one against the entire State,[138] or an overly narrow view, finding the "recipients" to be only those specific programs or activities within Laconia State School itself which plaintiffs have proven are sustained by federal funds. Neither of these constructions is satisfactory. The first would expand this lawsuit far beyond its original

**136.** For reasons stated in Part III.A.1. of this Opinion, we do not find this ruling inconsistent with our decision that no such private right of action is afforded under the Developmental Disabilities Assistance and Bill of Rights Act of 1975.

**137.** Both Title IX and § 504 borrowed the enforcement procedures of Title VI, 45 C.F.R. § 84.61 and 45 C.F.R. §§ 80.6–80.10 (1980).

**138.** The Court disregards for purposes of this discussion only, the fiction created by the Eleventh Amendment cases regarding suits against the State versus its officials. *See, Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

purpose,[139] and the second would put an intolerable burden on plaintiffs to identify precisely which federal funds flow to which activities and programs within Laconia State School. The difficulty of tracing federal funds from their original source to their ultimate destination is best exemplified by defendants' answer to plaintiffs' interrogatory requesting a breakdown of public and private funding for LSS, including state, federal, and local sources. Defendants responded as follows:

> Laconia State School and Training Center is a general fund agency. As a result, all funds received for the School must pass through the General Fund of this state; the funding source of the school is therefore, without exception, the State of New Hampshire.[140]

Although defendants' subsequent answers elaborate on the various federal funds received by the State, they do not specify the various components within LSS which benefit from these funds.

The Court therefore finds that the "recipient" for purposes of this lawsuit is Laconia State School. Plaintiffs have established that LSS receives and benefits from a variety of federal funds, which subjects it to the dictates of § 504. Having discussed these preliminary questions, we now turn to a discussion of what those dictates are, and whether the recipient LSS is in violation of same.

### 4. Defendants' violations under § 504

■ As in the Halderman case, the major thrust of plaintiff's argument under § 504 is that institutions such as Laconia State School are discriminatory in that they unnecessarily separate mentally retarded individuals from the rest of society, and such segregation prohibits these individuals from partaking in federally funded programs available to other members of the

community. This Court subscribes to Judge Seitz's dissenting opinion in Halderman, 612 F.2d 84, 119–21 (see p. 95 of this Opinion). For the reasons therein stated, and in consideration of the Opinion of the Court in Southeastern Community College v. Davis, supra, the concurring opinion of the Chief Justice in University of Texas v. Camenisch, supra, and the previously-cited recent decisions in American Public Transit Association v. Lewis, and Dopico v. Goldschmidt, both supra, we agree that § 504 cannot be construed so broadly as to require deinstitutionalization. Nor do we think that the Department of Health and Human Services envisioned such an interpretation of § 504, as evidenced by the following provision in the regulations thereunder, which obviously contemplates the continued existence of institutions.

§ 84.54 Education of Institutionalized persons.

A recipient to which this subpart applies and that operates or supervises a program or activity for persons who are institutionalized because of handicap shall ensure that each qualified handicapped person, as defined in § 84.3(k)(2), in its program or activity is provided an appropriate education, as defined in § 84.33(b). Nothing in this section shall be interpreted as altering in any way the obligations of recipients under Subpart D.

Therefore, insofar as plaintiffs request us to rule that defendants are required under § 504 to provide community placements to all mentally retarded citizens, this Court denies such relief. Defendants have, however, violated § 504 in several other aspects, which we now address.

■ As we have emphasized in our above discussion, § 504 is predicated upon the need for individualized treatment. For only by evaluating and treating people on an individual basis will we avoid discrimina-

---

**139.** See this Court's Opinion and Order of February 22, 1980, on Class Certification, which states the following:

> The Court emphasizes that plaintiffs' complaint as it has stood for the last twenty-two months challenges only the conditions at the Laconia State School to which current residents are subjected and to which non-resident developmentally disabled persons may in the future be subjected.

At p. 20.

**140.** See Defendants' Exhibit 82, pp. 1, 2.

tion based on generalized assumptions and prejudices. In recognition of this, the State has undertaken to provide residents at LSS with individual service plans (ISP's) which assess the present abilities of a given individual, establish goals to be sought, and diagram a course of action to meet those goals. All parties agreed that the ISP provides the starting point for the education, training, and care (i. e., for the "habilitation") of each individual, and it is this blueprint to which defendants refer in their efforts to maximize the potential of each individual. Notwithstanding the conceded importance of this document, at the time of trial defendants had completed ISP's for only 366 of 564 residents, or 65% of the population at LSS. Moreover, Superintendent Melton admitted that even as to those who had ISP's, a large percentage of the services planned for therein would never be provided due to lack of resources. Nor have defendants decided through an individualized process or a methodical system of any kind whatsoever which residents would receive ISP's. Instead, defendants have drawn two seemingly arbitrary classifications: (1) those residents who reside in ICF buildings, and (2) those residents who reside in non-ICF buildings. Thus, the determination of whether a resident at LSS has an ISP depends largely upon the type of building in which that resident happens to be located. The 350 residents who have been evaluated and are being served by the Education and Training Department (E&T) at LSS are almost all from ICF buildings, T. Gamache; of the 350 residents who have been evaluated for occupational therapy services, almost all reside in ICF units, T. Talley, York; [141] only ICF residents have been evaluated for vocational programs; the effort to reduce dosages of drugs has occurred only in ICF units; and whereas in ICF units nurses dispense drugs, charge attendants have this responsibility in non-ICF's.

This Court finds and rules that defendants have violated § 504 by according to certain individuals and by denying to others the benefit of the all-important ISP. Inasmuch as § 504 mandates individualized treatment wherein the ISP is the cornerstone, the relief the Court will afford plaintiffs herein pursuant to § 504 will require completion of an ISP for each resident of LSS.

■ The record reflects that in addition to the distinctions drawn between ICF and non-ICF residents at LSS, defendants have practiced another form of discrimination at LSS which is prohibited under § 504. Defendants have often made placements and disbursed services based not on an individual assessment of the abilities and potentials of each resident but on the generalized assumption that certain *groups* of people (e. g., profoundly retarded or non-ambulatory people) are unable to benefit from certain activities and services. This kind of blanket discrimination against the handicapped, and especially against the most severely handicapped, is unfortunately firmly rooted in the history of our country, and more particularly in the history of LSS. A Laconia policy and procedure manual points out that in the past:

> the prevailing concern was one of protection of society. Mental retardation was viewed primarily as a static condition. Not only were mentally retarded individuals generally considered incapable of profiting from instruction, they were often looked upon as dangerous and in need of confinement. For those individuals clearly not a danger to themselves or others, they were euphemistically characterized as 'better off with their own kind', and subsequently also deposited in institutions.[142]

Although defendants have proved that for the most part attitudes as archaic as those described above disappeared long ago at LSS, defendants and their predecessors have nevertheless clung to certain discrimi-

141. As noted on p. 188 of this Opinion, only 20 of these 350 individuals actually receive direct OT services.

142. Defendants' Exhibit 15, Policy # 121337, p. 2.

natory practices until very recently, and even today vestiges of that discrimination remain.

Defendants admitted at trial that until very recently only the higher functioning residents had been served by the E&T Department,[143] presumably either on the assumption that the lower functioning residents could not benefit therefrom or that the net gain by the higher functioning residents would be greater. Thus, profoundly retarded residents were completely denied such services (including physical therapy) until about a year ago, when the E&T Department initiated its "ward stimulation" program, encompassing OT, PT, and medical services. This discrimination against the most severely mentally handicapped has not been confined merely to the academically oriented programs, but it extends to recreational programs as well. The testimony reflects that although some residents participate in frequent off-campus field trips to such places as MacDonald's and bowling alleys, there are many residents—notably, the elderly and the most severely retarded—who are rarely if ever afforded this privilege.[144] Moreover, although LSS annually sends approximately one hundred residents to independent summer camps in New Hampshire, profoundly retarded and non-ambulatory residents are excluded from this group, due to the eligibility requirements imposed on LSS by the camp supervisors.[145] As a final example of the discrimination practiced at LSS against the severely retarded, we note that until recently only the mildly and moderately retarded were considered for community placement, although the evidence at trial convinced the Court that severely and profoundly retarded individuals are capable of benefitting from such placements.[146]

Recently defendants' presumptive policy against deinstitutionalization of severely and profoundly retarded residents has changed, as reflected in their document, Action for Independence, Defendants' Exhibit 139, which reflects the State's new non-exclusionary policy.

As reflected above, residents are denied access to programs on the basis of physical as well as mental handicaps. In the former category, the Court notes that until recently non-ambulatory residents were excluded from classes in Toll Building as well as field trips into town because the campus shuttle-bus could not accommodate those with physical handicaps. Even today non-ambulatory residents are precluded from living in the four "cottages", acknowledged to be the best living accommodations at LSS, because the cottages lack wheelchair ramps and other amenities necessary to accommodate the physically handicapped. Thus, plaintiffs succeeded in proving at trial not only that certain categories of individuals such as the profoundly retarded have, as a group, been discriminated against in the past, but that certain assumptions about their inability to learn and develop are inaccurate. The Court viewed photographic slides and heard testimony about many severely and profoundly retarded individuals across the country who, although at one time were cast aside as "untrainable", have through habilitation learned to care for themselves and in some instances to acquire vocations.

Section 504 and the HHS regulations thereunder prohibit discrimination based on generalized assumptions about the abilities (or disabilities) of handicapped people. The pertinent regulations (45 C.F.R. § 84.4, *et seq.*) provide:

---

**143.** T. Gamache, Sontag.

**144.** Named plaintiff Nancy Haggerty has never in her life left the grounds of LSS.

**145.** We note, however, that LSS has undertaken to provide its own summer camp program to at least certain residents, including non-ambulatory residents. Approximately 350 residents attend one week of day camp per summer, at which time they partake in swim-

ming and boating at nearby beaches, as well as arts and crafts and hiking.

**146.** *See* Government's Exhibit 91, which is a written directive from Gary Miller, Director of the Division of Mental Health, to the LSS "screening committee" to draw up a list of those residents who should be considered for community placement.

*Subpart A—General Provisions*

§ 84.4 Discrimination prohibited.

(a) *General.* No qualified handicapped person shall, on the basis of handicap, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity which receives or benefits from Federal financial assistance.

(b) *Discriminatory actions prohibited.* (1) A recipient, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of handicap:

(i) Deny a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit, or service;

(ii) Afford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

(iii) Provide a qualified handicapped person with an aid, benefit, or service that is not as effective as that provided to others;

(iv) Provide different or separate aid, benefits, or services to handicapped persons or to any class of handicapped persons unless such action is necessary to provide qualified handicapped persons with aid, benefits, or services that are as effective as those provided to others;

(v) Aid or perpetuate discrimination against a qualified handicapped person by providing significant assistance to an agency, organization, or person that discriminates on the basis of handicap in providing any aid, benefit, or service to beneficiaries of the recipients program;

. . . .

(vii) Otherwise limit a qualified handicapped person in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving an aid, benefit, or service.

(2) For purposes of this part, aids, benefits, and services, to be equally effective, are not required to produce the identical result or level of achievement for handicapped and nonhandicapped persons, but must afford handicapped persons equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement, in the most integrated setting appropriate to the person's needs.

*Subpart C—Program Accessibility*

§ 84.21 Discrimination prohibited.

No qualified handicapped person shall, because a recipient's facilities are inaccessible to or unusable by handicapped persons, be denied the benefits of, be excluded from participation in, or otherwise be subjected to discrimination under any program or activity to which this part applies.

§ 84.22 Existing facilities.

(a) *Program accessibility.* A recipient shall operate each program or activity to which this part applies so that the program or activity, when viewed in its entirety, is readily accessible to handicapped persons. This paragraph does not require a recipient to make each of its existing facilities or every part of a facility accessible to and usable by handicapped persons.

(b) *Methods.* A recipient may comply with the requirements of paragraph (a) of this section through such means as redesign of equipment, reassignment of classes or other services to accessible buildings, assignment of aides to beneficiaries, home visits, delivery of health, welfare, or other social services at alternate accessible sites, alteration of existing facilities and construction of new facilities in conformance with the requirements of § 84.23, or any methods that result in making its program or activity accessible to handicapped persons. A recipient is not required to make structural changes in existing facilities where other methods are effective in achieving compliance with paragraph (a) of this section. In choosing among available methods for meeting the requirement of paragraph (a) of this section, a recipient shall give priority to those methods that offer programs and activities to handicapped persons in the most integrated setting appropriate.

### Subpart F—Health, Welfare and Social Services

§ 84.52 Health, welfare and other social services.

(a) *General.* In providing health, welfare, or other social services or benefits, a recipient may not, on the basis of handicap:

(1) Deny a qualified handicapped person these benefits or services;

(2) Afford a qualified handicapped person an opportunity to receive benefits or services that is not equal to that offered nonhandicapped persons;

(3) Provide a qualified handicapped person with benefits or services that are not as effective (as defined in § 84.4(b)) as the benefits or services provided to others;

(4) Provide benefits or services in a manner that limits or has the effect of limiting the participation of qualified handicapped persons; or

(5) Provide different or separate benefits or services to handicapped persons except where necessary to provide qualified handicapped persons with benefits and services that are as effective as those provided to others.

. . . .

(d) *Auxiliary aids.* (1) A recipient to which this subpart applies that employs fifteen or more persons shall provide appropriate auxiliary aids to persons with impaired sensory, manual, or speaking skills, where necessary to afford such persons an equal opportunity to benefit from the service in question.

Not only must recipients refrain from discriminating against handicapped individuals, they must also take an active role in assuring that persons with impairments are afforded "appropriate auxiliary aids", 45 C.F.R. § 84.52(d). Although the regulations specify that aids and services are not required to achieve "identical result[s]" among all people, they must nevertheless "afford handicapped persons equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement, in the most integrated setting appropriate to the person's needs". 45 C.F.R. § 84.4(b)(2).

Our ruling that § 504 requires the formulation of ISP's for each resident of LSS puts in focus that an individual assessment of each resident's needs is essential. The pattern of excluding entire categories of retarded residents, such as the profoundly mentally retarded and the multiply physically handicapped, from entire categories of services and activities (*e. g.*, E&T, recreational trips off campus, etc.), without first accommodating them with appropriate auxiliary aids and without then making an *individualized* determination of their ability to participate, must cease. LSS need not make each of its existing facilities or every party of an existing facility accessible to or usable by all handicapped persons; nevertheless, all of the programs and activities at LSS, *when viewed in their entirety*, must be readily accessible to all handicapped persons, 45 C.F.R. § 84.22(a). LSS cannot, therefore, absolutely deny certain services to individuals without providing them equivalent services. For example, profoundly retarded residents must be afforded E&T services to the same extent as mildly retarded residents, even though the teaching methods might be different.

While the regulations require recipients to provide equivalent services to all residents, they nevertheless permit recipients to comply with this mandate by redesigning programs so that physically handicapped residents can be served in existing accessible buildings; however, "in choosing among available methods . . . a recipient shall give priority to those methods that offer programs and activities to handicapped persons in the most integrated setting appropriate", 45 C.F.R. § 84.22(b). We cite two examples wherein LSS would not meet the statutory mandate of making its programs accessible "in its entirety" simply by redesigning its programs.

First, it is conceivable that by reassigning classes and all other services to the residential building of a non-ambulatory person, that individual would technically be receiving "equivalent" services. Yet certainly

there is a wide discrepancy between the qualitative experience of a non-ambulatory retarded resident who is confined to one building all of his life and a retarded individual who leaves his residence to ride the shuttlebus to classes in Toll, to take an excursion to a baseball game in town, etc. Second, although a non-ambulatory resident of King Building could be said to have the same basic provisions, i. e., beds, bureaus, etc., as a resident of the four cottages (which at the time of trial were inaccessible to non-ambulatory residents), defendants readily admit that the living conditions in the cottages, taking into account privacy, ambience, etc.) are far superior to King. While § 504 does not require that identical living facilities for all people be provided, the spirit of the law is violated when certain residents are afforded qualitatively different and better facilities than their more profoundly handicapped peers.

For the reasons hereinabove indicated in Part III.B.1. through 4. of this Opinion, the Court finds and rules that the plaintiffs herein are entitled to relief pursuant to § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, the details of which relief will be set forth subsequently in the Orders for Relief at the conclusion of this Opinion.

### 5. Section 504; Subpart D—Preschool, Elementary and Secondary Education (45 C.F.R. § 84.31, et seq.).

Because the provisions of Subpart D of § 504 are so closely aligned with the provisions of the Education for All Handicapped Children Act, 20 U.S.C. § 1401, et seq., and with the provisions of N.H. RSA 186–C, we have consolidated our discussion of these statutes in the following section of this Opinion.

### C. Education for All Handicapped Children Act, 20 U.S.C. § 1401, et seq. ("EHCA"); Subpart D of § 504, Rehabilitation Act of 1973 (45 C.F.R. § 84.31, et seq); New Hampshire "Special Education" Statute, RSA 186–C.

The subclass in this lawsuit consists of "[p]ersons between the ages of three and twenty-one years who are or in the future may be confined at LSS, and whose rights under the Education for All Handicapped Children Act, 20 U.S.C. § 1401, et seq., may be violated." [147] The three named plaintiffs representing the subclass are Janet Smith, Tommy Vaillancourt, and Sandra Garrity, aged sixteen, fourteen, and eighteen respectively at the time of the filing of the Complaint. They allege that they and members of their subclass have been denied a "free and appropriate education" as required under the EHCA, under which the State of New Hampshire receives funds.[148] Since Subpart D—"Preschool, Elementary, and Secondary Education"—of § 504 of the Rehabilitation Act of 1973 is subsumed in the EHCA,[149] we will refer only to the provisions of the latter statute. The Court also addresses in this section New Hampshire's "Special Education" statute, RSA 186–C,[150]

---

**147.** See this Court's Class Certification Order dated February 22, 1980, at p. 20.

**148.** Defendants' Exhibit 214 reflects that the following funds were received by the State of New Hampshire under said Act for the fiscal years 1978, 1979, and 1980.
Fiscal year 1978 (7/1/77 to 9/30/79): $570,345 (Part B Grant Award)
Fiscal year 1979 (7/1/78 to 9/30/80): $1,082,039 (Part B Grant Award)
$23,037 (Early Childhood Incentive Grant)
Fiscal year 1980 (7/1/79 to 9/30/80): $2,013,039 (Part B Grant Award)
$19,558 (Incentive Grant Award)

**149.** For the purposes of the facts in this case, the provisions of Part D, § 504 of the Rehabili-

tation Act of 1973, are substantially the same as those of the EHCA, with the exception that § 504 does not address the requirement of individual education plans (IEP's), presumably because requiring IEP's goes beyond the discrimination context of the law.

**150.** Curiously, although the predecessor to RSA 186–C—RSA 186–A—was in full force at the time of plaintiffs' Complaint, they did not allude to that statute. Nevertheless, this Court has pendent jurisdiction over said statute, and we hereby rely on same. Under the principles enunciated in Bradley v. School Bd. of City of Richmond, Va., 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), we apply current law to this case.

a state statute that tracks much of the language of the EHCA, and that was clearly designed to implement the provisions of the EHCA.

## 1. EHCA

As with the DD Act, the EHCA is a federal-state funding Act under which the state educational agencies receive federal funds in exchange for their commitment to fulfill certain duties imposed by the Act. *Ezratty v. Commonwealth of Puerto Rico*, 648 F.2d 770 (1st Cir. 1981). The underlying purpose of the Act is to assure that all handicapped children are provided a "free appropriate public education", 20 U.S.C. § 1412(1),[151] and its various provisions specify the procedures which must be followed to that end. For example, the State must file a plan with the Secretary setting forth a timetable for and description of its program to provide all children between the ages of three and twenty-one [152] full educational opportunity. 20 U.S.C. § 1412(2)(B). This assistance is to be made available to children in private as well as public schools "at no cost to their parents or guardian". 20 U.S.C. § 1413. Each child who falls within the provisions of the Act is to be provided with an "individualized education program" (IEP), which consists of a written statement outlining (1) the present levels of educational performance of the child; (2) a statement of annual goals, including short-term instructional objectives; (3) a state-

ment of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs; (4) the projected date for initiation and anticipated duration of such services; and (5) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved. 42 U.S.C. § 1401(19). Participation in the formulation of the IEP is to be afforded to the local education agency,[153] the parents or guardian of the child, the child's teacher, and the child also where appropriate. 20 U.S.C. § 1401(19). As a condition to the receipt of federal funds, the State must provide "procedural safeguards" by which a parent can obtain review of the IEP. If the child's parents or guardian is unavailable, or if the child is a ward of the State, the State must establish procedures by which to appoint a "surrogate parent", which individual "shall not be an employee of the State or local education agency". 20 U.S.C. § 1415(b)(1)(B). If the parent, guardian, or surrogate parent objects to the IEP which the State has devised for his child, he or she is entitled to "an impartial due process hearing" provided by the state (or local) agency, but conducted by someone other than "an employee of such agency or unit involved in the education or care of the child". 20 U.S.C. § 1415(b)(2). If the par-

---

151. The term 'free appropriate public education' means special education and related services which (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and (D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title.
20 U.S.C. § 1401(18).

152. The Act requires that a free appropriate public education be available for all handicapped children between the ages of three and *eighteen* no later than September 1, 1978, and for all handicapped children between the ages of three and *twenty-one* no later than September 1, 1980. 20 U.S.C. § 1412(2)(B).

153. The term "local education agency" refers to a "public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary or secondary schools in a city, county, township, school district, or other political subdivision of a State, or such combination of school districts or counties as are recognized in a State as an administrative agency for its public elementary or secondary schools. Such term also includes any other public institution or agency having administrative control or direction of a public elementary or secondary school." 20 U.S.C. § 1401(8). ("Local education agency" shall hereinafter be referred to as "LEA".)

ent, guardian, or surrogate parent is "aggrieved by the findings and decision" made by the independent hearing examiner, he or she may bring an action in any state court of competent jurisdiction or in a district court of the United States, which court "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate". 20 U.S.C. § 1415(e)(2). If the State fails to comply with these or other statutory requirements, the Department of Education is instructed to withhold federal funds from the State. 29 U.S.C. § 1416. Thus, it is clear that unlike the DD Act, judicial review (at least of a limited nature) is specifically provided for in 20 U.S.C. § 1415(e)(2).

### 2. Exhaustion of Administrative Remedies

■ Although conceding that a private right of action exists, defendants nevertheless insist that plaintiffs must exhaust their administrative remedies before invoking this court's jurisdiction. In general, defendants are correct. *Ezratty v. Commonwealth of Puerto Rico*, 648 F.2d 770, 774 (1st Cir. 1981), *citing Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51, 58 S.Ct. 459, 463–64, 82 L.Ed. 638 (1938). But such is not always the case under the EHCA, as the First Circuit points out in *Ezratty*: "When the various interests pull in the direction of exhaustion, it is required, but where they pull in different directions, analysis of the particular case at hand is necessary." *Ezratty, supra*, 648 F.2d at 775, *citing* K. Davis, Administrative Law of the Seventies 446 (1976).

> Thus, not surprisingly, the exhaustion doctrine 'is not to be applied inflexibly,' *McGee v. United States*, 402 U.S. 479, 483, 91 S.Ct. 1565, 1568, 29 L.Ed.2d 47 (1971); *United States v. Newmann*, 478 F.2d 829, 831 (8th Cir. 1973), and courts are free to use their discretion, *United*

> *States Ex Rel. Marrero v. Warden, Lewisburg, Pen.*, 483 F.2d 656, 659 (3rd Cir. 1973), *rev'd on other grounds*, 417 U.S. 653, 94 S.Ct. 2532, 41 L.Ed.2d 383 (1974), applying the doctrine, or not, in accordance with its purposes. *McKart v. United States*, 395 U.S. [185] at 193, 89 S.Ct. [1657] at 1662 [23 L.Ed.2d 194]. Indeed, the legislative history of the Act reflects the understanding that exhaustion is not a rigid requirement.

*Ezratty, supra*, 648 F.2d at 774 (footnote omitted).

Upon review of the evidence here presented, this Court reaffirms its earlier decision (February 22, 1980, at pp. 9–11) that plaintiffs were not required to exhaust their administrative procedures under the EHCA. The reasons for this ruling are, first, that administrative procedures which existed in the State of New Hampshire were and are defective and, second, and more fundamentally, many of the members of the subclass had no access to same, in that they have lacked available parents and/or guardians, and the State has failed to provide them with either such guardian or a surrogate parent.[154] Accordingly, exhaustion of administrative remedies is found by this Court to be futile, and the Court follows the well-reasoned decisions of a number of lower courts that in such circumstances exhaustion of administrative remedies is not required. *Sessions v. Livingston Parish School Board*, 501 F.Supp. 251, 254 (M.D.La.1980); *Monahan v. State of Nebraska*, 491 F.Supp. 1074, 1086 (D.Neb. 1980); *Doe v. Koger*, 480 F.Supp. 225, 228 (N.D.Ind.1979); *Armstrong v. Kline*, 476 F.Supp. 583, 601–02 (E.D.Pa.1979), *remanded on other grounds*, 629 F.2d 269 (3rd Cir. 1980); *Harris v. Campbell*, 472 F.Supp. 51, 53–54 (E.D.Va.1979); *Loughran v. Flanders*, 470 F.Supp. 110, 112 (D.Conn.1979); *Campochiaro v. Califano*, No. H–78–64, slip op. at 4 (D.Conn., May 18, 1978); *New York State Association for Retarded Children, Inc. v. Carey*, 466 F.Supp. 479, 486 (E.D.N.Y.1978), *aff'd* 612 F.2d 644 (2d Cir. 1979).

---

**154.** Defendants' Exhibit 51 reveals that at the inception of this litigation more than a few children between the ages of three and twenty-one had not had guardians appointed for them.

Moreover, as the *Ezratty* Court has indicated, the legislative history of the Act reflects the intention of Congress that exhaustion not be required in these circumstances. Senator Harrison Williams, author of the Senate bill containing the EHCA, stated the following during a debate on the matter:

> Mr. President, with regard to the complaints, I want to underscore that exhaustion of the administrative procedures established under this part should not be required for any individual complaint filing a judicial action in cases where such exhaustion would be futile either as a legal or practical matter.

121 Cong.Rec. 37416 (1975), *cited in Ezratty, supra,* 648 F.2d at 774, n.5.

In conclusion, although in the case at hand we are in no position to evaluate the substance of the IEP's for individual members of the subclass because we have no administrative record to review, we are, however, in a position to rule on the adequacy of the procedural safeguards afforded same. *Loughran v. Flanders,* 470 F.Supp. 110, 113 (D.Conn.1979); *Monahan v. State of Nebraska, supra,* 491 F.Supp. at 1086.

### 3. The New Hampshire "Special Education" Statute, RSA 186-C

The "hybrid" composition of the law governing the educational rights of handicapped children comprises an amalgam of elements of both federal and state law. *Monahan v. State of Nebraska,* 491 F.Supp. 1074, 1080 (D.Neb.1980). N.H. RSA 186-C is the State counterpart to the EHCA, and represents the State's plan to ensure compliance with the federal mandates. The "special education" statute was approved by the Governor of the State of New Hampshire on June 22, 1981, and its effective date was July 1, 1981. Thus, RSA 186-C was not in effect at the filing of the complaint in this lawsuit, nor during the trial

itself. Nevertheless, for the purposes of injunctive relief, the Court applies the law presently in effect, *Bradley v. Richmond School Board,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974). We note that the new statute, RSA 186-C, does not substantially change the nature of the duties which were placed on defendants under its predecessor, RSA 186-A;[155] this is not a case, therefore, in which "manifest injustice" would result from retrospective application of a change in law because of new and unanticipated obligations placed on a party, *Bradley, supra,* 416 U.S. at 720, 94 S.Ct. at 2020. In fact, the new statute actually diminishes the duties imposed on defendants. As with other recent statutory enactments, both state and federal, the passage of RSA 186-C (and the repeal of its predecessor, RSA 186-A) were triggered by a desire on the part of legislators to cut back on the obligations of government in funding human services.[156] Thus, whereas 186-A required the State to pay the local school districts for any special education programs which exceeded two and one-half times the average state tuition (and thus created open-ended liability for the state), the new statute places a ceiling on the amount of state liability.

The policy behind RSA 186-C is stated in its preamble, which tracks the language of the federal statute:

> It is hereby declared to be the policy of the state that all children in New Hampshire be provided with equal educational opportunities. It is the purpose of this chapter to insure that the state board of education and the school districts of the state provide a free and appropriate public education for educationally handicapped children.

RSA 186-C:1. Under the legislative scheme the State Board of Education through its Special Education Administrative Unit "shall adopt rules establishing

---

**155.** RSA 186-A was repealed on June 30, 1981. *See* Laws of 1981, ch. 100, § 2.

**156.** This is not the first occasion upon which a court in this district has commented upon the

inadequacy of legislative support for education of the handicapped. *See Doe v. Laconia Supervisory Union No. 30,* 396 F.Supp. 1291, 1295 (D.N.H.1975).

standards for the approval of programs of education that are maintained by school districts, regional special education centers, and private organizations *or state institutions* for the benefit of educationally handicapped children ...." RSA 186–C:5 (emphasis added). "However, the development of an individualized education plan for each educationally handicapped child shall be the responsibility of the school district in which such child resides or of the school district which bears financial responsibility[157] for the child's education." RSA 186–C:7. Each child between the ages of three and twenty-one who has been determined by the local school district to be "educationally handicapped" is entitled to attend an approved program which can implement his or her IEP. RSA 186–C:9. If the school district is unable to accommodate the child within its jurisdiction it "shall pay tuition to such an approved program maintained by another school district or by a private organization". RSA 186–C:10.[158] Thus, "[a]ll expenses incurred by a school district in administering the law in relation to the education for all educationally handicapped children shall be paid by the school district in which such child resides", RSA 186–C:13, with the caveat that

> [f]or an educationally handicapped child placed in a home for children, health care facility or state or private institution, all expenses for special education or special

education and educationally related services[159] shall be the liability of the district in which the child last resided before placement in a home for children, health care facility or state or private institution.

RSA 186–C:13 II. The above provision was obviously included so that taxpayers within school districts such as the Laconia School District would not be disproportionately burdened by the fortuitous location of an institution within their jurisdiction.[160] RSA 186–C:13 II is consistent with RSA 126–A:49, which explicitly excludes educational expenses from the expenses otherwise recoverable from relatives and other persons charged with support of residents at LSS under RSA 126–A:46:

> *Educational Expenses.* Educational expenses of any resident or patient, who is capable of being benefited by instruction and who is between 6 and 21 years of age, as required under statute and incurred in the institutions named in or at the direction of the commissioner of health and welfare, in any public or private institution or elsewhere, shall be recovered from the school district in which the patient's or resident's parents or legal guardian reside on the January first preceding the recovery up to the state average elementary cost per pupil, as determined by the state board of education for the preceding school year. The liability

---

**157.** *See* RSA 186–C:13 for provision on financial responsibility.

**158.** Dr. Edward George DeForrest, Director for Special Education in New Hampshire, testified at trial that LSS is considered an "out-of-district" placement.

This section of the special education statute requiring school districts to pay tuition for out-of-district placements corresponds with the New Hampshire statute governing regular education, RSA 193:4—"District Liability for Elementary or Junior High School Tuition".

**159.** " 'Educationally related services' means transportation and such developmental, corrective, and other supportive services as are specifically required by an individualized education plan to assist an educationally handicapped child to benefit from special education. 'Educationally related services' do not include medical services unless such services are nec-

essary for purposes of diagnosis and evaluation." RSA 186C:2 V.

**160.** RSA 186–C:13 was also apparently formulated with an eye to the decision of the New Hampshire Supreme Court in *In Re Juvenile Case # 1089*, 119 N.H. 64, 398 A.2d 65 (1979), wherein the New Hampshire Supreme Court construed the provisions of the former statute, RSA 186–A:8 II, which placed the liability for tuition for handicapped children on the school district wherein the child resided. In that case, the parents were residents of Londonderry, but the child had been placed in a foster home situate in Keene and was attending the special education program at Keene State College. The Court upheld the rulings of the state district court that Keene, and not Londonderry, was financially responsible for the education of the handicapped child as Keene was the municipality wherein the child resided.

of the school district for such expenses shall precede that of the persons or estates named in RSA 126–A:46 and RSA 126–A:47, which are hereby relieved of liability for such expenses to the extent of the school district's liability. RSA 126–A:49 (Supp.1979).

Under RSA 186–C:15, the local school district is financially responsible not only for the regular school year for an educationally handicapped child; it "shall provide an approved program for an extended period when it can be demonstrated by a preponderance of the evidence, in accordance with rules adopted by the state board of education, that interruption of the program of an educationally handicapped child would result in severe and substantial harm and regression and would have the effect of negating the benefits of such educationally handicapped child's regular special education program." RSA 186–C:15. As mentioned above, the recently enacted version of the special education statute, 186–C, sets a ceiling on the amount of state aid to be appropriated for each fiscal year. The somewhat complex formula for computing the per-pupil rate is found in 186–C:18 II and III.

The State Board of Education is charged with the duty of adopting rules, pursuant to RSA 541–A, the state Administrative Procedure Act, relative to the following: developing individualized education plans, approving special education programs, reporting the number of educationally handicapped children in a school district, appealing school district decisions regarding individualized education plans, determining eligibility for participation in approved programs, appointing surrogate parents, determining the length of the school year for handicapped children, and other matters related to complying with provisions of the statute. RSA 186–C:16 I–VIII. Presently under consideration by the State Board of Education pursuant to this mandate are detailed rules which are contained in a 137–page document entitled "New Hampshire Standards for the Education of Handicapped Students". (We hereinafter refer to this document as "*Standards*".)

Two sections of *Standards* specifically refer to LSS. Under the section entitled, "Placement of Educationally Handicapped Students", Article IX dictates the following: (a) that it shall be the responsibility of the administration of LSS to refer to the school district of residence all admittees for whom an educationally handicapping condition is suspected; (b) that the school district shall process all such referrals according to their usual procedure; (c) that if the district determines that the LSS admittee is eligible for special education or special education and necessary related services, it shall be the responsibility of the district to develop an IEP for that child; and (d) that the district of residence shall have financial liability for educationally handicapped students at LSS retroactive to the date the person began receiving special education and necessary related services. *Standards* at p. 44. Article V under the section on "Financial Liability For the Education of Handicapped Students" reiterates that the districts of residence have financial liability for educationally handicapped children at LSS. *Standards* at p. 64.

### 4. *Violations Under EHCA and N.H. RSA 186–C*

The aforementioned federal and state statutes appear to create a direct line of accountability and responsibility for educationally handicapped children at Laconia State School. Unfortunately, although the rights, obligations, and duties are neatly defined on paper, the comprehensive scheme has fallen apart in practice. One of the underlying problems is that although the New Hampshire Legislature has designated the State Board of Education [161] (specifically, the Special Education Unit within same) as the agency responsible for fulfilling the requirements of the Act, and al-

---

**161.** The Commissioner of the State Board of Education, Robert M. Brunelle, is a defendant to this lawsuit.

though the State Board of Education does indeed have the legal authority to accredit and supervise the localities, N.H. RSA 186:5, education in New Hampshire remains a peculiarly local issue, with the quality of individual education controlled by the place of residence. As we have previously indicated (p. 30 of this Opinion), most of the funding for education in New Hampshire is local, and it is therefore not surprising that New Hampshire ranks second-to-last among the states in financing education. Whereas the national average of state money going to special education is 3.63 percent of every dollar spent on education, New Hampshire spends only .9 percent of every dollar on special education. T. DeForrest. In short, if money talks, the localities in New Hampshire have a powerful voice in the education of their children.

Whether out of timidity in the face of this powerful local voice, out of deference to the local taxpayers who are primarily footing the bill for education in the state, or out of sheer abdication of responsibility, the State Board of Education has failed to fulfill its responsibility of enforcing the EHCA and RSA 186–C. Far from being the driving force behind the towns and cities, the State too often ends up "passing the buck", and indeed, in the past has failed to live up to its own statutory responsibilities by failing to reimburse the towns and cities for the excess cost of education, as required by RSA 186–A (now repealed). All too often in the past LSS has served as a repository for children whose own school district cannot or will not provide for them. Children often end up at LSS not because it has been deemed, after careful consideration, to be the most suitable placement for them among an array of alternative services, but for reasons completely unrelated to their best educational interests. Parents, often extremely well meaning, have become utterly frustrated with caring for their mentally retarded children at home. Local school districts, already under fire from angry property taxpayers for the cost of edu-

cation, refuse to accommodate the special needs of these children in their own schools or to fund alternative local placements; instead, they deposit the child in the lap of the State and consider their task to be done.

In passing the Education for All Handicapped Children Act, Congress recognized the political reality that these entities, if for no other reasons than their financial control, exercise great power over the destiny of the children within their districts. Thus, as a condition of receiving federal funds, the EHCA requires the states to ensure that the LEA's are an integral part of the special education process.[162] RSA 186–C and the *Standards* promulgated thereto expand on the duties of the LEA's. In addition to the LEA's financial responsibility for `out-of-district placements, the *Standards* provide the following:

VII. *DEVELOPMENT OF INDIVIDU-AL EDUCATION PROGRAMS FOR STUDENTS PLACED IN PRIVATE FACILITIES, REGIONAL PROGRAMS, OR OTHER NON–DISTRICT PROGRAMS.*

The Local Education Agency is responsible for the development, maintenance, and evaluation of Individual Education Programs for educationally handicapped students who are placed in private schools, regional programs, or nondistrict programs by the Local Education Agency.

A. The Local Education Agency shall initiate and conduct Individual Education Program planning conferences for these purposes.

B. The Local Education Agency shall provide for the presence of teacher(s) or private school and/or non-district program representatives at the planning conference or an alternative for physical presence.

C. *The Local Education Agency has final responsibility for the development of the Individual Education Program even if they opt to delegate this re-*

---

**162.** The Act's provisions for the involvement of the LEA's coincides with Congress's endorsement of the concept of "mainstreaming", which

refers to the concept of educating handicapped students with their non-handicapped peers to the greatest extent possible.

*sponsibility to the private school and/or non-district program.*

D. The conferences to review and/or revise the Individual Education Program of these students may be conducted by the private school and/or non-district program personnel at the discretion of the Local Education Agency. *The Local Education Agency representatives and parents must be involved in the review and/or revision meetings and must have approved proposed changes prior to implementation.*

E. The Local Education Agency shall provide a copy of the approved Individual Education Program to the private school and/or nondistrict program and the parents.

F. The Local Education Agency is responsible for insuring that all changes, modifications, and/or revisions of Individual Education Programs shall occur with parental approval in accordance with the Special Education Evaluation/Placement Team procedures described in the *Individual Education Program* Section of these *Standards*.

*Standards*, pp. 30–31 (emphasis added). Thus, even though the LEA is permitted to delegate certain duties to the out-of-district placement, it remains ultimately responsible for the formulation and review of the child's IEP, and it *"must be involved in the review and/or revision meetings and must have approved proposed changes prior to implementation". Standards*, p. 31 (emphasis added). However, the evidence at trial revealed that the local education agencies (LEA's) fail to take responsibility for children at LSS who originated in their districts, and that the State has failed to exert pressure on them to do so. In effect, LSS has assumed the role of the LEA's. The School and its administration had, at the time of trial, developed IEP's for the approximately ninety children residing there. But Edward DeForrest, Director of Special Education for the State, testified that less than twenty-five percent of the school districts from which these children have come are involved in the formulation and review of these IEP's. Peter Gamache, Director of

Therapeutic Activities at LSS, testified that "school districts are afraid of financial responsibilities". Their testimony is buttressed by Defendants' Exhibit 220, a written report following the "on-Site Approval of the Special Education Programs at Laconia State School", by the Special Education Section of the Division of Vocational Rehabilitation in New Hampshire. Many of the recommendations in the report emanate from the findings of inadequate cooperation from the LEA's. The surveyors repeatedly recommend that LSS continue to encourage the involvement of parents and LEA's. What is most telling is the responsive comment to this criticism from Jack E. Melton, Superintendent of LSS. In his formal letter of comment to the surveyors, Melton stated:

> *Section D :*
>
> Sub-Part 3—IEP's
>
> It is recommended that the Laconia State School & Training Center take steps to insure that the LEA's write or participate in the writing of the IEP's which contain all of the required information.
>
> *Comment :* We do take steps to involve LEA's in the IEP process. *But, we have no control and cannot be held accountable for School District[']s failure to comply with its obligation.* We suggest the recommendation be changed to read: It is recommended that Laconia State School & Training Center continue [its] efforts to involve LEA's in the writing of IEP's which contain all of the required information.

(Emphasis added.) *See* letter from Jack E. Melton to Harvey Harkness, dated October 11, 1978; attached to Defendants' Exhibit 220. The surveyors from the Division of Vocational Rehabilitation apparently agreed with Melton that the State has no control over the LEA's, for they accepted Melton's suggestion:

> We have taken your suggestion and modified the report. The recommendation now reads: "It is recommended that Laconia State School and Training Center continue its efforts to involve LEA's in

the writing of IEP's which contain all of the required information.

*See* Letter from Harvey Harkness to Jack E. Melton, dated November 26, 1978, attached to Defendants' Exhibit 220.

Without participation from the LEA's, children at LSS lose an effective advocate, and in some instances, they lose their *only* outside advocate. As mentioned above, at the inception of this trial, several children between the ages of three and twenty-one were without parents or guardians. At the time of trial ten children were without parents, fifteen percent had limited contact from their parents, thirty-five to fifty percent had little if any contact. T. DeForrest. Only twenty-eight percent of the parents are involved in the IEP process. T. DeForrest. Although the EHCA and RSA 186–C:14 require that the Commissioner of Education or his designee arrange for the appointment of "surrogate parents" [163] for those children whose parents or guardians are "unavailable", which "surrogate parents" shall assist those children in the "educational decision-making process", including the identification, evaluation, and placement as well as the hearing, mediation, and appeal procedures, there was no indication from defendants whatsoever that they have complied with said section. Moreover, N.H. RSA 171–A:10 II (Supp.1977) [164] requires the administration of LSS to petition the Probate Court in Belknap County, Merrimack County, or the resident's home county for the appointment of a guardian if the resident is over the age of eighteen and is deemed incompetent, but state officials have had difficulty implementing this mandate.[165] Consequently, although at the time of trial all of the children at LSS aged three to twenty-one had guardians, such has not been the case in the recent past, nor can we be assured that this will occur in the future.[166]

In conclusion, the crossed lines of authority and lack of accountability for educationally handicapped children in New Hampshire has created the perverse situation that the children in greatest need of services and individual attention often receive the least care and attention. Local school districts serve non-handicapped students, but see LSS as an oasis in which they can discard their more difficult and more costly handicapped students. Even assuming that the State exercises good faith in attempting to pick up the slack and to provide an adequate education to students at LSS, the fact is that for many children, LSS is a wasteland. Without prodding from interested parties such as parents, guardians, or surrogate parents and the LEA, as envisioned by the EHCA, the State becomes, in effect, the guardian of the child and the reviewer of its own programs.[167] Not surprisingly, as

---

**163.** " 'Surrogate parent' shall mean a person appointed to act as a child's advocate in place of the child's natural parents or guardian in the educational decision-making process." RSA 186–C:14 II(a). " 'Unavailable parent' shall include a parent or guardian who is committed to a mental institution, incarcerated, or otherwise unable to act as the child's advocate in the educational decision-making process." RSA 186–C:14 II (c).

**164.** *See* Part III. D. of this Opinion for a discussion of RSA 171–A.

**165.** *See In Re Gamble,* 118 N.H. 771, 394 A.2d 308 (1978), which addresses the obligation of the administrator of LSS to find guardians for its residents. The Supreme Court of New Hampshire rejected the State's argument that it is merely the Superintendent's duty under RSA 171–A:10 II to *nominate* guardians and that he is not required actually to *obtain* the guardian. The Court, finding that "the legal rights of patients would not be protected under the

State's interpretation", *In Re Gamble,* 118 N.H. at 774, 394 A.2d at 309, held that the State must obtain *and* nominate guardians.

**166.** A defendant does not necessarily moot a case that is live at its inception by promising to conform to plaintiff's wishes. *United States v. W. T. Grant Co.,* 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). The determination of whether the conduct is likely to recur lies in the equitable discretion of the Court. *Campbell v. McGruder,* 580 F.2d 521, 541 (D.C.Cir.1978). "The crucial question, of course, is to what degree one can be certain that the same or related practices will not recur." *Rubbermaid, Inc. v. FTC,* 575 F.2d 1169, 1172 (6th Cir. 1978).

**167.** Recognizing the problem of conflict of interest and the need for impartial review, Congress established procedural safeguards requiring, for example, that the impartial due process hearing provided by the State or local agency be conducted by someone other than "an. em-

its own appeals court, the State has been extremely lenient on itself. There being a small pie to begin with, education at LSS gets a very small slice.

Whereas their non-handicapped peers receive the statutorily required 5¼ hours of education daily, more than fifty percent of the children at LSS receive less than 2½ hours of education per day, and seventeen receive services for only one hour. T. Gamache. As elsewhere outlined in this Opinion, many have in the past been denied the experience of attending class in Toll outside of their residential wards because the campus bus could not accommodate them. Moreover, even for those who attend Toll, there has been little if any coordination between the teachers and the ward attendants, and thus little reinforcement of the skills learned. Although at present each child has an IEP, defendants readily admit their failure to implement many of the goals stated therein. Indeed, the evidence supports the fact that many of the needed services are unavailable. For example, the IEP of named plaintiff Tommy Vaillancourt, a multiply handicapped individual, reflected a need for occupational therapy from 1977 to 1979, but such services were never delivered due to lack of staff. Unfortunately, Tommy Vaillancourt's situation is not unlike other children at LSS.

The Court finds that it is more than just coincidence that no child at LSS has been deemed to require more than 180 days of schooling. The fact that all educational training at LSS ceases for the summer months, T. DeForrest, indicates a defect in the procedures whereby one obtains review of his or her IEP, and emphasizes that the advocates for many of these children are either non-existent or ineffective.

As stated initially in this section, since we have no administrative record before us by which to review the substance of each IEP, and since plaintiffs did not present suffi-

cient evidence at trial to allow us to do so, we confine our order to remedying the procedural defects which exist under the EHCA and RSA 186–C. However, there is no doubt that in this area of the law as in many others procedure and substance are inextricably linked. Thus, a revision of the procedures currently afforded educationally handicapped children in New Hampshire will substantially affect the quality of their education.

The Court finds and rules that pursuant to the mandates of EHCA, RSA 186–C, and the *Standards* promulgated thereunder, the plaintiffs herein are entitled to relief, the details of which will be addressed in the Orders for Relief at the conclusion of this Opinion.

### D. Services for the Developmentally Impaired, N.H. RSA 171–A

The 1975 New Hampshire Legislature enacted a statute, the intent of which was the provision of a comprehensive program of services for the "developmentally impaired", RSA 171–A (Supp.1979).[168] The definition of "developmental impairment" includes disabilities attributable to

(a) mental retardation, cerebral palsy, epilepsy, autism or a specific learning disability; or

(b) any other condition of an individual found to be closely related to mental retardation as it refers to general intellectual functioning or impairment in adaptive behavior or to require treatment similar to that required for mentally retarded individuals which disability: (1) originates before such individual attains age 18, (2) which has continued or can be expected to continue indefinitely, and (3) which constitutes a severe handicap to such individual's ability to function normally in society.

---

ployee of such agency or unit involved in the education or care of the child", 20 U.S.C. § 1415(b)(2), and that the appointed "surrogate parent" "shall not be an employee of the State or local education agency". 20 U.S.C. § 1415(b)(1)(B).

**168.** As originally enacted in 1975, the statute was entitled "Services for the Developmentally Disabled", but, as amended in 1979 (Laws of 1979, Ch. 322, § 1, effective July 1, 1979) the term "impaired" was substituted for "disabled" wherever the latter word appeared.

N.H. RSA 171–A:2 V(a)(b) (1978 and Supp. 1979).[169]

The stated purpose of N.H. RSA 171–A is to enable the Division of Mental Health in New Hampshire "to establish, maintain, implement and coordinate a comprehensive service delivery system for developmentally impaired persons". N.H. RSA 171–A:1 (Supp.1979).[170] "Service delivery system" is defined as "a comprehensive array of services for the diagnosis, evaluation, habilitation and rehabilitation of developmentally impaired persons, including but not limited to development centers, work activity programs, community residences, family care, foster care, day care, and residential care and treatment such as provided at Laconia state school and training center." N.H. RSA 171–A:2 XVI (Supp.1979). N.H. RSA 171–A:4 (Supp.1979) mandates that such a system, "including Laconia state school", be maintained under the supervision of the Director of the Division of Mental Health (hereinafter "Director").

The statute contemplates the development of "area agencies" for various geographic areas designated by the Director, to be staffed by "area boards".[171] "Each area board shall appoint an executive director who shall be accountable to the board for administering the area-wide programs and services for developmentally impaired persons." N.H. RSA 171–A:18 I, III (Supp. 1979).

A developmentally impaired individual seeking service shall apply to his or her area agency in the appropriate geographic region. N.H. RSA 171–A:6 I (Supp.1979).

Entry into the service delivery system is described as "voluntary", in the sense that minors and legally incompetent persons cannot be admitted without representation by a parent or legal guardian. N.H. RSA 171–A:5 (Supp.1979). Before the recommendation for placement is made by the area agency, the following must occur:

II. A comprehensive screening evaluation, coordinated by the staff of the area agency, shall determine the scope of the person's disability and the locus and nature of services to be provided. Such evaluation shall include, but not be limited to, a physical examination and individual intellectual assessment and functional behavior scales which shall be established by rule of the division and shall take into account the provisions of and services established under [N.H. RSA 186–C].

N.H. RSA 171–A:6 II (Supp.1979).

III. A recommendation for placement by the area agency shall utilize the criterion of the least restrictive environment for the client and shall be made to the program or service which best meets the needs of the client . . . .

N.H. RSA 171–A:6 II, III (Supp.1979). Withdrawal from the service delivery system is also "voluntary", according to the statute. N.H. RSA 171–A:7 (Supp.1979). Provision for legal counsel and guardianship is found in N.H. RSA 171–A:10 (Supp. 1979):

*171–A:10 Residential Place; Legal Counsel and Guardianship.*

I. When a recommendation is made for any placement at Laconia state school

**169.** As with our consideration of RSA 186–C (*see* p. 218, n. 150) we here apply well-established principles relative to pendent jurisdiction, finding the existence of a common nucleus of operative fact as between the federal and state claims herein advanced, and that the nature of the plaintiffs' claims herein are such that they "would ordinarily be expected to try them all in one judicial proceeding". *United Mineworkers v. Gibbs*, 383 U.S. 715, 725–26, 86 S.Ct. 1130, 1138–39, 16 L.Ed.2d 218 (1966).

**170.** *See also* N.H. RSA 126–A:39 (Supp.1979).

**171.** The statute as enacted in 1975 called for "fixed point[s] of referral", defined as "a public or private agency designated by the director to

serve a mental health region to provide service information to clients and their families, to plan and organize the screening evaluations prior to entry into the service delivery system and to make recommendations for placement of clients in the service delivery system." N.H. RSA 171–A:2 VIII. Since the "fixed point of referral" system was never implemented, the Division of Mental Health introduced legislation in 1979 calling for "area boards" to supercede the "fixed point of referral" function as well as to decentralize some of the functions of the Division. T. Shumway.

and training center or in any other residential setting which restricts in any way the liberty or informed decisions of a client, such client shall have the right to representation by legal counsel. If a client's attorney objects to the placement, he shall request a hearing before the director whose decision shall supersede the initial placement recommendation by the area agency. The results of such hearing, the procedures for which shall be established under RSA 171–A:6, may be appealed to the superior court in the county of the client's residence or the county in which the program or service is located. The client shall pay the costs of legal services rendered in connection with this section. If such client is unable to pay, the probate court located in the county where the client resides shall appoint a member of the New Hampshire legal assistance or its successor organization, or an attorney who shall be compensated for his services at the same rate as appointed counsel in a criminal case heard before the superior court.

II. Whenever a client over the age of 18 years is considered incapable of managing his own affairs or property by an appropriately constituted interdisciplinary body, and said client does not have a legal guardian, the administrator shall petition either the probate court in either the county of Belknap or the county of Merrimack or the probate court in the resident's home county for the appointment of a guardian over said person. The administrator shall recommend the appointment of a client's parents or guardian while the client was a minor as legal guardian in the petition, unless said parents or guardian are incompetent, unable or unwilling to assume the responsibility, in which case the administrator shall recommend the appointment of another person as guardian who is able and willing to manage the affairs or property or both of the client. The court costs, and any other such costs or fees that are incurred pursuant to any hearing on such a petition, or any reasonable cost incurred by the guardian appointed by said probate court, shall be borne by the client.

III. Notwithstanding any other provisions of this chapter, a client considered incapable of managing his affairs or property under RSA 171–A:10, II, and for whom a recommendation for placement has been made pursuant to RSA 171–A:6, RSA 171–A:8, or RSA 171–A:10, I, shall not be denied placement solely for the reason that the client does not have a legal guardian or that the administrator has not been able to nominate an individual willing or able to serve as such guardian. In such a case, the client's representative may consent to, or challenge the recommended placement under the procedures established pursuant to RSA 171–A:6. Nothing in this paragraph shall be deemed to affect in any way the obligation of an administrator to petition for guardianship pursuant to RSA 171–A:10, II.

Once in the service delivery system, each client shall receive a periodic review of his or her placement which shall include but not be limited to the following:

(a) a thorough clinical examination including an annual physical examination;

(b) a clinical evaluation of the competency of such client; and

(c) consideration of less restrictive alternatives for service, particularly for those clients in residential placements.

N.H. RSA 171–A:11 I(a)–(c). Such periodic review shall take place at least once during the first six months of placement and annually thereafter, and only after the administration has given a week's written notice to the client and the client's nearest relative or guardian. N.H. RSA 171–A:11 II.

For every client in the service delivery system, N.H. RSA 171–A:12 mandates that an "Individual Service Plan" (ISP) be provided, the preliminary draft of which shall be based on the pre-placement comprehensive screening evaluation (N.H. RSA 171–A:6 II [Supp.1979]) and which shall be promulgated within fourteen days of placement. The ISP "shall be continually reviewed by the administrator or his designee and shall be modified if necessary." N.H.

RSA 171–A:12 I. It is clear from the statute that the ISP must represent more than a lofty goal for the provision of services; indeed, N.H. RSA 171–A:13 (Supp.1979) speaks in terms of "Service Guarantees":

> *171–A:13 Service Guarantees.* Every developmentally impaired client has a right to adequate and humane habilitation and treatment including such psychological, medical, vocational, social, educational or rehabilitative services as his condition requires to bring about an improvement in condition within the limits of modern knowledge.

The rights enunciated above are expanded on and explicated in two other sections, N.H. RSA 171–A:9 and N.H. RSA 171–A:14 (1978 and Supp.1979). Among other things, these sections specify that "[r]estraint or seclusion may be used only in cases of emergency such as the occurrence or serious threat of extreme violence, personal injury or attempted suicide", N.H. RSA 171–A:9 II; that "[t]he client's right to individual dignity shall be respected at all times and upon all occasions", N.H. RSA 171–A:14 (Supp.1979); and that "[a] client in a residential placement shall have the right to wear his own clothes, to keep and use his own personal possessions including toilet articles, to keep and be allowed to spend money for canteen or other purchases, to have access to telephones to make and receive confidential calls and any other rights specified by rules of the division . . . ." RSA 171–A:14 IV.

1. *Liability of Defendants Under N.H. RSA 171–A*

 The major thrust of plaintiffs' claims under N.H. RSA 171–A is that plaintiffs and members of their class have been denied the right to live in the "least restrictive environment",[172] as they allege is guaranteed by N.H. RSA 171–A:6 III (Supp. 1979), because defendants have failed to establish and maintain residential placements in the community.[173] Although we hereinafter find and rule that defendants are in substantial violation of several statutory mandates under N.H. RSA 171–A (1978 and Supp.1979), we reject plaintiffs' above claim that defendants have violated N.H. RSA 171–A:6 III (Supp.1979) by failing to place residents of LSS in the "least restrictive environment".

The language of N.H. RSA 171–A:6 III (Supp.1979), relied on by plaintiffs, that "[a] recommendation for placement by the area agency *shall utilize the criterion* of the least restrictive environment for the client and shall be made to the program or service which best meets the needs of the client" (emphasis added), can hardly be construed as a mandate to the State to place every resident of LSS in the community. Assuming, *arguendo*, that "least restrictive environment" could in every instance be defined as placement in the community, the statute merely requires that community placement be used as the standard, or *"criterion"*, for placement; thus, in placing a developmentally disabled person, the "least restrictive environment" must be taken into consideration.

Nor does the language of N.H. RSA 171–A:4 (Supp.1979), which provides that "the division shall maintain a state service delivery system, comprised of a substantial number of programs and services, *including Laconia state school and training center*, for the care, habilitation, rehabilitation, treatment and training of developmentally impaired persons" (emphasis added), serve as a mandate to the State to place all residents of LSS into the community. This section of the statute which was included in the original legislation passed in 1975, lacks the specificity that would be necessary to warrant such an interpretation, since it speaks in terms of "a *substantial* number of programs and services" (emphasis added), but more importantly, it expressly includes LSS as part of the service delivery system.

---

**172.** Plaintiffs attempted to prove throughout the trial that Laconia State School and Training Center would rarely, if ever, be the "least restrictive environment" for any individual.

**173.** *See* Plaintiffs' Post-Trial Memorandum of Law, filed July 11, 1980, p. 32.

Moreover, the legislative history [174] of N.H. RSA 171–A supports our finding that the statute cannot be construed, as plaintiffs have urged, as a legislative mandate for deinstitutionalization. It is evident from the legislative debate of N.H. RSA 171–A on May 1, 1975; [175] that the Health and Welfare Committee to which the bill was originally referred devoted little time and study to the legislation. The Chairperson of the Committee, Representative Roma Spaulding, noted during the debate that "[t]his is a fourteen-page bill which was studied by the Committee of Laws Affecting Mental Health [an ad hoc committee without the New Hampshire Legislature], but which was not studied by one member of our Committee". Debate on H.B. 944 before the New Hampshire House of Representatives (May 1, 1975) (remarks of Representative Roma Spaulding) (hereinafter referred to as "*House Debate*"). For this reason, Representative Spaulding stated that although the Health and Welfare Committee members favored the bill (12–4), a majority of the Committee voted (10–7) that it should be referred to an Interim Study Committee.

Explaining to House members the ramifications of H.B. 944 (N.H. RSA 171–A), its sponsor stated:

This statute updates the previous statute on care and treatment of the mentally retarded .... The only opposition to this bill in the past has been the usual fear that it would cost more money. This is simply not true. All of the programs under this bill are ongoing programs....

*House Debate, supra* (remarks of Representative Marion Copenhaver, sponsor of H.B. 944). Representative Donalda Howard, also speaking in favor of the legislation, stated, "[t]he major purpose of the bill is to ensure that no child be sent to Laconia state school and training center without proper screening and tests". *House Debate, supra.* And another supporter explained,

All this bill does is repeal Chapter 171, which deals only with Laconia state school and training center. It provides for residents in the school, for their guardians, and it provides for a continuation of services. The law will make it possible for a coordination of all services which are *in existence* in New Hampshire now.

*House Debate, supra* (remarks of Representative Fred Murray) (emphasis added). Finally, when asked whether H.B. 944, if passed, would be sent to the House Appropriations Committee, the Chairperson of the Health and Welfare Committee responded that the bill probably would not have to be sent to Appropriations unless the Human Rights Committee [176] which it created required an appropriation for mileage reimbursement.[177]

A review of the foregoing remarks makes clear that in passing N.H. RSA 171–A the New Hampshire House of Representatives did not intend to impose upon the State the obligation of establishing over seven hundred [178] community placements for the residents of LSS. The sponsor of the bill stated that the bill would create no new programs, nor cost any more money; as contemplated by the Chairperson of the Committee in which the bill originated, the only possible appropriation required by the bill

---

174. As is true of almost all legislation in New Hampshire, N.H. RSA 171–A lacks a well documented history. Committee debates are not recorded and committee minutes, if they exist, are very brief. However, debates before the full House are recorded and preserved for posterity in the State Library. The Court has listened to the legislative debate of May 1, 1975, on the subject of passage of N.H. RSA 171–A.

175. The question before the New Hampshire House of Representatives was whether the words "ought to pass" should be substituted for the Health and Welfare Committee's recommendation that House Bill (H.B.) 944 (RSA 171–A) be sent to an Interim Study Committee.

176. *See* N.H. RSA 171–A:17 (Supp.1979).

177. Jack Melton, Superintendent of LSS, and a one-time member of the Human Rights Committee, testified that in fact the members of the Committee did not receive mileage.

178. The in-residence population at LSS in 1975 was 737. Defendants' Exhibit 35.

would be for the Human Rights Committee whose members "might" be entitled to reimbursement for mileage. Had the Legislature intended to mandate the construction of community placements for LSS residents, and thus to make a substantial capital outlay, there would most certainly have been a lengthy debate on the ramifications of such expenditure.[179]

Plaintiffs cite the fact that defendants themselves have construed N.H. RSA 171-A as creating a right on behalf of plaintiffs to live in the "least restrictive environment". It is true that defendants' witness Donald Shumway, acting assistant director of development of community services in the New Hampshire Division of Mental Health, testified at trial that *Action for Independence* [180] was drafted to carry out the mandates of N.H. RSA 171-A, and the introduction to *Action for Independence* states that "[RSA 171-A] mandates the Division of Mental Health and Developmental Services to establish a comprehensive service delivery system for the developmentally impaired".[181] *Action for Independence*, Defendants' Exhibit 139, p. 2.

The interpretation of Mr. Shumway and his colleagues in the Division of Mental Health of N.H. RSA 171-A is of some significance to this Court in light of the rule of statutory construction that

[i]nterpretive regulations by officers, administrative agencies, departmental heads and others officially charged with the duty of administering and enforcing a statute, and their practices which reflect the understanding they have of provisions they are charged to carry out, have great weight in determining the operation of a statute.

2A Sutherland (C. Sands Rev.1973), Statutory Construction § 49.05 at 238. However, defendants have certainly not admitted that N.H. RSA 171-A imposed on them a deadline to have a specific number of community residences in place by the time of the filing of this lawsuit in April of 1978. To the contrary, Shumway testified at trial that it takes a great deal of time to implement the mandates of a major piece of social legislation. The fact that defendants have exercised good faith in attempting to plan community services for residents at LSS in the future does not convert their goals into a legislative mandate of which they can be found in violation.

In reaching this result, we have also been guided by the recent decision of the New Hampshire Supreme Court in *Region 10 Client Management, Inc. v. Town of Hampstead*, 120 N.H. 855, 424 A.2d 207 (1980), wherein the Court (holding that local zoning could not override a state legislative purpose of providing community residences for the developmentally impaired) stated in pertinent part:

Placements into the different area agencies are to be based on geographical regions as established by rules of the Division of Mental Health. RSA 171-A:6 I (Supp.1979). Residential placement is clearly contemplated, with periodic review under the supervision of State officials and comprehensive guarantees of the rights of the retarded. *See* RSA 171-A:9 to 17. *The purpose of the legislation was to de-institutionalize some of the patients at the Laconia State School by use*

179. The Court takes judicial notice of the fact that New Hampshire State Legislators, like their counterparts in many other states, rarely approve large expenditures of money without full consideration of the attendant tax consequences. This is particularly true in New Hampshire, where as of this writing the Legislature maintains its historical opposition to any broad-based, *i. e.*, sales or income, taxes.

180. The third draft of *Action for Independence*, dated January 3, 1980, is marked as Defendants' Exhibit 139. The document was drawn up based on Governor Gallen's directive, and

was chaired by Edgar J. Helms, Jr., Commissioner of Health and Welfare. Others assisting on the draft were defendants Dr. Gary Miller, Director of the Division of Mental Health and Developmental Services; Dr. Jack Melton, Superintendent of the Laconia State School and Training Center; and Mr. Donald L. Shumway.

181. The Court notes that at the time of the filing of the Complaint defendants had established a substantial number of community programs about which the Court heard lengthy testimony.

of "community residences" located throughout the State as part of a plan entitled "Action for Independence." Pursuant to federal legislation, funding was obtained from the United States Department of Housing and Urban Development to locate residences throughout the State. According to the brief filed by the State of New Hampshire, two homes such as the one at issue in this case have become operational, while four others are in the development stage. The Division of Mental Health has also developed twelve group homes, seven apartments and many specialized home care facilities for the retarded.

*Region 10 Client Management, supra,* 120 N.H. at 886, 424 A.2d at 208 (emphasis added).

A review of the above-emphasized language of the Supreme Court relative to deinstitutionalization of *some* residents of LSS hardly translates into a mandate that the State of New Hampshire provide community residential placement for *all* of such residents. In conclusion, it is clear that the New Hampshire Legislature, through such legislation as N.H. RSA 171–A (Supp.1979), and N.H. RSA 126–A:39 (Supp.1979), has placed its imprimatur on the concept of community living facilities for the developmentally impaired. Pursuant to said statutes, the Director of the Division of Mental Health is required to continue to develop and maintain "a statewide service delivery system, comprised of a substantial number of programs and services, including Laconia state school and training center, for the care, habilitation, rehabilitation, treatment and training of developmentally impaired persons". N.H. RSA 171–A:4 (Supp.1979). But it is also clear from the previously quoted authorities and from the lack of specificity in the above-cited provisions (including the absence of a specific timetable and the number and types of services required) that defendants were not under a duty to provide the least restrictive placement for each and every resident of LSS as of the filing of the Complaint in this lawsuit. This Court therefore rejects plaintiffs' claim that defendants have violated N.H. RSA 171–A in this regard, and proceeds to consideration of the remaining sections.

As is true of the New Hampshire Special Education legislation,[182] N.H. RSA 171–A represents an unfulfilled promise to developmentally disabled individuals of the state. The statute speaks in terms of specific rights, obligations, and guarantees, and unlike § 6010 of the DD Act,[183] the rights and obligations created by N.H. RSA 171–A are not triggered by or conditioned upon the receipt of federal funds. Yet, as the following discussion will reveal, the State of New Hampshire has failed to meet many of its obligations under N.H. RSA 171–A, and plaintiffs have been denied their rights under same.

### 2. Entry Into the Service Delivery System

The statute provides that all applications for entry into the service delivery system shall be made to the area agency in the appropriate geographic region, N.H. RSA 171–A:6 I (Supp.1979), that a comprehensive screening evaluation by the staff of the area agency shall determine the scope of the individual's disability, N.H. RSA 171–A:6 II (Supp.1979), and that placement into the system shall be "voluntary". N.H. RSA 171–A:5 (Supp.1979). These principles and mandates were incorporated into the original statute passed in 1975 (effective August 3, 1975), and were altered only slightly by the 1979 amendments.[184] Nevertheless, at the time of trial in this lawsuit not a single "fixed point of referral" nor "area agency" had been established. T. Nichols, Shumway, Melton. Although the State had anticipated expending approximately $400,000

---

**182.** N.H. RSA 186–C is discussed in Part III.C. of this Opinion, pp. 221–223.

**183.** *See* Part III.A. of this Opinion, and n.99.

**184.** The term "area agency" replaced the term "fixed point of referral" in the 1979 amendments to N.H. RSA 171–A; however, the two systems do not differ substantially. *See* p. 228, n. 171 of this Opinion.

to create area boards, said sums were diverted into resettling residents of another State program, "Guardianship Trust", which had gone into receivership. Thus, at the time of trial the Division of Mental Health was fulfilling the role of "area agency" for the entire state.

Moreover, only 170 residents had guardians [185] at the time of the filing of the Complaint in this lawsuit, despite the stipulation in N.H. RSA 171–A:5 (1978 and Supp.1979) that "all placements shall be voluntary. If the client is under the age of 18, the application for service may be initiated by a parent or legal guardian. If the client is over the age of 18 and has been adjudicated incompetent by the probate court, the application for service may be initiated by a court appointed guardian." N.H. RSA 171–A:5 (1978 and Supp.1979). In 1977 the Act was amended to specify the procedure for the appointment of guardians. N.H. RSA 171–A:10 II (Supp.1979), charges the Superintendent of LSS [186] with the duty of petitioning the probate court for the appointment of a guardian over "a client over the age of 18 years . . . considered incapable of managing his own affairs". This section of the statute was construed by the New Hampshire Supreme Court in the case of *In Re Gamble*, 118 N.H. 771, 394 A.2d 308 (1978), following argument by the State that if the Superintendent was unable to find and appoint a guardian for a resident, the probate court must do so. But the Supreme Court disagreed, finding and ruling that it is the State's duty under the statute to obtain and nominate guardians, and that "its inability to find guardians [does not excuse] it from performing the legislative mandate". *In Re Gamble*, 118 N.H. at 776, 394 A.2d at 310. In so ruling, the Court explicitly stated the policy behind the need for guardians:

> A person who is legally declared incompetent is substantially deprived of liberty. An incompetent person is reduced to the status of a child and cannot dispose of his

property or determine his place of residence. He cannot give his informed consent to medical treatment. The appointed guardian protects the incompetent person's rights by caring for his person and his estate.

*In Re Gamble, supra,* 118 N.H. at 775, 394 A.2d at 309–10 (citations omitted).

Although N.H. RSA 171–A:10 II (Supp. 1979) specifically applies only to "a client *over the age of 18 years* [who] is incapable of managing his own affairs or property" (emphasis added), *In Re Gamble* speaks in terms of "incompetent persons", without reference to age. Thus, an incompetent person under the age of 18 who is recommended for placement at LSS is also entitled to have a legal guardian nominated and appointed for him by the superintendent of LSS or his deputy, pursuant to the procedures outlined in N.H. RSA 171–A:10 II (Supp.1979). *See also* N.H. RSA 464–A (Supp.1979) (outlining court appointment of guardians for incompetent persons). The appointment of a legal guardian for individuals under the age of 18 is crucial in light of our previous ruling that the Education for All Handicapped Children Act and N.H. RSA 186–C, liability for financial responsibility for the education of children at LSS lies with the local school district in which the child's parent or guardian resided on the January first preceding the recovery. N.H. RSA 186:13; N.H. RSA 126–A:49 (Supp.1979). Absent a parent or guardian, it would be difficult to identify the local school district financially responsible for the child.

The above section on failure to appoint guardians addresses a defect in the State's *application* of N.H. RSA 171–A regarding the admissions procedure to LSS. Another defect in the admission procedures appears on the face of N.H. RSA 171–A, insofar as said statute conflicts with the federal mandates of the Education For All Handicapped Children Act (EHCA), 20 U.S.C. § 1401, *et*

---

**185.** Fifty-four guardian petitions were pending. Named plaintiffs Debra Roman and Richard Pond lacked legal guardians at that time.

**186.** We confine our discussion herein to admissions to LSS, although the Act applies to all facilities in the "Service Delivery System".

*seq.* One of the major purposes of the latter statute was to assure a "single line of authority with regard to the education of handicapped children",[187] so that no child would get lost in the shuffle; accordingly, 20 U.S.C. § 1412(6) places overall responsibility for assuring that the mandates of the Act are carried out on the "State educational agency", which in New Hampshire would be the State Department of Education. The rationale for this provision is best explained in the *Comment* following 45 C.F.R. § 121a.600:

> Without this requirement, there is an abdication of responsibility for the education of handicapped children. Presently, in many states, responsibility is divided, depending upon the age of the handicapped child, sources of funding, and types of services delivered. While the Committee understands that different agencies may, in fact, deliver services, the responsibility must remain in a central agency overseeing the education of handicapped children, so that failure to deliver services or the violation of the rights of handicapped children is squarely the responsibility of one agency. (Senate Report No. 94–168, p. 24 [1975]).

45 C.F.R. § 121a.600. *See also Kruelle v. Biggs,* 489 F.Supp. 169 (D.Del.1980).

The State of New Hampshire has not avoided these crossed lines of authority, as evidenced by the conflict between 20 U.S.C. § 1401, *et seq.,* N.H. RSA 186–C, N.H. RSA 171–A, and the confusion created by the division of responsibility in said statutes. The State Special Education Unit is within the Division of Vocational Education, a subdivision of the Department of Education in New Hampshire. Laconia State School and Training Center, however, is vested in the New Hampshire Division of Mental Health within the Department of Health and Welfare. Thus, whereas the State Board of Education is charged with the duty of administering and implementing N.H. RSA 186–C,[188] the State's Special Education law, the Director of the Division of Mental Health is charged with administering LSS [189] and with implementing N.H. RSA 171–A.

Although the "area agency" (which under RSA 171–A reviews applications for placement) is statutorily required to "take into account the provisions of and services established under N.H. RSA 186–[C]", N.H. RSA 171–A:6 II (Supp.1979), the "area agency" is not required by statute to accede to the decision of the State Board of Education, and in any event, the decision of the Director of the Division of Mental Health "shall supersede the initial placement recommendation by the area agency". N.H. RSA 171–A:10 I (Supp.1979).

Thus there are at least two means by which children can be placed at LSS, through a local education agency pursuant to the procedures established in the EHCA and N.H. RSA 186–C, or through the Division of Mental Health according to the procedures of N.H. RSA 171–A. We find and rule that this scheme of placement violates the federal mandate that there be one centralized agency which assumes responsibility for providing a free and appropriate education to handicapped children. Moreover, the procedures established under N.H. RSA 171–A are inconsistent with the federal due process requirements [190] incorporated into the EHCA; most notably, N.H. RSA 171–A does not require that before placement an IEP be formulated for the child with the input of interested parties, including but not limited to the parents, guardian, or surrogate parent and a representative from the local education agency. Nor does said statute charge the local education agency with financial responsibility for chil-

---

**187.** 45 C.F.R. § 121a.600 (1980).

**188.** N.H. RSA 186:5.

**189.** N.H. RSA 126–A:31.

**190.** N.H. RSA 171–A:10 III (Supp.1979) specifically allows individuals to be placed at LSS even if a guardian has not been located for that individual. The statute does provide, however, for the appointment of a "representative" to safeguard the client's interests. *But see In Re Gamble,* 118 N.H. 771, 775, 394 A.2d 309–10 (1978), and p. 160 of this Opinion.

dren from its district. The EHCA and its counterpart, § 504 of the Rehabilitation Act of 1973, were enacted to address just this type of problem. The regulations under § 504 explicitly state:

Recipients of funds may not refuse to provide services to a handicapped child in its jurisdiction because of another person's or entity's failure to assume financial responsibility.

45 C.F.R. § 83.34(a) (1980).

■ In sum, although we recognize that organization of state government is peculiarly entrusted to state officials and that principles of federalism militate against interference with same, this Court also recognizes its responsibility to order whatever equitable relief is necessary to protect the federal statutory rights of this politically powerless group. Accordingly, because we have determined that many of the problems and deprivations encountered by developmentally disabled children in New Hampshire are rooted in the lack of accountability by any single state agency for same,[191] we will hereinafter order defendants to revise their placement procedures to make them conform to the procedural protections afforded by the EHCA. In short, under RSA 171–A, the detailed relief to be contained in our subsequent Orders will include development and maintenance of a proper statewide service delivery system; revision of placement procedures for developmentally impaired individuals; compliance with the statutory requirements for "area agencies" and "area boards", N.H. RSA 171–A:2 I(a)–(c) (Supp.1979); N.H. RSA 171–A:6 (Supp. 1979); comprehensive screening evaluations; proper guardians; individual service plans; periodic reviews contemplated by RSA 171–A:11; the proper notices to clients, relatives, and guardians required by RSA 171–A:8; and detailed instructions as to housing, privacy, noise levels, equipment, evaluation for education and training, recreational programs, diets, medical care, administration of medication, the use of physi-

cal restraints, and written policies relative to mistreatment, neglect, or abuse of residents.

## IV. The Constitutional Claims

■ Plaintiffs herein have alleged several constitutional violations, the majority of which we decline to rule upon, here applying the well-established doctrine that federal courts "ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable". *Harris v. McRae*, 448 U.S. 297, 306–07, 100 S.Ct. 2671, 2682–83, 65 L.Ed.2d 784 (1980), *citing Spector Motor Service, Inc. v. McLaughlin*, 323 U.S. 101, 105, 65 S.Ct. 152, 154, 89 L.Ed. 101 (1944). As is outlined in the brief discussion below, all but one of the plaintiffs' constitutional claims have been heretofore disposed of on statutory grounds; thus, the only constitutional issue this Court must address is whether plaintiffs have a constitutional right to habilitation in the least restrictive environment under the Due Process Clause of the Fourteenth Amendment.

We have previously herein ruled that N.H. RSA 171–A guarantees plaintiffs and members of the plaintiff class the right to adequate and humane treatment and habilitation, the right to privacy, and the right to be protected from physical harm. Having disposed of these claims on that statutory basis, we need not address plaintiffs' alternative basis for relief under the Fourth, Fifth, Eighth, and Fourteenth Amendments to the Constitution. Similarly, our holding under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, precludes our addressing plaintiffs' Equal Protection claim. Section 504, which is in effect a codification of the Equal Protection Clause of the Fourteenth Amendment, affords plaintiffs at least as much protection as they would receive under current interpretation of the United States Constitution. Whereas the prevailing judicial view is that mentally retarded individuals do not constitute a sus-

---

**191.** There was ample testimony at trial concerning the interagency battles (particularly between local education agencies) over who is

responsible, financially or otherwise, for a given child. The *un*contested placement was said to be the exception to the rule. T. DeForrest.

pect classification for equal protection purposes, *see Doe v. Colautti*, 592 F.2d 704 (3d Cir. 1979), *citing Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (per curiam), Congress implicitly requires courts to apply heightened judicial scrutiny—at least equivalent to that degree of scrutiny applied to sex discrimination cases—to allegations of discrimination against the mentally retarded under Section 504. Therefore, we decline to rule on the above constitutional questions and turn to the only issue which was not disposed of on a statutory basis, *i. e.*, whether plaintiffs have a right under a substantive due process analysis of the Fourteenth Amendment to receive treatment from defendants in the least restrictive setting.

Plaintiffs claim that defendants have violated their rights to substantive due process by not providing them habilitation in the least restrictive setting; *i. e.*, in the "community" rather than in an institution such as Laconia State School and Training Center. Borrowing language from the First Amendment case of *Shelton v. Tucker*, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960), plaintiffs formulate a "quid pro quo" analysis to establish their alleged right to habilitation in the least restrictive environment. In *Shelton*, the Court struck down an Arkansas statute which required every teacher to file an annual affidavit listing all organizations to which he or she belonged or contributed. The Court held that

> even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgment must be viewed in the light of *less drastic means* for achieving the same basic purpose.

*Shelton v. Tucker*, 364 U.S. at 488, 81 S.Ct. at 252 (emphasis added). Relying on this theory, plaintiffs argue that if defendants curtail the liberty of plaintiffs and members of their class they must do so in the least drastic means.

Before we turn to the question of whether defendants have indeed taken away the liberty of said individuals, *i. e.*, whether plaintiffs are voluntarily or involuntarily confined at LSS, we make a preliminary observation about the use of the least drastic means test in the context of this case. For it is important that a court does not unthinkingly apply mechanical tools of the trade in a context foreign to that under which they were developed. Rather, we must strive to analyze the rationales behind these tools.

The least drastic means analysis was developed in the context of protecting freedom of association and freedom of speech, and was a response to universal agreement that one's First Amendment liberties are most often promoted by preventing government regulation of speech. Such an analysis is but a paraphrase of the First Amendment itself, which states, "Congress shall make *no law* ... abridging the freedom of speech ... or the right of the people peaceably to assemble ...." U.S.Const. amend. I (emphasis added). However, plaintiffs have taken a giant leap in attempting to fit the least drastic means test into the context of this case. For here plaintiffs are certainly not advocating that government make *no laws* or that government not interfere with their individual autonomy. Indeed, plaintiffs are arguing herein that government has an *obligation* to make laws which will protect them from the "hazards of freedom", *O'Connor v. Donaldson*, 422 U.S. 563, 574, n.9, 95 S.Ct. 2486, 2493, n.9, 45 L.Ed.2d 396 (1975), which because of their handicaps and because of the lack of resources and help from their family and friends they are otherwise "helpless to avoid", *id.* As Chief Judge Seitz eloquently points out in his Dissent in *Halderman v. Pennhurst*, 612 F.2d 84, 128 (3d Cir. 1979), the difficulty in plaintiffs' approach is not an absence of less drastic means as to each individual:

> [I]n theory there will be some perfect balance between freedom and supervision; some 'least restrictive alternative'. Instead, the difficulty I perceive is a judicial inability to strike the perfect balance in any particular case.

The Dissent continues to focus on the least restrictive alternative analysis by concluding that such analysis contemplates a "single better alternative"—a "single and final solution", *id.*, which, although conceivable in the First Amendment field, will never materialize in the context of placement of the mentally retarded. In the instant case, plaintiffs' proof at trial was to the effect that effective care for residents at LSS requires constant review and reevaluation by experts in multiple disciplines, and that such scrutiny must be applied on an individualized basis because of unique needs of each developmentally impaired person.

Therefore, even if this Court were to arrogate to itself the medical decision of what is the least restrictive environment for every individual in the class, that decision would remain valid for but a fleeting period of time. As the following discussion will reveal, however, the prevailing case law in this area does not require us to adopt plaintiffs' forced analysis of the least restrictive means test.

The proper analysis to be followed under substantive due process is delineated in *Jackson v. Indiana*, 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972), in which the Supreme Court examined the constitutionality of a statutory scheme allowing commitment of a person adjudged incompetent to stand trial on criminal charges. Therein the Court held that "at the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed". *Jackson*, 406 U.S. at 738, 92 S.Ct. at 1858. A similar test was employed in the more recent case of *O'Connor v. Donaldson, supra,* in which an individual challenged his commitment to a state mental hospital in which he alleged he was receiving no treatment. The evidence in the case revealed that the individual was dangerous neither to himself nor to others, and that responsible persons had been willing to care for him outside of the institution. In that context, the Court ruled that

A State cannot constitutionally confine without more a dangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends.

*O'Connor v. Donaldson, supra,* 422 U.S. at 576, 95 S.Ct. at 2494. Thus, in light of *Jackson* and *Donaldson*, we must inquire into the reasons for which plaintiffs have been confined at LSS and ask whether their commitment therein is reasonably related to a legitimate governmental objective.

We note at the outset that the "quid pro quo" analysis is only applicable to involuntarily committed individuals to LSS. *Harper v. Cserr*, 544 F.2d 1121 (1st Cir. 1976). For we are guided by the underlying principle of *Dandridge v. Williams*, 397 U.S. 471, 487, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491 (1970), that "there is no constitutional provision which imposes a duty on the state to provide services to its citizens"; it is only when the state curtails an individual's liberty that it owes something in return. *Jackson v. Indiana, supra,* 406 U.S. at 737, 92 S.Ct. at 1857. But the question of whether plaintiffs are voluntarily or involuntarily confined at LSS is not easily resolved. On the one hand, N.H. RSA 171–A:5 (Supp. 1979) explicitly provides that "all placements [to LSS] shall be voluntary" and N.H. RSA 171–A:7 (Supp.1979) states that "a client at any time may seek a change in placement or withdraw entirely from the service delivery system". On the other hand, these statutory provisions are rendered meaningless for most mentally retarded individuals unless they are read in conjunction with another mandate of the statute, that the Superintendent nominate and oversee the appointment of guardians for any individual who is deemed incapable of managing his own affairs, N.H. RSA 171–A:10 II (Supp.1979); *In Re Gamble*, 118 N.H. 771, 394 A.2d 308 (1978).[192] As we have previously detailed, defendants have

---

192. Defendants admitted that if a resident who lacks a guardian was deemed to be incompetent by an interdisciplinary team, the staff might refuse to release him on his own request.

*See* Defendants' Answer, ¶ 44. *See also* Plaintiffs' Exhibit 88 (1–19) which indicates that some residents are discharged even though incompetent.

continued to violate their statutory duty of securing guardians for many residents of LSS. Therefore, we find and rule that at least that percentage of the population at LSS who are without guardians are committed involuntarily, and for purposes of this discussion only, we assume *arguendo* that all individuals at LSS, by virtue of their degree of mental retardation and lack of any other place to go, reside there involuntarily.

Unlike the plaintiff in *O'Connor v. Donaldson,* however, plaintiffs herein reside at LSS because their family or friends are either unable or unwilling to care for them and because if left to the "hazards of freedom" they are "dangerous to [themselves]". *O'Connor v. Donaldson,* 422 U.S. 563, 574, n.9, 95 S.Ct. 2486, 2493, n.9, 45 L.Ed.2d 396 (1975); *Halderman v. Pennhurst State School and Hospital,* 612 F.2d 84, 125 (1979) (Seitz, C. J., dissenting). Therefore, we agree with Chief Judge Seitz of the Third Circuit who stated in his *Halderman* Dissent that the state's willingness to provide the residents with such necessities as food, clothing, shelter, medical care, and supervision, for which the residents have no other source, forms an adequate basis for some state-imposed restrictions on their liberty", and indeed, acts as a "quid pro quo", *Harper v. Cserr,* 544 F.2d 1121, 1123 (1976), for their confinement at LSS. In a similar context, the First Circuit has recently held that the parens patriae action of the state in caring for the mentally ill is a meritorious basis for such supervision. *See Rogers v. Okin,* 634 F.2d 650, 657 (1st Cir. 1980), *cert. granted,* —— U.S. ——, 101 S.Ct. 1972, 68 L.Ed.2d 293 (1981).

As we have previously ruled, defendants are statutorily mandated to provide habilitation to every resident at LSS, and to formulate for each resident at LSS an individual service plan which shall include "criteria for transfer to less restrictive settings for habilitation". N.H. RSA 171–A:12 II(e). Contrary to plaintiffs' contentions, however, we find no statutory or constitutional basis for requiring that defendants provide habilitation in the "least restrictive environment", and we hereby reject plaintiffs' substantive due process claim to that effect.

In the best of all worlds, charitable motives oft impel humans to sacrifice their own sustenance in the affording of assistance to the less fortunate. It has been recently suggested that such "voluntarism" will provide adequate replacement for "entitlement" programs heretofore funded through allocation of tax dollars. We must await the writing of future history to ascertain whether such suggestion is valid, particularly as it bears reference to the rights of the developmentally impaired. Human nature being what it is, rational persons may entertain doubts—but in the interim, a Court must confine itself to interpretation of the law based on the best tools to it currently available "mindful that the function of legal process is to minimize the risk of erroneous decisions". *Addington v. Texas,* 441 U.S. 418, 425, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323 (1979).

In the instant case, this Court has found and ruled that there have been violations of federal and state legislation such that plaintiffs are to be afforded relief as hereinafter ordered. But the Court is unable to find or rule under any view of evidence or applicable rule of law that such relief requires the defendants to provide community residential living arrangements for all residents of LSS regardless of their circumstances. For whatever reason, New Hampshire has not chosen as regards its developmentally impaired citizens to follow the lead of other states. However, the fact that it has not done so does not require a conclusion that the plaintiffs herein have sustained injury in the constitutional sense. In this regard, it is to be borne in mind that "the essence of federalism is that states must be free to develop a variety of solutions to problems and not be forced into a common, uniform mold". *Addington v. Texas, supra,* 441 U.S. at 431, 99 S.Ct. at 1812.

### V. The Relief ORDERED

*A. Section 504 (29 U.S.C. § 794) of the Rehabilitation Act of 1973*

Pursuant to the mandates of § 504 (29 U.S.C. § 794) of the Rehabilitation Act of

1973, the Court hereby ORDERS the following:

1. Defendants shall provide each and every resident with an Individual Service Plan documenting the *individual* needs of such resident, and providing for the delivery of services necessary to fulfill same. In formulating said ISP's, defendants will give particular attention to the many services, including E&T, OT, PT, speech therapy, and adaptive equipment, recreational and medical services, which have in the past been denied to individuals merely because of their status as non-ICF residents, severely or profoundly retarded residents and/or physically handicapped residents. Defendants are precluded from denying said services to the above categories of people merely because they fall into one of these categories; instead, defendants are ordered to formulate decisions on an individualized basis. Defendants are ordered to make such reasonable adjustments in their programs, activities, services, and facilities as will allow all residents to take part in same. This includes providing appropriate auxiliary aids to people with impaired sensory, manual, or speaking skills where necessary to afford such persons an equal opportunity to benefit from the services in question.

2. Pursuant to our previous discussion of the Education For All Handicapped Children Act (*see* Part III.C.), defendants shall provide to all residents between the ages of three and twenty-one 5¼ hours of education [193] per day for the 180-day school year. For those students who can demonstrate by a preponderance of the evidence, in accordance with the rules adopted by the State Board of Education, that interruption of the program of an educationally handicapped child would result in severe and substantial harm and regression and would have the effect of negating the benefits of such educationally handicapped child's regular special education program, defendants shall provide whatever number of days in excess of 180 are required for the proper education of that particular individual. No resident aged three to twenty-one will receive less than 5¼ hours per day of some form of education unless defendants specifically document a medical need or some other compelling reason for excluding an individual from same.

In the course of providing education to all residents aged three to twenty-one pursuant to the above order, defendants shall also provide these residents with educationally related services, including transportation, and such developmental, corrective, and other supportive services (including speech pathology and audiology, psychological services, physical and occupational therapy, recreation, and medical and counseling services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a handicapped child to benefit from special education.

3. Defendants shall provide medical services, including psychotropic drugs, to residents based on *documented* individual needs.

4. Defendants shall provide recreational services, including off-campus field trips, summer camp, etc., to residents on an equal basis, and shall not exclude residents from partaking in same solely on the basis of the severity of their mental retardation or their physical handicaps. Identical services need not be provided, but defendants must provide *equivalent* services to residents. The campus bus shall be altered as necessary to provide accommodation for physically handicapped residents.

5. Defendants shall afford residents the opportunity to live in residential buildings of equivalent quality and caliber and shall not relegate the most severely retarded to the least desirable living facilities. Defendants shall either make the cottages accessible to non-ambulatory residents by building ramps and other facilities or improve the other residential buildings so that they reach the standards of the cottages.

---

**193.** The Court defines "education" broadly, to include the teaching of academic skills and daily living skills, as well as OT, PT, speech therapy, etc.

6. Defendants' former presumption against deinstitutionalization of severely and profoundly retarded residents shall cease. Defendants shall make community placements on an *individualized* basis.

### B. EHCA—RSA 186–C and Standards Promulgated Thereunder

Pursuant to the mandates of the EHCA, RSA 186–C, and the Standards promulgated thereunder, the Court hereby orders the following:

1. Defendant Commissioner of the State Board of Education (or his designee) shall take all steps necessary to cause the Board to fulfill its obligation to refer to the school district of residence all residents of and admittees to LSS between the ages of three and twenty-one for whom an educationally handicapping condition is suspected. The determination of the district of residence of each child shall be made on the basis of the school district in which the individual's parents or legal guardian resided on the preceding January first.

2. Defendant Commissioner shall require the local education agency (LEA) to fulfill its responsibility for the development, maintenance, and at least annual evaluation of IEP's for educationally handicapped children from its district at LSS.

3. Defendant Commissioner shall require the LEA to initiate and conduct planning conferences for the IEP's, notifying and encouraging the presence of the parents or guardian of the child, the child's teacher or teachers, and a representative of the LEA and the out-of-district placement. If the parents or guardian of the child are unavailable, the Commissioner shall appoint a "surrogate parent" pursuant to the procedures outlined in the *Standards*.

If the LEA chooses to delegate to LSS the responsibility for planning conferences for the review and/or revision of IEP's, defendant Commissioner shall nevertheless require that an LEA representative and, if possible, the parents, guardian, or surrogate parent of the child be present at the IEP meetings. The LEA shall have final responsibility for the development of the IEP, and shall provide a copy of the approved IEP to LSS and the parents, guardian, or surrogate parent.

4. The Defendant Commissioner shall ensure that the local school district in which the parents or legal guardian of the child resided on the January first prior to the assessment for placement at LSS shall fulfill its financial responsibility by funding the child's special education and educationally related services at LSS. The local school district's financial liability for a child at LSS shall be no less than its financial liability for a non-handicapped child of the same age within the district. Financial responsibility for "educationally related services" includes the following: transportation, and such developmental, corrective, and other supportive services (including speech pathology and audiology, psychological services, physical and occupational therapy, recreation, and medical and counseling services, except that medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a handicapped child to benefit from special education.

5. The Defendant Commissioner shall provide procedural safeguards for the review of all IEP's consistent with those outlined in the EHCA, 20 U.S.C. § 1415, including an impartial due process hearing which shall be conducted by a person other than an employee of the state or local education agency who is involved in the education or care of the child.

### C. RSA 171–A

Pursuant to the mandates of N.H. RSA 171–A (1978 and Supp.1979), the Court hereby ORDERS the following:

1. Defendants shall continue to develop and maintain a statewide service delivery system; *i. e.*, a comprehensive array of services for the diagnosis, evaluation, habilitation, and rehabilitation of developmentally impaired persons, including but not limited to development centers, work activity programs, community residences, family care, foster care, day care, and residential care and treatment such as provided at Laconia State School and Training Center.

2. Defendants shall revise their placement procedures for developmentally impaired individuals to insure that the State Department of Education is designated as the one centralized agency responsible for the placement of individuals aged three through twenty-one. The procedural protections outlined by the Education For All Handicapped Children Act shall be followed in the placement of all individuals aged three through twenty-one.

3. Defendants shall establish "area agencies" and "area boards", as contemplated by N.H. RSA 171–A:2 I(a)–(c) (Supp. 1979), and N.H. RSA 171–A:6 (Supp.1979), in such geographic regions as are defined and designated by the director for the purpose of providing services to developmentally impaired persons.

4. Upon application by a developmentally disabled person to the "area agency", a comprehensive screening evaluation, coordinated by the staff of the area agency, shall determine the scope of the person's disability and the locus of the nature of services to be provided. Such evaluation shall include, but not be limited to, a physical examination and individual intellectual assessment and functional behavior scales which shall be established by rule of the division.

5. Defendant Superintendent of LSS shall obtain and nominate guardians for each and every resident of LSS by petitioning the probate court in Belknap County or the probate court in the resident's home county for the appointment of a guardian over said person. The alleged inability of the Superintendent to locate guardians for residents shall not serve as an excuse for failure to perform this mandate.

6. Defendants shall complete an Individual Service Plan (ISP), based on a comprehensive screening evaluation, for each resident of LSS within fourteen days of placement. The ISP shall be continually reviewed by the Superintendent or his designee and shall be modified if necessary. Each ISP shall include but not be limited to the various components outlined in N.H. RSA 171–A:12.

7. Defendants shall conduct a periodic review of every resident at LSS pursuant to N.H. RSA 171–A:11. Such periodic review shall take place at least once during the first six months of placement and annually thereafter. The Superintendent shall give written notice to the client and his nearest relative or legal guardian at least one week prior to a periodic review. The results of each periodic review shall become part of the client's clinical record, and recommendations resulting from such review shall be shared with the client, and, where appropriate, with his guardian, parent, or nearest relative.

8. Prior to termination of service or transfer from LSS to another setting, the Superintendent shall give thirty days' notice to the client and his parent or legal guardian, and shall follow the other requirements outlined in N.H. RSA 171–A:8. No client shall be terminated or transferred from LSS without full and adequate preparation for said transfer.

9. Defendants shall insure that all buildings at LSS meet the current safety standards in effect in the State of New Hampshire, including but not limited to the following: (1) "Life Safety Code", N.F.P.A. (National Fire Protection Association) Doc. No. 101, 1976 ed., effective March 2, 1978; (2) "Fire Prevention Code", A.I.A. (American Insurance Association), 1976 ed., effective March 2, 1978; (3) B.O.C.A. (Building Officials and Code Administrators, International, Inc.), effective August 10, 1981. (See Ch. 233, Laws of 1981, amending certain statutes relative to construction and inspection of public buildings.)

10. Defendants shall cease their practice of housing non-ambulatory residents on upper stories.

11. Defendants shall accommodate no more than four residents in a living area, although such living area may properly be a partitioned section of a larger room.

12. Defendants shall provide each and every resident with individual storage space for his or her personal possessions, which shall be accessible to said resident.

13. Defendants shall insure that residents are afforded privacy and dignity; toilet and bathing facilities shall be equipped with partitions, and male and female residents shall not be bathed or toileted together unless privacy is assured. Toilet paper and paper towels shall be furnished to residents as their needs shall require. Defendants shall insure that residents are properly clothed, especially in open areas through which visitors and others pass.

14. Defendants shall make efforts to reduce the noise level in the wards by placing either carpeting, linoleum, or other material on any cinderblock floors.

15. Defendants shall equip residential wards and recreational rooms with sufficient furniture and recreational material to accommodate residents, and shall attempt to improve the overall comfort and ambience of said rooms.

16. Defendants shall evaluate all residents for participation in programs of the Education and Training Department and shall provide regular programs and age appropriate materials to all residents who can benefit from same. All residents shall be evaluated for PT, OT, speech therapy, and audiology and shall be provided with services as needed. No resident shall be denied regular education and training programming unless his medical needs so dictate. Programming shall not terminate for the summer unless regular recreation programs are substituted therefor. PT, OT, speech therapy, and audiology services shall be offered year-round for any resident who has been deemed to need same. Auxiliary aids, such as hearing aids, eyeglasses, etc., shall be provided to residents who require same. This order does not alter in any way our order regarding services to be provided to developmentally disabled individuals between the ages of three and twenty-one pursuant to the Education for All Handicapped Children Act.

17. Defendants shall provide residents with recreational programs and equipment and shall make an effort to provide off-campus trips for all residents except those whose medical conditions will not tolerate same.

18. Defendants shall furnish residents with nourishing, well-balanced diets in dining areas equipped with utensils appropriate for the developmental levels of said residents. Direct-care staff in sufficient quantity must be trained in and use proper feeding techniques, taking sufficient time to feed each resident. Defendants shall insure that residents are fed in an upright position unless medically contraindicated, and proper adaptive equipment shall be provided to that end.

19. Defendants shall provide individualized adaptive wheelchairs and other adaptive equipment to each physically handicapped LSS resident in need of same.

20. Defendants shall hire a qualified physician to serve as medical director of LSS. Defendants shall also hire enough qualified physicians, nurse practitioners, RN's, LPN's, and other medical personnel to meet both the chronic and acute medical needs of residents at LSS. In particular, defendants shall hire at least one physician who is qualified in "developmental medicine" to meet the long-term or chronic needs of the LSS resident population. Attendants shall not be allowed to assume medical duties for which they do not have thorough training.

21. Defendants shall insure that physicians at LSS have input into the formulation of residents' ISP's, both initially and on review; however, physicians need not attend each and every interdisciplinary team meeting.

22. Defendants shall formulate a written policy regarding the administration of medication. Physicians and/or nurse practitioners must prescribe and review medication orders for each resident at least monthly or more often if needed. Careful documentation of all drugs dispensed must be made, including effects of said drugs on residents. Only appropriately trained staff may administer medication. The "unit dosage" method or some comparable error-reducing method shall be employed by defendants in dispensing drugs.

23. Psychotropic drugs shall be administered only according to a comprehensive program designed to meet the needs of the individual. Said program shall be designed to fit into the resident's overall plan as indicated by his or her ISP. All residents shall be evaluated for dosage reduction, and excessive dosages shall be reduced. Psychotropic drugs shall not be used (a) excessively; (b) as punishment; (c) for the convenience of the staff; (d) as a substitute for activities or treatment; or (e) in quantities that interfere with a resident's habilitation program.

24. Defendants shall insure that physical restraints are used only in case of emergency, such as the occurrence of serious threat of extreme violence, personal injury, or attempted suicide. Restraints shall not be used without the authority of the Superintendent or his designee, and without full documentation of their use. An order for physical restraint shall not be in effect longer than twelve (12) hours. An appropriately trained staff member must check a resident placed in a physical restraint at least every thirty (30) minutes and keep a record of these checks.

25. Defendants shall establish written policies to the effect that mistreatment, neglect, or abuse of a resident by an employee is absolutely prohibited. All alleged violations of these policies must be investigated immediately and reported to the Superintendent or his designee within twenty-four (24) hours of the incident; if the alleged violation is verified, defendants shall take appropriate measure to discipline and/or terminate responsible staff members. All incidents of abuse and accidents shall be well documented.

26. Defendants shall hire staff members in sufficient quantity and of a sufficient degree of expertise to effect the provisions of this Order.

### VI. Implementation of the Relief Ordered

For the purpose of assuring that the relief hereinabove ordered in Part V of this Opinion is properly implemented, the Court herewith directs counsel for the respective parties to confer as expeditiously as possible for the purpose of filing with this Court, not later than November 1, 1981, an agreed Plan of Implementation (Consent Decree), setting forth therein a detailed timetable for the accomplishment of the relief hereinabove ordered, which in any event shall be completed by November 1, 1982.

In the event the parties are unable for any reason to reach agreement as to all aspects of the relief hereinabove ordered, and fail to complete and execute such agreed Plan of Implementation, counsel are to file with the Court by November 1, 1981, detailed statements setting forth the bases of any disagreement and alternate suggestions for implementation of the Orders herein. If necessary, the Court will then following review of such alternate suggestions either schedule a hearing or issue a separate Order.

In any event, whether the timetable for implementation of the relief which the Court has hereinabove ordered be by an agreed Plan of Implementation (Consent Decree) or by final Order of this Court, the defendants will be and are herewith ordered to furnish the Court and opposing counsel at least once every sixty days with written statements detailing what efforts have been and are being made to carry forward implementation of the Order for Relief as set forth herein. The Court does not believe it either wise or necessary at this juncture of the proceedings to appoint either a monitor or special master, believing that the parties will in good faith attempt to resolve any minor differences that may exist between them with reference to the implementation of the Court's Order, but the Court reserves the right to appoint such monitor or special master should the parties prove in any way recalcitrant in their prompt compliance with its Orders.

SO ORDERED.